JOINER, Judge.[1]
The appellant, Devin Darnell Thompson,[2] was convicted of murdering Fayette Police Officers Arnold Strickland and James Crump and police dispatcher Leslie “Ace” Mealer during the course of a robbery, violations of §§ 13A-5-40(a)(2), 13A-5-40(a)(5), and 13A-5-40(a)(10), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Thompson be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Thompson to death. This appeal followed.
The State’s evidence tended to show the following. At approximately 6:00 a.m. on the morning of June 3, 2003, Tim Brown, a paramedic with the Fayette Medical Center, was dispatched to the Fayette Police Department. Brown testified that when he approached the station he saw Mealer’s body lying on the other side of the door to the police station, which was locked. After he forced his way inside, Brown said, he discovered that Mealer had been shot in the head. He proceeded through the building and found the bodies of Officer Crump and Officer Strickland. Both, he said, had been shot in the head and were lying in a pool of blood.
Testimony showed that at around 3:00 a.m. on the morning of June 3, 2003, Officer Crump and Officer Strickland approached a vehicle parked in the lot of a local restaurant and found Thompson asleep in the vehicle. The dispatcher informed them that the vehicle had been stolen, and the officers took Thompson into custody.
*102 While the officers were booking Thompson they discovered that a dry-cleaning business, near where the car had been stolen, had been burglarized and clothing had been taken from that business. A shoe print had been discovered at the scene of that burglary. The officers removed Thompson’s handcuffs in order to take his fingerprints and removed one of his shoes to get a shoe print.
While Thompson was being fingerprinted, he took Strickland’s .40-caliber service pistol and shot Strickland in the head. Thompson then crossed the hall and shot Officer Crump in the head. As Thompson walked toward the exit of the police station he encountered Mealer. He shot Mealer multiple times and left the station.
Thompson attempted to reenter the station when he realized that one of his shoes was still inside, but the door had automatically locked when it closed, and he was unable to reenter. Thompson proceeded to the Fayette Fire Station, which was located in the same building as the Fayette Police Department, and told two firemen that “something bad had happened up front.” Thompson then stole a police cruiser and fled the scene.' He was arrested later that day near Columbus, Mississippi. The pistol Thompson had taken from Officer Strickland was found in the police cruiser.
At trial, Thompson did not dispute that he shot and killed the police officers and the dispatcher. His defense was that he was not guilty by reason of mental disease or defect. Thompson presented expert testimony to the effect that he was suffering from post-traumatic stress disorder (“PTSD”) at the time of the murders and that he was in a dissociative state; therefore, he argued, he was not responsible for his actions. The State countered Thompson’s expert testimony by presenting expert testimony to the effect that Thompson was not in a dissociative state when he committed the murders.
The jury convicted Thompson of six counts of capital murder. A separate sentencing hearing was held, and the jury recommended, by a vote of 10 to 2, that Thompson be sentenced to death. A pre-sentence report was prepared, and a separate sentencing hearing was held before the circuit court. The circuit court found four aggravating circumstances: (1) That the murders were committed during the course of a robbery, § 13A-5-49(4), Ala.Code 1975; (2) that the murders were committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody, § 13A-5-49(5), Ala.Code 1975; (3) that the murders were committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws, § 13A-5-49(7), Ala.Code 1975; and (4) that the multiple murders were committed pursuant to one scheme or course of conduct, § 13A-5-49(9), Ala.Code 1975. After weighing the aggravating circumstances and the mitigating circumstances, the circuit court followed the jury’s recommendation and sentenced Thompson to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala. Code 1975.

Standard of Review

According to Rule 45A, Ala. RApp. P., because Thompson has been sentenced to death, this Court must review the lower court proceedings -for plain error. Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or *103 probably has adversely affected the substantial right of the appellant.”
While the failure to object will not bar our review of any issues Thompson raises on appeal, it will weigh against any claim of prejudice that Thompson makes on appeal. Brooks v. State, 973 So.2d 380, 387 (Ala.Crim.App.2007). “‘[T]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ ” Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993) (quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn, United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).

Guiltr-Phase Issues

I.
Thompson argues that the circuit court erred in failing to ensure that his trial was free from all outside influences. Specifically, he argues that the circuit court erred in declining to move his trial to a county that was free from allegedly prejudicial pretrial publicity.
The record shows that in April 2004, Thompson ‘moved for a change of venue, arguing that pretrial publicity had so “saturated the community and prejudiced prospective jurors against [Thompson] making a selection of a fair and impartial jury impossible.” (R. 100.) The State did not oppose the motion, and on August 17, 2004, the circuit court entered an order moving the trial to Lauderdale County. (R. 109; 116.) Sometime later, the court entered the following order, rescinding its August 2004 order and changing venue to Lamar County:
“On August 17, 2004, this Court entered an order on the defendant’s motion and the State’s consent transferring venue to the Circuit Court of Lauder-dale County. The transfer to Lauder-dale County was based on two criteria as set forth by [Thompson]: First, Lauderdale County is outside of the Birmingham, Alabama, media market; and, second, that Lauderdale County is similar to Fayette County in population demographics.
“The 24th Circuit consists of Fayette, Lamar, and Pickens Counties. The Court assumed, based on its location, that Lamar County is included in the Birmingham, Alabama, media market. The Court has now determined that Lamar County is outside of the Birmingham market. Furthermore, Lamar County is similar to Fayette County in population demographics. The defendant is African-American and, based on the 2000 United States Census, the percentage of Black or African-American persons in Fayette County is 11.9% and is 12% in Lamar County.
“Accordingly, to provide a pool of impartial prospective jurors and to promote judicial economy and efficiency, it is ordered, adjudged and decreed as follows:
“1. That the venue of this action, for trial, is and it is hereby transferred to the Circuit Court of Lamar County, Ala-bama_”
(C.R. 207-08.) At the hearing on this motion, defense counsel objected to moving the case to Lamar County and argued that § 15-2-24, Ala.Code 1975,[3] prohibited .the court from changing venue a second time once venue had been changed.[4] The *104 Court stated: “Based upon a reading of the statute, that the trial must be removed to the nearest county, free from exception, the move to Lauderdale County would not have been proper, that is not the nearest county, and that the move to Lamar County would be the nearest county, without exception.” (R. 233-34.) Defense counsel then withdrew his motion for a change of venue and stated on the record that Thompson voluntarily and intelligently waived his right to a change of venue. (R. 235.) The court then issued an order stating that the motion for a change of venue had been rendered moot because Thompson had withdrawn his request and that the trial could proceed in Fayette County. (C.R. 209.)
Thompson did not present evidence indicating that pretrial publicity had saturated Lauderdale County or Lamar County, and he withdrew his motion for a change of venue when the court held that to comply with § 15-2-24, the case should be moved to a county nearer to Fayette County — Lamar County. Accordingly, if error did occur it was invited by Thompson’s actions.
“ ‘ “ ‘Invited error has been applied to death penalty cases. “An invited error is waived, unless it rises to the level of plain error.” Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991).’ ” ’ See Saunders v. State, 10 So.3d 53, 88 (Ala.Crim.App.2007), quoting Scott v. State, 937 So.2d 1065, 1075 (Ala.Crim.App.2005), quoting in turn Adams v. State, 955 So.2d 1037, 1050-51 (Ala.Crim.App. 2003), rev’d on other grounds, 955 So.2d 1106 (Ala.2005).”
Doster v. State, 72 So.3d 50, 84 (Ala.Crim.App.2010). '
When reviewing a ruling on a motion for a change of venue, the Alabama Supreme Court has stated:
“An accused is entitled under § 15-2-20 to a change of venue if he can demonstrate that he cannot receive a fair trial in the county where he is to be tried. It is well established in Alabama, however, that the existence of pretrial publicity, even if extensive, does not in and of itself constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense. Beecher v. State, 288 Ala. 1, 256 So.2d 154 (1971), rev’d on other grounds, 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317 (1972); see, also, the cases annotated at § 15-2-20. In Nelson v. State, 440 So.2d 1130 (Ala.Crim.App.1983), the Court of Criminal Appeals correctly noted that jurors do not have to be totally ignorant of the facts and issues involved in a particular case in order to reach an unbiased verdict.”
Ex parte Fowler, 574 So.2d 745, 747 (Ala.1990).
“In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 *105 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).
“The ‘actual prejudice’ standard is defined as follows:
“ ‘To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and “rendered] a verdict based on the evidence presented in court.” Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].’
“Coleman v. Zant, 708 F.2d at 544.
“... [The defendant] relies on the ‘presumed prejudice’ standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.’ 778 F.2d at 1490 (emphasis added). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575,107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’ Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely applicable, and is reserved for only ‘extreme situations.’ Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’ Coleman v. Kemp, 778 F.2d at 1490.”
Hunt v. State, 642 So.2d 999, 1042-44 (Ala.Crim.App.1993).
“The burden of showing actual prejudice or community saturation with prejudicial publicity lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333 (1966). In addition, the appropriate method to establish the existence of adverse publicity or actual prejudice is through voir dire examination of potential jurors. Anderson v. State, 362 So.2d 1296 (Ala.Cr.App.1978); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865 (1985).”
Hart v. State, 612 So.2d 520, 527 (Ala.Crim.App.1992).
There was no evidence presented to support the motion for a change of venue; thus, we have no newspaper articles or transcripts of media coverage to review on appeal. The voir dire examination shows that numerous individuals in the jury pool had heard about the case, but those that had a fixed opinion were struck for cause. Other jurors indicated that they could set aside their opinions and render a fair decision based on the evidence presented in the case. The record fails to establish that the court committed reversible error in its actions in regard to Thompson’s motion for a change of venue.
*106 Thompson also argues, in this section of his brief, that the circuit court erred in denying his motion to exclude the public and representatives of the media from all pretrial proceedings. Thompson moved that the court “exclud[e] the public, print and electronic media from all pretrial hearings in this case.” (C.R. 156.) The circuit court denied the motion but ordered that no cameras would be allowed in the courtroom. (C.R. 187.)
“ ‘The closure of a trial ... implicates both the defendant’s Sixth Amendment right to a public trial and the public’s First Amendment right of access.’ Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo. L.J. 853, 1388 (1993). See Ex parte Consolidated Pub. Co., 601 So.2d 423, 426-28 (Ala.), cert. denied, 506 U.S. 1024, 113 S.Ct. 665, 121 L.Ed.2d 590 (1992), briefly summarizing the development of the law in this area. The United States Supreme Court has clearly established that the public, which includes the press, has a First Amendment right of access to the trial of a criminal case. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980). This right is related to, but independent of, an accused’s Sixth Amendment right to a public trial, ‘the common concern being the assurance of fairness.’ Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 7, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986) (hereinafter ‘Press-Enterprise II ’). The Supreme Court has held that the public’s right of access extends to jury voir dire, Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984) (hereinafter ‘Press-Enterprise /’), and to preliminary hearings, Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. at 2741.
“In determining whether a First Amendment right of access applies to a particular proceeding, the United States Supreme Court has utilized a two-part analysis, taking into ‘consider[ation] whether the place and process have historically been open to the press and general public’ and “whether public access plays a significant positive role in the functioning of the particular process in question.’ Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. at 2740. Where these questions are answered in the affirmative, the ‘First Amendment right of public access attaches.’ Id. at 9, 106 S.Ct. at 2740.
“... While each case must be decided on its own facts, there is a presumption in favor of openness. See Richmond Newspapers, 448 U.S. at 573, 100 S.Ct. at 2825. Cf. The News-Journal Corp. v. Foxman, 939 F.2d 1499, 1512 (11th Cir.1991), and cases cited therein (discussing presumption in favor of openness in the context of prior restraint). The trial court may order closure only when ‘the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced.’ Press-Enterprise II, 478 U.S. at 7, 106 S.Ct. at 2739.”
Ex parte Birmingham News Co., 624 So.2d 1117, 1124-25 (Ala.Crim.App.1993).
The only grounds Thompson argued in support of the motion to exclude the public and media representatives were (1) that he was charged with capital murder arising from a publicized case; (2) that there was a great deal of publicity concerning the case; (3) that the publicity was prejudicial; and (4) that “coverage of the proceedings herein ha[d] not only resulted in the dissemination of prejudicial information re *107 vealed at those hearings, but ha[d] also triggered the recounting by the media of the history of this case.” (R. 153.) Thompson does not cite any instance that occurred during trial that prejudiced him because of the circuit court’s denial of his motion to close the proceedings. Thompson failed to meet his burden of establishing that the closure of his trial was warranted. Therefore, the circuit court did not abuse its discretion in denying this motion.
Thompson also argues, in this section of his brief, that the circuit court erred in denying his motion to seal the records and transcripts until a jury was impaneled and sequestered or until after trial. (C.R. 152; 187.)
“Judicial records have historically been considered public records. There is a right of public access to court records, and a presumption in favor of such access. Moreover, the media has a right of access to judicial records, which right is no greater than that to the public.
“The right of access rises under the common law, and may arise under a statute or court rule. Although there is authority that the right is not of constitutional origin, it has also been held that there is a federal or state constitutional right of access to judicial records. Once documents have been filed in court, they become a judicial record, subject to the access accorded such records, and an agreement by the parties to restrict access is not binding on the court.”
76 C.J.S. Records § 82 (2011). See also M.C. Dransfield, Annot., Restricting Access to Judicial Records, 175 A.L.R. 1260 (1948).
The United States Supreme Court in Nixon v. Warner Communications, Inc., 485 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), recognized that the right to inspect judicial records is not absolute. But “[o]nly the most compelling reasons can justify non-disclosure of judicial records.” In re Knoxville News-Sentinel Co., 723 F.2d 470, 476 (6th Cir.1983). “Trial courts have always been afforded the power to seal their records when interests of privacy outweigh the public’s right to know. But ... the decision as to when judicial records should be sealed is left to the sound discretion of the district court, subject to appellate review for abuse.” 723 F.2d at 474.
Again, the only grounds argued in support of this motion were the same grounds Thompson argued to support his motion to close the pretrial proceedings. The circuit court did not abuse its discretion in denying Thompson’s motion to seal the records and transcripts until a jury had been empaneled in the case.
II.
Thompson next argues that the circuit court erred in allowing his statements to law-enforcement personnel to be admitted into evidence because,' he says, they were illegally obtained. He makes several different arguments in support of this contention.
The record shows that Thompson moved that his statements be suppressed because, he said, they were obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), and they were involuntary. (C.R. 171.) An extensive hearing was held on the motion, at which time numerous Alabama and Mississippi law-enforcement officers testified. (R. 79-222.) The circuit court denied the motion to suppress Thompson’s confession and took the motion under advisement as it related to the statements that Thompson made to police officers while being transported from Belk, Alabama, to the Pickens County jail. When these statements were *108 offered into evidence, the circuit court denied the motion to suppress them. (R. 2056.)
In reviewing a circuit court’s ruling on a motion to suppress a confession we apply the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
“For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person ... shall be compelled in any criminal case to be a witness against himself....’ Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or in-, ducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is “whether the defendant’s will was overborne at the time he confessed’) (emphasis added).”
718 So.2d at 729 (footnote omitted).
A.
Thompson first asserts that his statement to Johnny Tubbs, an agent with *109 the Alabama Bureau of Investigation, should have been suppressed because, he says, it was involuntary. Specifically, Thompson contends that his confession was involuntary because he was only 18 years old at the time he confessed, his mental impairment rendered him incapable of making a voluntary confession, he was alone with police for 8 hours in a small room, and the transcript of the confession was Agent Tubbs’s version of what Thompson told him and was not Thompson’s own words. The transcript of Thompson’s confession read as follows:
“On June 6, 2008, at approximately 5:30 p.m., I bought a white Toyota car from a crack head in Jasper, Alabama. I gave him $500 for it. I don’t know the crack head’s name but he is a black male, tall, dark complexion with a slim face....
“On June 7, 2003, at approximately 1:00 a.m., I parked in a gas station (convenience store) parking lot and went to sleep. This store is in Fayette, Alabama and is near a swimming pool. Sometime after 3:00 a.m. I was awakened] by a white police officer. He questioned me about the vehicle I was in. After checking on the vehicle the white officer told me the vehicle had been stolen from a shop in Jasper, Alabama. He put handcuffs on my wrists and placed me in the rear of his patrol car. At this time a black police officer arrived and started asking me questions. Then the white officer transported me to the Fayette Police Department. Upon arrival at the Fayette Police Department I was fingerprinted and photographed. Prints were taken of my shoes also by the black police officer. While he was printing my shoes the white police officer asked me to tell him where I got the vehicle. He stated that if I didn’t tell him I was going to spend at least two (2) to three (3) years in jail for receiving stolen property. He told me that I was being charged with a felony which was a serious crime.
“We were sitting in an office and after he made that statement I started freaking out. I started looking at his pistol and planning in my mind how I was going to escape. But things didn’t go as planned. I had planned to get the white police officer’s gun and make him handcuff himself to the black police officer. But after I got his pistol he started screaming and I freaked out and started shooting. After I got his pistol I was standing and he was still sitting in the chair. I don’t know how many times I shot him but I shot until he fell to the floor. As I was leaving that office, I met the black police officer in the hallway. I think he was coming to assist the white police officer because after I got his gun he screamed ‘He got my pistol.’ When I met the black police officer in the hallway he reached for his pistol. At this time I shot him. I don’t know how many times I shot him but he fell to the floor.
“Then I ran near another office where another officer (white) was watching what looked like a television screen. I heard him say ‘Oh sh~.’ I stood away from the office door and started shooting him. I shot until he fell out of his seat onto the floor. After I shot him I exited through a door and realized that I didn’t have but one (1) shoe on (left). I tried to go back inside to get my other shoe but I was locked out. At this time I shot at a thick piece of glass but it didn’t break. I shot at the glass until the pistol wouldn’t shoot anymore and it (pistol) locked open.
“I exited the police department and ran around the building and reentered through the fire department and went back to the police department area look *110 ing for my shoe but never found it. I reentered the building about two (2) or three (3) times. The last time I reentered a man that was sleeping in the fire department saw me and asked me what was going on. I told him that there were some officers down inside the police department. This was a white firefighter. He went inside with me and after he saw the bodies he ran to get some help. I got the first officer that I shot keys off the desk and exited the building and left the area in his patrol vehicle. I was en route to Jasper when I heard the police talking about me on the police radio. They stated where I was from Jasper, Alabama, and that I was armed and dangerous. At this time I decided not to go to Jasper, Alabama. At some point I took the police lights off the top of the police car that I had stolen.
“The reason I shot those officers was I didn’t want to go to jail. The reason I didn’t shoot the firefighter was he wasn’t a danger to me.” •
A supplemental statement was also admitted. This statement, signed by Agent Tubbs, included various observations that Thompson made to him: Thompson said that there was a smell of death in the police department and that every time he entered the station he smelled death, that he knew that he was going to die for what he had done, and that he hoped God would have mercy on his soul.
The young age of a defendant does not automatically render a confession inadmissible, but it is a relevant factor in assessing the voluntariness of the confession. See Jackson v. State, 516 So.2d 726, 745 (Ala.Crim.App.1985). In Clarke v. State, 51 Ala.App. 222, 283 So.2d 671 (Ala.Crim.App.1973), we .stated:
“We subscribe to the general proposition that the confession of a minor is not ipso facto inadmissible; however, infancy is certainly a relevant factor bearing upon the voluntariness, vel non, of a confession. 23 C.J.S. Criminal Law § 829; 87 A.L.R.2d 624; Burton v. State, 107 Ala. 108, 18 So. 284 [ (1895) ]. The better rule appears to equate the capacity required for a valid confession with that prerequisite to criminal responsibility. We conclude from Burton, supra, that generally a person whose age and mental faculties make him amenable to criminal sanctions is sui juris in matters relating to confessions and in-culpatory admissions.”
51 Ala.App. at 224, 283 So.2d at 673. Thompson was 18 years old when he made his statement; thus, he was not entitled to have juvenile rights read to him.[5]
“The fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary.” Baker v. State, 557 So.2d 851, 853 (Ala.Crim.App.1990). See also Charles C. Marvel, Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession, 8 A.L.R.4th 16 (1981).
“ ‘The Alabama courts have recognized that subnormal tendencies of the accused are but one factor to review in the totality of the circumstances surrounding the confession. See McCord v. State, 507 So.2d 1030 (Ala.Cr.App.1987); Sasser v. State, 497 So.2d 1131 (Ala.Cr.App.1986); Corbin v. State, 412 So.2d 299 (Ala.Cr.App.1982). For a more in-depth discussion of this point, see, 23 A.L.R. 4th 493, 8 A.L.R.4th 16.
*111 “ ‘Judge Bowen, speaking for this court in Corbin, supra, 412 So.2d at 301, stated:
“ ‘ “Mental ‘subnormality’ does not in and of itself render a confession involuntary. Parker v. State, 351 So.2d 927 (Ala.Cr.App.), cert. quashed, 351 So.2d 938 (Ala.1977); Arnold v. State, 348 So.2d 1092 (Ala.Cr.App.), cert. denied, 348 So.2d 1097 (Ala.1977). The mere fact thát the defendant was simpleminded or ‘functionally illiterate’ will not vitiate the voluntariness of his confession.” ’ ”
Wheeler v. State, 659 So.2d 1032, 1034 (Ala.Crim.App.1995) (quoting Harkey v. State, 549 So.2d 631, 633 (Ala.Crim.App.1989)).
Questioning a suspect for three hours is not, in itself, coercive. See State v. Rousan, 961 S.W.2d 831, 846 (Mo.1998) (stating, in a case where the appellant had been in police custody for six hours, that “[t]he length of appellant’s interrogation was not coereive, in and of itself’).[6]
Also, “[a] confession is not inadmissible because it is not transcribed verbatim as related by the defendant if the transcription is substantially as related and affirmed by the prisoner as correct.” Hobbs v. State, 401 So.2d 276, 282-83 (Ala.Crim.App.1981). See also Smith v. State, 54 Ala.App. 237, 307 So.2d 47 (1975).
“ ‘ “The state is not required to prove all that the accused said when he confessed because the accused himself has the right to prove the remainder of his statement.” McElroy, § 200.17 at 446. “A confession is not rendered inadmissible because it is not verbatim as related by the accused and is admissible if its transcription is substantially as related and affirmed by the accused.” King v. State, 355 So.2d 1148, 1150 (1978). “The fact that the written statements signed by the defendant are not exactly, word for word, what he told the investigators is without legal significance.” Corbin v. State, 412 So.2d 299, 301 (Ala.Cr.App.1982). See also Hobbs v. State, 401 So.2d 276, 282-83 (Ala.Cr.App.1981); Carpenter v. State, 400 So.2d 417, 423 (Ala.Cr.App.), cert. denied, 400 So.2d 427 (1981).’ ”
Sneed v. State, 1 So.3d 104, 126 (Ala.Crim.App.2007) (quoting Barrow v. State, 494 So.2d 834, 840 (Ala.Crim.App.1986)).
Agent Tubbs testified that on the morning of June 7, 2003, his commanding officer directed him to go to the Lowndes County jail in Mississippi to interview Thompson concerning the triple homicide in Fayette, Alabama. Tubbs testified that when he arrived at the jail he asked that Thompson be brought to an interview room. Tubbs advised Thompson of his Miranda rights. Another individual, Tommy Camp, a jailer with the Lowndes County jail, was also present during the interview. Agent Tubbs said that Thompson signed a waiver-of-rights form, that he was willing to make a statement, and that Thompson had not been coerced or threatened in order to obtain the statement. (R. 87.) Tubbs further testified that after Thompson confessed he put Thompson’s statement in writing and had Thompson read the transcription. After Thompson indicated that portions of the statement were incorrect, those portions were corrected, and Thompson then signed the transcribed confession. Tubbs also testified that he made no promises to Thompson, that Thompson did not appear to be under the influence of alcohol or drugs at the time he made the statement, *112 and that Thompson was not threatened or coerced, in any way. He said that at first Thompson was calm but by the end of questioning he was crying. The questioning lasted from 10:30 a.m. until 1:05 p.m.
Officer Camp testified that he witnessed Agent Tubbs read Thompson his Miranda rights, that Tubbs did not coerce or in any way threaten Thompson, that Thompson was made no promises, and that he witnessed Thompson sign the waiver-of-rights form.
“In reviewing a trial court’s ruling on a motion to suppress, this Court may consider the evidence adduced both at the suppression hearing and at the trial.” Smith v. State, 797 So.2d 503, 526 (Ala.Crim.App. 2000). There was no medical testimony offered at trial indicating that Thompson was incapable of understanding his Miranda warnings.
Based on the totality of the circumstances, we hold that the circuit court did not err in allowing Thompson’s confession to be received into evidence.
B.
Thompson next asserts that the statements he made while being transported from Belk, Alabama, to Pickens County were inadmissible because, he says, he was not given his Miranda warnings a second time. Thompson specifically argues that “because both the location of the interrogation and the identity of the interrogators had changed” law-enforcement officers were required to repeat the Miranda rights.
Danny Jenkins, a former officer with the Fayette Police Department, testified that he went to Belk, Alabama, to transport Thompson to Pickens County on June 3, 2003. Jenkins said that Investigator Keith Cox was also in the vehicle with them. For a good portion of the ride, he said, everyone was silent. To relieve the silence he asked Thompson if he was related to “Mookie Moore.” Jenkins testified that Thompson then responded: “Don’t slander my family because of something I did.” (R. 209.) Jenkins then testified, reading from a statement that had been prepared by Officer Cox, about the conversation that Thompson had with the officers while in the patrol car:
“Moore said for us to tell him the truth. This writer responded, ‘yeah, it’s the top of the pile.’ Moore than asked about murder, first degree. And this writer stated there was not such a charge. Moore asked if he would get the death penalty. This writer responded, ‘that’s a question I can’t answer. That’s why we have juries and trials, to decide those things.’
“Moore also asked if we had seen the news. Both this writer and Jenkins stated we had not. Moore stated, ‘I figured I’d be on the news.’ ”
(R. 210.) Jenkins said that they did not question Thompson about the facts of the case but that Thompson merely volunteered the above statements when asked about a relative.
Thompson was given his Miranda warning at approximately 10:30 a.m. on the morning of June 3, 2003, and was transported at 3:25 p.m. that afternoon. Approximately 5 hours had elapsed since the time Thompson was given his Miranda warnings at the Lowndes County, Mississippi, jail by a different law-enforcement officer and the time he made the statement to Jenkins in the patrol car en route to Belk, Alabama. The Alabama Supreme Court has recently addressed when Miranda warnings become stale:
“Other courts have, in addressing whether Miranda rights have become stale, focused on the circumstances surrounding the interrogation. In Jarrell *113 v. Balkcom, 735 F.2d 1242 (11th Cir.1984), Jarrell confessed to murder, kidnapping, armed robbery, and aggravated assault approximately three hours after receiving his Miranda warnings from a police investigator at city hall. Jarrell was never readvised of his rights, even after being arrested. From the time Jarrell received his Miranda warnings until he confessed, Jarrell was escorted from city hall to police headquarters, where he was interviewed by a police sergeant, driven from headquarters to the district 'attorney’s office, where a polygraph examination was administered, then driven back to police headquarters, where he was arrested by the same police sergeant, and interrogated for an additional 30 to 45 minutes by the sergeant before confessing. Jarrell argued that the Miranda warnings should have been refreshed and that, therefore, the confession was inadmissible.
“ ‘Under the circumstances of this case, we do not view a confession given less than four hours after the issuance of Miranda warnings inadmissible because of the failure to reissue the warnings. Although Jarrell was not technically in custody until he was arrested, he was a suspect from the moment he received his warnings. The record reflects that the warnings given were complete and that Jarrell understood them. Cf. Edwards v. Indiana, 412 N.E.2d 223, 225-26 (Ind.1980) (where defendant, not yet a suspect, was given orally his Miranda warnings and record contained no evidence of content of oral advisement, confession given 5 hours later when defendant had become a suspect not admissible). Furthermore, the fact that Jarrell confessed to a state officer (Blannott) other than the one who administered the Miranda warnings (Bishop), does not render the warnings insufficient, especially since, before interrogating Jarrell, Blannott asked Bishop in Jarrell’s presence ' whether petitioner had received his Miranda warnings. (T.T. 545). See State v. Gallagher, 36 Ohio App.2d [2]9, 301 N.E.2d 888 (1973) (change from one state interrogator to another insufficient break to require fresh warnings). Cf. United States v. Hopkins, 433 F.2d 1041 (5th Cir.1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (1971) (change from state police officer questioning defendant about state crime to federal officer questioning about federal crime; no new warnings required); Mitchell v. State, 3 Tenn.Cr.App. 153, 458 S.W.2d 630 (1970) (questioning regarding different crime occurred on following day; no new warnings required). We conclude that no violation of petitioner’s rights occurred by the failure to reissue the Miranda warnings at the time of arrest because the totality of the facts do not reflect that Jarrell was unaware of his rights, that he was pressured, or that he was mentally deficient or naive about the process that was under way. Additionally, Jarrell had had previous experience with law enforcement officers where his rights were explained.’
“735 F.2d at 1254.”
Ex parte Landrum, 57 So.3d 77, 84-85 (Ala.2010). The Landrum Court held that even though Miranda warnings had been given to Landrum 60 hours before he made a statement and his location had changed from the police department to a city jail, based on the totality of the circumstances, the Miranda warnings were not stale.
The Miranda warnings in this case were not stale when Thompson made the statements to Jenkins approximately five hours *114 after he was read his Miranda rights. See Landrum.
Moreover,
“the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term ‘interrogation’ under Miranda refers not only to express questioning, but also to any words .or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive . police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.”
Rhode Island v. Innis, 446 U.S. 291, 301-02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (emphasis added).
“Although it is undisputed that such statements were made while the defendant was in custody and without the benefit of Miranda warnings, they were spontaneous and, therefore, admissible (see, People v. Stoesser, 53 N.Y.2d 648, 650, 438 N.Y.S.2d 990 [ (1981) ]; People v. Suarez, 140 A.D.2d 558, 528 N.Y.S.2d 424 [(1988)]). The challenged statements were preceded only by questions requesting pedigree information which were not likely to elicit incriminatory responses (see, People v. Padron, 118 A.D.2d 599, 499 N.Y.S.2d 202 [(1986)]).”
People v. Smith, 151 A.D.2d 792, 793, 543 N.Y.S.2d 121,122 (1989).
The question Jenkins asked Thompson — whether he was related to Mookie Moore — was not a question designed to elicit an incriminating response. Thus, Miranda warnings were not necessary.
Furthermore, in Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court held that the erroneous admission of a defendant’s confession may be harmless.
“When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.”
499 U.S. at 310. “In order for the harmless error doctrine to be applied in this situation, the evidence against the accused must be overwhelming.” McCray v. State, 629 So.2d 729, 732 (Ala.Crim.App.1993). Even if it was error to admit the statements made to Jenkins, the error was harmless beyond a reasonable doubt, particularly in view of Thompson’s earlier statement to Tubbs. See Arizona v. Fulminante[7]
*115 III.
Thompson next argues that the circuit court erred during the jury-selection process. Specifically, he asserts that the court failed to remove jurors who were biased, failed to remove jurors who would automatically vote for the death penalty, erroneously allowed the jurors to be death-qualified, and failed to sequester the jury. We will address each of these claims individually.
A.
Thompson argues that the circuit court should have removed prospective jurors L.E., D.S., M.S., and S.W.[8] for cause because, Thompson says, they stated during voir dire that they believed that Thompson was guilty or their answers during voir dire showed an absolute bias against Thompson.
Initially, we note that juror S.W. was removed by the use of a peremptory strike and jurors L.E. and D.S. were alternates and were removed prior to jury deliberations. Accordingly, any error in failing to remove these jurors for cause was harmless beyond a reasonable doubt. “[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem’l Hosp., 833 So.2d 1 (Ala.2002).” Pace v. State, 904 So.2d 331, 341 (Ala.Crim.App.2003). Cf. Ex parte Colby, 41 So.3d 1 (Ala.2009) (may not be harmless when multiple challenges for cause are involved).
Moreover,
“To justify a challenge for cause, there must be a proper statutory ground or ‘“some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.” ’ Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This court has held that ‘once a juror indicates initially that he or she is biased or prejudiced or has deepseated impressions’ about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror ‘need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.’ Kinder v. State, 515 So,2d 55, 61 (Ala.Cr.App.1986).”
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998).
“The test for determining whether a strike rises to the level of a challenge for cause is “whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.’ Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). ‘Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.’ Ex parte Nettles, 435 So.2d 151,153 (Ala.1983). ‘The decision of the trial court “on such questions *116 is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.” ’ Nettles, 435 So.2d at 158.”
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
“The qualification of a juror is a matter within the discretion of the trial court. Clark v. State, 443 So.2d 1287,1288 (Ala.Cr.App.1983). The trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.” Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990). “ ‘[JJurors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.’ Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000).” Sharifi v. State, 993 So.2d 907, 926 (Ala.Crim.App.2008).
“It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination techniques that frequently are employed ... [during voir dire].... Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge may properly choose to believe those statements that were the most fully articulated or that appeared to be have been least, influenced by leading.”
Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).
Thompson asserts that L.E. should have been removed for cause because, he says, she indicated in her juror questionnaire that she believed Thompson was guilty. The following occurred during the voir dire of L.E.:
“[Defense counsel]: In your questionnaire — and I could have this wrong. So, if I am wrong, just don’t think I’m completely crazy. But you’ve made the statement — you said you’re familiar with the news about the case. And I think you said, T believe Devin Thompson is guilty of murdering three police officers and should be judged and punished accordingly.’ You put that in your questionnaire?
“[L.E.]: Yes, I did.
“[Defense counsel]: Now, you’ve just— the Judge has just asked you if you have a fixed opinion that could not be — that would prevent you from listening to the evidence. Would that—
“[L.E.]: No.
“[Defense counsel]: It would not?
“[L.E.]: No.
“[Defense counsel]: That opinion that you expressed in there is not a fixed opinion?
“[L.E.]: No.
“[Defense counsel]: And it would not prevent you from listening to the evidence in this case and making a verdict, or rendering a verdict, accordingly; is that right?
“[L.E.]: That’s correct.”
(R. 1267-68.) “‘[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.’ ” Sharifi v. State, 993 So.2d 907, 926 (Ala.Crim.App.2008) (quoting Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000)). The circuit court asked L.E. if she had a fixed opinion about Thompson’s guilt or innocence, and L.E. indicated that she did not. L.E. also indicated when questioned by defense counsel that any view that she had about the case was not so *117 fixed that it would prevent her from rendering a fair verdict in the case. Thompson did not move the court to remove this juror for cause. The circuit court did not err in failing sua sponte to remove L.E. for cause.
Thompson argues that D.S. should have been struck for cause because she indicated that she knew one of the victims and his wife and that fact “would affect [her].” (R. 644.) The following then occurred during the voir dire examination of juror D.S.:
“The Court: All right. Now, if you are a juror on this case, it will be your duty, and you would take an oath, to render a verdict based solely on the evidence and law presented in court. In other words, just what happens in the courtroom.
“Now, my question for you is: This relationship that you had with those people, would you be able to set aside and make a decision based solely on the evidence and the law presented in court? Could you do that?
“[D.S.]: Yes.”
(R. 820.)
“‘[T]he mere fact that a prospective juror is personally acquainted with the victim [or his family] does not automatically disqualify a person from sitting on a criminal jury.’ Brownlee v. State, 545 So.2d 151, 164 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).... Instead, the test is ‘whether the [prospective] juror’s acquaintance with [the victim] or relative is such that it would result in probable prejudice.’ Vaughn v. Griffith, 565 So.2d 75, 77 (Ala.1990), cert. denied, 498 U.S. 1097, 111 S.Ct. 987, 112 L.Ed.2d 1072 (1991).”
Morrison v. State, 601 So.2d 165, 168 (Ala.Crim.App.1992). The court asked D.S. if her friendship with one of the victims would prevent her from rendering a fan-decision in the case, and she responded that it would not. Thompson did not move that D.S. be struck for cause. The circuit court did not err in failing sua sponte to remove D.S. for cause.
Thompson asserts that juror M.S. should have been struck for cause because, he said, she responded that she thought the insanity defense was used too frequently. During questioning she indicated that she could follow the court’s instructions. (R. 707.) M.S. responded:
“[M.S.]: Yes, sir, I do. I feel like there’s a reason we’re here. It’s—I’m not personally involved with the families but I know them. I’m not personally involved with Devin. I don’t know him. But I know he’s due a fair trial, and I can do that, I believe.”
(R. 1714-15.) M.S. indicated that any feelings she had would not prevent her from giving Thompson a fair trial. Also, Thompson did not move that M.S. be struck for cause. The court did not err in failing sua sponte to remove M.S. for cause.
Juror S.W. should have been removed, Thompson says, because she never indicated that she could set aside her preconceived views and render a decision based on the evidence. The following occurred during the voir dire examination of S.W.:
“Prospective Juror [S.W.]: I think there’s a lot of predetermined views already, you know, among people. And we would just have to weigh the evidence.
“[Prosecutor]: You wouldn’t let those predetermined views, or the fact that somebody might have them, affect you in this case? That wouldn’t sway you?
“[S.W.]: No, I don’t think so.
*118 “[Prosecutor]: You would make up your own mind?
“[S.W.]: Yes, sir.”
(R. 1751.) Juror S.W. indicated that she could be impartial and base her decision on the facts and the evidence presented in the case. There was no error in the circuit court’s failure sua sponte to remove S.W. for cause.
B.
Thompson next argues that the circuit court erred in failing to remove for cause those jurors who stated during voir dire that they would automatically vote for the death penalty. Specifically, he asserts that prospective jurors W.C. and D.H. indicated that they would automatically vote for death and that the circuit court should have removed them from the venire.
“ £[W]hether a prospective juror in a capital murder case is properly excluded based on the juror’s views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge’s discretion, because the judge was present and capable of observing the potential jurors and their responses.’ Price v. State, 725 So.2d 1003, 1025 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), citing Wainwright v. Witt, [469 U.S. 412 (1985) ].
“In Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), this court stated:
“ ‘ “Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court’s exclusion for cause of venire-persons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it ‘unmistakably clear (1) that they would automatically vote against imposition of capital punishment ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant’s guilt.’ Id. 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would ‘ “prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] oath.” ’ Id., 469 U.S. at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with the Witherspoon reference to ‘automatic’ decision-making, and eliminated the requirement that a venireperson’s bias be proved with ‘unmistakable clarity.’ 469 U.S. at 424, 105 S.Ct. at 852.” ’ ”
Burgess v. State, 811 So.2d 557, 570 (Ala.Crim.App.1998), rev’d on other grounds, 811 So.2d 617 (Ala.2000).
The record shows that juror D.H. indicated that he believed that the death penalty should be automatic for premeditated killings. When questioned about his views he stated that he could not think of any reason why he “could not give both the State and Defendant a fair and impartial trial.” (R. 1374.)
Juror W.C. stated that if someone was convicted of intentional murder they should get the death penalty. The following occurred during further questioning of W.C.:
*119 “[Defense counsel]: If the Judge instructed you that you would have to fairly, and with an open mind, weigh these reasons to give the death penalty and reasons to not give the death penalty, would you be able to set aside your feelings about the death penalty and do that in accordance with the Judge’s instructions?
“[W.C.]: With his instructions, I should be.
“[Defense counsel]: And all this — with your feelings about the death penalty, you ain’t going to put us to a higher standard? You’re going to give us a fair hearing?
“[W.C.]: That’s just — that was just my opinion.
“[Defense counsel]: Yes, sir, I understand.
“[W.C.]: And, you know, when the Judge tells what a fellow’s got to do, I mean, you know, he’s got to do it.”
(R. 1107.)
Both D.H. and W.C. indicated that they could set aside their views on the death penalty and follow the law as instructed by the court. “[The jurors] indicated that [they] could be objective and consequently [were] not subject to a challenge for cause.” Harrell v. State, 470 So.2d 1303, 1306 (Ala.Crim.App.1984).
Moreover, neither D.H. nor W.C. served on Thompson’s jury; therefore, any error in failing to remove them for cause was harmless. See Pace, supra.
C.
Thompson next argues that the circuit court erred in excusing F.W. for undue hardship. The following occurred during the voir dire examination of F.W.:
“The Court: Do you believe that taking these medications [Lipitor, hydrochlo-rothiazide, lisinopril, Actos, diclofenac sodium, and Prandin], the illnesses that you have, and the problem that you have of dozing off, would prevent you from being a good juror in this case?
“[F.W.]: If I don’t hear what’s going on, I might not be.
“The Court: And you’re saying that this falling asleep is something you can’t help?
“[F.W.]: No.
“The Court: And yesterday, during the proceedings, you did it — you’re telling me that you fell off asleep three times while I was talking?
“[F.W.]: Yeah.
“The Court: And you just woke up— how late — how much later?
“[F.W.]: I don’t have no — I don’t know time, how long I be asleep.
“The Court: But you know that you went to sleep while I was talking, or one of the lawyers was talking, and then you just woke up?
“[F.W.]: That’s it.
“The Court: Do you feel like you missed anything while you were nodded off?
“[F.W.]: I can’t remember.
. “The Court: All right. [F.W.] you will be excused.”
(R. 758-59.) Thompson objected to the circuit court’s removal of F.W.
Section 12-16-63, Ala.Code 1975, addresses a court’s authority to excuse prospective jurors from jury service. At the time of Thompson’s trial, this section stated, in pertinent part:
“(a) The court, upon request of a prospective juror or on its own initiative, shall determine On the basis of information provided on the jury qualification form or interview with the prospective juror or other competent evidence whether the prospective juror should be excused from jury service. The jury *120 commission shall enter this determination on the juror qualification form and the master list.
“(b) A person who is not disqualified for jury service may be excused from jury service by the court only upon a showing of undue hardship, extremq inconvenience or public necessity, for a period the court deems necessary, at the conclusion of which the person may be directed to reappear for jury service in accordance with the court’s directions.”[9]
In addressing the scope of § 12-16-68, Ala.Code 1975, we have stated:
“The trial court is vested with broad discretion in excusing potential jurors from service under this section. See Giles v. State, 682 So.2d 568, 574 (Ala.Cr.App.1992). Trial courts have properly excused jurors pursuant to this section for a myriad of reasons. See Madison v. State, 718 So.2d 90, 100 (Ala.Cr.App.1997) (potential juror excused because mother had recently undergone surgery and suffered with Alzheimer’s disease; another potential juror excused because juror’s mother was terminally ill); Allen v. State, 683 So.2d 38, 42 (Ala.Cr.App.1996) (eight potential jurors were excused, most of whom were students at the University of Alabama with pending final exams); Knotts v. .State, 686 So.2d 431, 480 (Ala.Cr.App.1995) (veniremember excused by a ‘court strike’ because there was an odd number of veniremembers remaining); Giles v. State, supra, at 574 (black potential juror properly excused because she was sole caretaker of an infant and a five-year-old child). See also Gwin v. State, 425 So.2d 500, 504 (Ala.Cr.App.1982) (appellant’s claim that judge had arbitrarily excused potential jurors was without merit). Moreover, a trial court is not required to ask follow-up questions or to have potential jurors elaborate on any possible preventions of their hardships. See Madison v. State, supra, at 100.”
McWhorter v. State, 781 So.2d 257, 273 (Ala.Crim.App.1999).
The circuit court did not abuse its broad discretion in removing juror F.W. for health reasons.
D.
Thompson next argues that the circuit court erred in removing jurors C.K, M.S., and K.T. because, he asserts, they indicated that they could be fair and impartial. These jurors were removed based on their views on the death penalty. Thompson did not object to the court’s granting of the State’s motions to remove jurors C.K. and M.S. for cause and specifically stated on the record that he had no objection to the removal of juror K.T. Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), allows the prosecution in a capital case to strike for cause those potential jurors who would automatically vote against imposing capital punishment without regard to any evidence that might be developed at trial or those potential jurors whose attitude toward the death penalty would prevent them from making an impartial decision as to the defendant’s guilt. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court held that in a capital case the prosecutor may exclude *121 venirepersons whose views would ‘prevent or substantially impair’ their performance of their duty as ... jurors.
“In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that it violated the requirements of due process to allow the prosecution to strike for cause persons who are opposed to the death penalty while not allowing the defense to exclude for cause those venirepersons who are predisposed to impose capital punishment regardless of the evidence presented. Thus, a capital defendant may challenge for cause any venireper-son who would automatically vote to impose death if the defendant was convicted of a capital crime.”
Ex parte Smith, 698 So.2d 219, 221 (Ala.1997).
Juror C.K. stated during voir dire that she did not think she could vote for the death penalty and that she could not follow the law. She was struck for cause. (R. 1524.) Juror M.S. said that she was opposed to the death penalty and could not consider it as a punishment. She was likewise struck for cause. (R. 1724.) Juror K.T. stated that he had problems with voting for the death penalty and could not set aside those feelings and follow the law. He was also struck for cause. (R. 1772.) The record of the voir dire shows that these jurors indicated that they could not be impartial and follow the law because of their opposition to the death penalty. The circuit court did not abuse its discretion in removing these jurors for cause based on their opposition to the death penalty. See Smith, supra.
E.
Thompson next asserts that death-qualifying the jurors produced a “conviction-prone” jury and violated his right to a fair and impartial trial because, he says, it disproportionately excluded minorities and women from his jury. Thompson did not object to these questions during voir dire examination. In fact, Thompson filed a pretrial motion requesting that the court exclude from the venire all jurors who would automatically vote for the death penalty. (C.R. 142.) The circuit court granted this motion. (C.R. 187.) Thus, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the United States Supreme Court held that veniremembers in a capital-murder trial may be ‘death-qualified’ to determine their views on capital punishment. The appellate courts in Alabama have repeatedly applied the Lockhart holding. As this Court stated in Sockwell v. State, 675 So.2d 4 (Ala.Crim.App.1998):
“ ‘In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from “death qualification” of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama Courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).’
“675 So.2d at 18.”
Lee v. State, 44 So.3d 1145, 1161-62 (Ala.Crim.App.2009).
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be *122 more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constittion prohibits the state from ... death-qualifying jurors in capital cases. Id,.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
Davis v. State, 718 So.2d 1148, 1157 (Ala.Crim.App.1995).
The circuit court complied with long-established law by allowing the jurors to be death-qualified to determine their views on capital punishment. See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). There was no error in regard to this claim.
F.
Thompson next argues that the circuit court erred in failing to sequester the jury.
Thompson did not move to sequester the jury; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“The trial court, in allowing the jury to separate, acted pursuant to § 12-16-9, Ala.Code 1975, amended effective June 15, 1995. That section provides:
“‘In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may at any time on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate.’
“Thus, the trial court acted within its discretion in allowing the jury to separate.
“Moreover, there is no indication in the record that the appellant suffered any prejudice by the failure to sequester the jury. Rule 19.3(a), Ala. R.Crim. P., amended effective December 1, 1997, to ensure conformity with § 12-16-9, Ala. Code 1975, provides, in pertinent part:
“ ‘(1) In the prosecution of any felony ease, the trial court, in its discretion, may permit the jury hearing the case to separate during the pendency of the trial. Such a separation of the jury shall create a prima facie presumption that the accused was not prejudiced by reason of the separation.
“‘(2) The court may, at any time, on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever the jurors leave the jury box, or the court may allow the jury to separate. A motion to separate or sequester shall not be made within the hearing of the [jury, and the jury shall not be informed which] party, if any, requested the separation or sequestration.’
“See also Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000); Ex parte Stewart, 730 So.2d 1246 (Ala.1999), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999) (the Alabama Supreme Court stated this court ‘correctly held that § 12-16-9, [Ala.Code 1975] overrode the conflicting portions of Rule 19.3, [Ala. R. Cr. P.].’ Id. at 1250.)
“The record indicates that the appellant presented no evidence to rebut the prima facie presumption that he was not prejudiced by the court’s failure to require sequestration.”
*123 Centobie v. State, 861 So.2d 1111, 1183 (Ala.Crim.App.2001).
There is no indication in the record that Thompson was prejudiced as a result of the failure to sequester the jury. The circuit court did not err in failing sua sponte to sequester the jury.
IV.
Thompson argues that the State violated Batson[10] by, he says, using its peremptory strikes to remove black prospective jurors from the venire based solely on their race.
The United States Supreme Court in Batson held that it violates the Equal Protection Clause of the United States Constitution to strike a black individual from a black defendant’s jury based solely on his or her race. This holding was extended to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to defense counsel in criminal cases in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and to gender in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The Alabama Supreme Court extended this holding to white prospective jurors in White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993).
After Thompson’s jury was struck, defense counsel asserted that the State had violated Batson by using four of its peremptory strikes to remove all the black jurors from the venire. The circuit court found that the defense had established a prima facie case of discrimination and directed the State to set out its reasons for removing the black jurors. After the State provided its reasons, the circuit court found that the reasons for removing the black prospective jurors were race-neutral. (R. 1841.)
“ ‘After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The State then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. Ex parte Jackson, [516 So.2d 768 (Ala.1986) ].’
“Ex parte Branch, 526 So.2d 609, 623 (Ala.1987).
“‘Within the context of Batson, a “race-neutral” explanation “means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.” Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). “In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.” Id. “[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within the trial judges’s province.’” Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.’
“Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994).”
*124 Martin v. State, 62 So.3d 1050, 1058-59 (Ala.Crim.App.2010).
“ “When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.’ Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001). ‘A trial court is in a far better position than a reviewing court to rule on issues of credibility.’ Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). ‘Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.’ Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“ ‘Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will “largely turn on evaluation of credibility.” 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.’
“Hernandez v. New York, 500 U.S. 352, 365 (1991).”
Doster v. State, 72 So.3d 50, 73-74 (Ala.Crim.App.2010).
“[Wjhen more than one reason was given for striking some veniremembers, we need only find one race neutral reason among those asserted to find that the strike was race-neutral; we need not address any accompanying reasons that might be suspect. See Powell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Davis v. State, 555 So.2d 309 (Ala.Cr.App. 1989).”
Zumbado v. State, 615 So.2d 1223, 1231 (Ala.Crim.App.1993). “ ‘So long as there is a non-racial reason for the challenge, the principles of Batson are not violated.’ ” Jackson v. State, 686 So.2d 429, 430 (Ala.Crim.App.1996) (quoting Zanders v. Alfa Mut. Ins. Co., 628 So.2d 360, 361 (Ala.1993)).
“Once the prosecutor has articulated a race-neutral reason for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext.” Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). “A determination regarding a moving party’s showing of intent to discriminate under Batson is ‘ “a pure issue of fact subject to review under a deferential standard.” ’ Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997), quoting Hernandez v. New York, 500 U.S. 352, 365 (1991).” Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010). “The trial court is in a better posi tion than the appellate court to distinguish bona fide reasons from sham excuses.” Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991).
The record shows that the venire comprised over 170 prospective jurors. After jurors were removed for hardship and health reasons, the State had 31 peremptory strikes and the defense had 30 peremptory strikes.[11] (Supp. R. 47.) The actual striking of the jurors was not conducted on the record.
*125 A.
The State asserted at the Batson hearing that it struck juror R.B. because, it said, she stated during voir dire that she “did not believe in killing,” that killing went against the Bible, and that the death penalty should never be imposed. R.B. also responded that she knew Thompson’s father because he was a member of her church and that her ex-boyfriend worked for Thompson’s father. Also, the prosecutor said, in 1994 R.B. was charged with negotiating a worthless instrument. The prosecutor also said that the police chief told him that R.B. would not be a good juror because she did not like the police.[12]
Defense counsel countered the prosecutor’s explanation by arguing that other jurors who had worthless-check convictions and who had reservations about the death penalty were not struck. However, defense counsel did not specifically identify any jurors who, he asserted, had been treated differently.
“It is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App.1994). See also Jackson v. State, 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); Brown v. State, 705 So.2d 871, 874 (Ala.Crim.App.1997); and Wood v. State, 715 So.2d 812, 816 (Ala.Crim.App.1996), aff'd 715 So.2d 819 (Ala.1998). ‘Where a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ ”
Martin v. State, 62 So.3d 1050, 1059-60 (Ala.Crim.App.2010).
Moreover, “ ‘[t]he strike of a potential juror because he knew the appellant or the appellant’s family is a valid race-neutral reason that does not violate Batson v. Kentucky, supra. Brown v. State, 623 So.2d 416 (Ala.Cr.App.1993); Williams v. State, 620 So.2d 82 (Ala.Cr.App.1992).’ ” Lee v. State, 898 So.2d 790, 814 (Ala.Crim.App.2001) (quoting Carroll v. State, 701 So.2d 47, 52 (Ala.Crim.App.1996)). See also Jackson v. State, 686 So.2d 429 (Ala.Crim.App.1996).
The reasons for striking juror R.B. were race neutral and did not violate Batson.
B.
The State asserted that it struck juror W.H. because she wrote on her juror questionnaire that she knew Thompson and that she could “not do this” but indicated during voir dire that she had changed her mind and now thought she could “do it.” Also, when asked whether she knew one of the police officers who was expected to testify she indicated that she did and then said “don’t ask me about him.” W.H. also went to school with Thompson, and Thompson’s father and her stepfather “hung out together.” The prosecutor also stated that W.H. “rolled her eyes” in a negative manner when he passed her. W.H. had also been prosecuted by the district attorney’s office in 2002 for harassment. Defense counsel questioned the prosecutor’s reasons for striking W.H., and the judge indicated that he had heard W.H.’s comment about one of the police officers.
“[R]ace-neutral reasons for peremptory challenges often invoke a juror’s demeanor ... making the trial court’s *126 first-hand observations of even greater importance ... We have recognized that these determinations of credibility and demeanor lie ‘ “peculiarly within a trial judge’s province,” ’ ibid, (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)), and we have stated that ‘in the absence of exceptional circumstances, we would defer to the [the trial court].’ ”
Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).
More recently, the United States Supreme Court held:
“[W]here the explanation for a peremptory challenge is based on a prospective juror’s demeanor, the judge should take into' account, among other things, any observations of the juror that the judge was able to make during the voir dire. But Batson plainly did not go further and hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror’s demeanor.”
Thaler v. Haynes, 559 U.S. 43, 48, 130 S.Ct. 1171, 1174, 175 L.Ed.2d 1003 (2010).
“[T]he demeanor of a juror can also provide a sufficiently race-neutral explanation for a prosecutor’s use of a peremptory challenge.... [T]he way in which a person behaves or conducts himself, can include a number of characteristics, such as ... perceived favoritism toward the accused.” Stephens v. State, 580 So.2d 11, 19 (Ala.Crim.App.1990). “As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lie ‘peculiarly within a trial judge’s province.’ Wainwright v. Witt, 469 U.S. 412, 428 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038 (1984).” Hernandez v. New York, 500 U.S. at 365.
The prosecutor’s reasons for removing juror W.H. were race neutral and did not violate Batson.
C.
Juror C.N. was struck, the prosecutor said, because she knew the defendant, had gone to school with him, and had almost completed a degree with a major in human development or childhood development, and, as the prosecutor said: “We expect that there will be a good amount of psychological expert testimony in this case and we did not want her to be basing her decision on anything other than the evidence.” (R. 1853.)
The State indicated that it struck everyone who knew the defendant. The defense objected, and the circuit court asked the State to list the jurors, both white and black, that it had struck because they knew the defendant. The prosecutor then listed the prospective jurors and stated that it would have struck all of them but defense counsel had struck some of the jurors before the State could strike them. The court found no Batson violation. There was no evidence of disparate treatment in removing jurors based on this reason.
As we stated above, “ ‘[t]he strike of a potential juror because he knew the appellant or the appellant’s family is a valid race-neutral reason that does not violate Batson v. Kentucky, supra. Brown v. State, 623 So.2d 416 (Ala.Cr.App.1993); Williams v. State, 620 So.2d 82 (Ala.Cr.App.1992).’” Lee v. State, 898 So.2d 790, 814 (Ala.Crim.App.2001) (quoting Carroll v. State, 701 So.2d 47, 52 (Ala.Crim.App.1996)).
The reasons for striking juror C.N. were race neutral and did not violate Batson.
D.
The State said that juror R.N. answered on her questionnaire that she did not have a relative who had been ac *127 cused of a crime; however, during voir dire she said that her brother, who was also a member of the venire for Thompson’s trial, had been convicted of selling drugs. The prosecutor stated: “I’m concerned that that was her brother and she may harbor some resentment against the judicial system or the State or the process because of the numerous times that he was put on the spot, and even laughed about by the panel during this process.” (R. 1857.) R.N. also had children who had been prosecuted by the district attorney’s office and she knew Thompson. The court stated: “A brother or a sister of a juror that was struck for cause for being a convicted felon, I don’t know of anybody else that came up on out there.” (R. 1859.) The court found this reason to be race neutral.
“[Previous criminal charges, prosecutions, or convictions of potential jurors or their relatives [is] a race-neutral reason_” Johnson v. State, 43 So.3d 7, 12 (Ala.Crim.App.2009). See also Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001); Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000); Thomas v. State, 611 So.2d 416 (Ala.Crim.App.1992). The prosecutor’s reason for removing juror R.N. was race neutral.
“ £A circuit court’s ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous.’” Brown v. State, 982 So.2d 565, 587 (Ala.Crim.App.2006) (quoting Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App.1996)). The circuit court’s denial of Thompson’s Batson motion was not clearly erroneous.
V.
Thompson next argues that the circuit court erred in allowing the autopsy reports on the three victims to be received into evidence because, he says, they were inadmissible hearsay.
The State moved in limine that the autopsy reports prepared on the three victims be admitted into evidence. (C.R. 272.) John McDuffie, the director of the Tuscaloosa laboratory for the Alabama Department of Forensic Sciences, testified that the autopsies on the three victims had been performed by Dr. John Glenn. McDuffie said that Dr. Glenn no longer worked with the laboratory, that he had taken a medical retirement, and that Dr. Glenn’s medical doctor had informed McDuffie that he was not “capable of testifying.” (R. 2842.) McDuffie testified that as director he is custodian of all the autopsy reports, that the reports are completed and kept in the regular course of business, and that the reports are public records. Thompson objected to the admission of the autopsy reports, arguing that their admission without Dr. Glenn’s testimony violated the Confrontation Clause. A lengthy hearing was held outside the jury’s presence. (R. 2847-60.) The circuit court determined that the reports were nontesti-monial and were admissible as business records. (R. 2861.)
Charles James, a death investigator with the Alabama Department of Forensic Sciences, testified that he was present when Dr. Glenn performed the autopsies on the three victims and that before those autopsies he had been present when Dr. Glenn performed at least 100 autopsies. James testified that he was present when the photographs of the bodies were taken, that he was present when the bullets were removed from the bodies, and that he was present when Dr. Glenn used probes to track the trajectories of the bullet wounds.
Michael Brown, a forensic-pathology technician for the Alabama Department of Forensic Sciences, testified that he had assisted Dr. Glenn in approximately 300 autopsies and that he assisted him in per *128 forming the autopsies on Arnold Strickland, James Crump, and “Ace” Mealer. Brown said that he assisted Dr. Glenn in tracking and locating the trajectories or the bullet paths of the wounds on the three victims.
Dr. Adam Craig, a forensic pathologist with, the Alabama Department of Forensic Sciences, testified that based on his review of the autopsy reports, the photographs taken of the bodies, and the testimony of Charles James and Michael Brown, Strickland, Crump, and Mealer all died of multiple gunshot wounds.
In Perkins v. State, 897 So.2d 457 (Ala.Crim.App.2004), we held that it was not a violation of the Confrontation Clause to admit an autopsy report without the medical examiner’s testimony or testimony indicating that he or she was not available. We stated:
“In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the admission of a wife’s out-of-court statements to police officers, regarding an incident in which the defendant, her husband, allegedly stabbed the victim, violated the Confrontation Clause. The Supreme Court stated that an out-of-court statement by a witness that is testimonial is barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statement is deemed reliable by the trial court, abrogating its previous holding in Ohio v. Roberts [, 448 U.S. 56 (1980) ]. While the Supreme Court applied a stricter standard to the admission of testimonial hearsay, however, it did not do so with regard to nontestimonial hearsay, noting:
“ Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law — as does -Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.’
“541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.
“Unlike the hearsay in Crawford v. Washington, the hearsay at issue in this case is nontestimonial in nature — an autopsy report on the victim, Wysteria Mathews. As the Court noted in White [v. Illinois, 502 U.S. 346 (1992)]: ‘[w]here [the] proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied.’ 502 U.S. at 356.
“Both Alabama and federal caselaw have recognized that the business records exception is a firmly rooted exception to the hearsay rule. See, e.g., McNabb v. State, 887 So.2d 929, 969 (Ala.Crim.App.2001); Ohio v. Roberts, 448 U.S. at 66 n. 8, 100 S.Ct. 2531. Moreover, under Alabama law, ‘An autopsy report made in the regular course of business is admissible under the business records exception.’ 2 Charles W. Gamble, McElroy’s Alabama Evidence § 254.01(18) (5th ed.1996) (footnote omitted). See also Adams v. State, 955 So.2d 1037, 1072-73 (Ala.Crim.App.2003); Baker v. State, 473 So.2d 1127, 1129 (Ala.Crim.App.1984). The results of Dr. Embry’s autopsy and the supporting materials are business records, which bear the earmark of reliability or probability of trustworthiness and further the ‘ “integrity of the fact-finding process,” ’ see Coy v. Iowa, 487 U.S. 1012, 1020, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (quoting Kentucky v. Stincer, *129 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987))....”
897 So.2d at 463-65. See Gobble v. State, 104 So.3d 920 (Ala.Crim.App.2010); Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008). See also Annot., Evidence — Confrontation Clause — Second Circuit Holds that Autopsy Reports are not Testimonial Evidence — United States v. Feliz, 467 F.3d 227 (2d Cir.2006), 120 Harv. L.Rev. 1707, 1714 (2007). In Thompson’s case, the admission of the autopsy reports, which were nontestimonial in nature, did not implicate the Confrontation Clause or Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
Moreover, there was no dispute that the officers and the dispatcher were shot to death — Thompson did not even dispute that he shot them. Thus, even if it was error to admit the autopsy reports, that error was harmless beyond a reasonable doubt. See Sharifi v. State, 993 So.2d 907, 932 (Ala.Crim.App.2008).
Thompson also argues, in this section of his brief, that the circuit court erred in allowing Dr. Craig to remain in the courtroom during the testimony of Charles James and Michael Brown. See Rule 615, Ala. R. Evid.
“ ‘Although an expert witness may not express an opinion based on the opinion of another expert, he may base his opinion upon the facts testified to by another expert.’ Johnson v. State, 378 So.2d 1164, 1170 (Ala.Cr.App.), writ quashed, 378 So.2d 1173 (Ala.1979). The trial court felt that in order for Dr. Embry to be able to give an opinion as to the cause of death, it was necessary for him to hear Mike Lee’s testimony. This was the reason Dr. Embry was exempted from the trial court’s sequestration order. ‘Where the rule for the exclusion of witnesses from the courtroom is invoked, it is within the sound discretion of the trial court to allow any one of the witnesses to remain in the courtroom during the examination of the others and the exercise of this discretion is not reviewable on appeal.’ (Citations omitted.) Jackson v. State, 502 So.2d 858, 863 (Ala.Cr.App.1986); Hall v. State, 500 So.2d 1282, 1291 (Ala.Cr.App.1986); Chesson v. State, 435 So.2d 177, 179 (Ala.Cr.App.1983); Young v. State, 416 So.2d 1109,1111 (Ala.Cr.App.1982).”
Henderson v. State, 583 So.2d 276, 291 (Ala.Crim.App.1990). Allowing Dr. Craig to be exempted from the operation of Rule 615, Ala. R. Evid., was “a matter within the sound discretion of the trial court.” See Jackson v. State, 502 So.2d 858, 864 (Ala.Crim.App.1986). Accordingly, there is no error in regard to this claim.
VI.
Thompson next argues that the circuit court erred in admitting into evidence photographs of the victims that, he argues, were highly prejudicial and that served no purpose but to “arouse the passion and prejudice of the jury.” (Thompson’s brief, p. 116.)
Specifically, Thompson challenges the admission of State’s exhibits 31, 32, 33— photographs of the victims as they appeared before they were murdered — and State’s exhibits 37, 38, 48, 49, 52, 53, 54, 55, 56, 57, 58, 63, 65, 66, 67, 68, 69, and 70-photographs of the victims’ bodies as they appeared when they were discovered at the police station.
Thompson did not object to the admission of State’s exhibits 31 through 33 and, in fact, specifically noted that he had no objection. (R. 1932; 1941.) Nor did Thompson object to the admission of State’s exhibits 38 (R. 2050); 48 (R. 2559); 49 (R. 2562); 52 (R. 2560); 53 (R. 2560); 54 (R. 2561); 55 (R. 2561); 56 (R. 2558); *130 57 (R. 2558); 58 (R. 2559); 68 (R. 2564); 65 (R. 2564); 66 (R. 2564); 67 (R. 2564); 68 (R. 2564); 69 (R. 2564), and 70 (R. 2564.) The only objection that Thompson made to any of the now-challenged photographs was to the admission of State’s exhibit 87, a photograph of Officer Strickland’s body after it was discovered. (R. 2004.) Thompson argued that it was graphic and that it appealed to the passions of the jurors and for those reasons should be excluded.
“ ‘Alabama courts have held on many occasions that photographs of the crime scene and the victims are admissible, even though they might be gruesome and cumulative, if they shed light on an issue being tried. E.g., Baird v. State, 849 So.2d 223, 246 (Ala.Crim.App.2002).’ McGahee v. State, 885 So.2d 191, 214 (Ala.Crim.App.2003).”
Blackmon v. State, 7 So.3d 397, 449 (Ala.Crim.App.2005).
“Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984).”
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989).
“ ‘Courts and juries cannot be squeamish about looking at unpleasant things, objects or circumstances in proceedings to enforce the law and especially if truth is on trial. The mere fact that an item of evidence is gruesome or revolting, if it sheds light on, strengthens, or gives character to other evidence sustaining the issues in the case, should not exclude it.’ ”
Gwin v. State, 425 So.2d 500, 508 (Ala.Crim.App.1982) (quoting Baldwin v. State, 282 Ala. 653, 656, 213 So.2d 819, 820 (1968)). The circuit court did not abuse its discretion in allowing the photographs of the victims to be admitted into evidence.
VII.
Thompson further argues that the circuit court erred in not declaring a mistrial after, he asserts, it was discovered that two jurors had been “tainted by extrinsic influences.” (Thompson’s brief, p. 62.)
The record shows that during trial defense counsel informed the circuit court that he had received an anonymous call and that the caller told him that one of the jurors had been communicating with a courtroom spectator, Cynthia Turner, a *131 former girlfriend of one of the victims. Counsel said that the caller told him that the juror and Turner had been talking at least every other day and had been e-mailing each other and that he thought that this contact was improper.
The court held an extensive hearing concerning this issue. (R. 2590-2682.) The circuit court called the juror, P.N., to question her about the allegations. The court asked P.N. if she had failed to disclose that she knew Turner, who had formerly had a relationship with Officer Crump. P.N. indicated that she did not know about Turner’s relationship and that they had not been discussing the case. The circuit court then excused P.N. from the jury. (R. 2607.)
The court then individually polled each juror to see if P.N. had spoken about the case to them. Each juror indicated that they had not discussed the case with P.N. Two jurors indicated that other people had approached them and said that they were praying for them. (R. 2664; .2670.) Both of these jurors said that the people who had told them that they were praying for them did not attempt to talk about the case or to influence them in any way. (R. 2664; 2670). Defense counsel requested a mistrial or, in the alternative,. the removal of these two jurors from the jury because, he said, the jurors might “interpret those comments about praying for them to be [saying] that they were praying that they would impose the death penalty and achieve retribution in this case.” (R. 2680.) The circuit court stated:
“I was there. The first thing is '... I didn’t see any expression of dread on her face. Those jurors, to me, were remarkable in their responses about doing their duty and their responsibilities as jurors, just as the Court has instructed them. I have been especially — I think it’s important that they be instructed. They have followed those instructions.
“We questioned them endlessly about the pretrial publicity, and to make a decision based solely on the facts and law in this case. And I think that they are — I think that is most clearly demonstrated in the questions that they were asked in chambers recently. So, your motion is denied.”
(R. 2682.) •
“ ‘Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law.’ Whitten v. Allstate Ins. Co., 447 So.2d 655, 658 (Ala.1984). As a general rule, ‘[w]here extraneous material [is] introduced into the jury’s deliberations, ... actual prejudice [must] be shown to work a reversal of the verdict.’ Nichols v. Seaboard Coastline Ry., 841 So.2d 671, 672 (Ala.1976). However, in some cases, ‘the character and nature of the extraneous material ... constitutes prejudice as a matter of law and no showing that the jury was in fact influenced thereby in arriving at their verdict is necessary.’ Id. (prejudice presumed as a matter of law from jury’s consulting encyclopedia and dictionary definitions of ‘negligence,’ ‘contributory negligence,’ ‘subsequent negligence,’ and ‘subsequent contributory- negligence’).”
Minshew v. State, 594 So.2d 703, 716 (Ala.Crim.App.1991).
“Generally, under Alabama law, juror misconduct involving the introduction of extraneous materials warrants a new trial when one of two requirements is met: 1) the jury verdict is shown to have been actually prejudiced by the extraneous material; or 2) the extraneous material is of such a nature as to constitute prejudice as a matter of law. Knight v. *132 State, 710 So.2d 511, 517 (Ala.Crim.App.1997).”
Ex parte Apicella, 809 So.2d 865, 870 (Ala.2001).
Moreover,
“a presumption of prejudice applies only-in a case in which the jury’s consideration of the extraneous material was ‘ “crucial in resolving a key material issue in the case.” ’ Dawson v. State, 710 So.2d 472, 475 (Ala.1997) (citing Hallmark v. Allison, 451 So.2d 270, 271 (Ala.1984), and Ex parte Thomas, 666 So.2d 855 (Ala.1995)).”
Apicella, 809 So.2d at 872. See also Ross v. State, 41 So.3d 106 (Ala.Crim.App.2009).
Thompson does not question the court’s removal of juror P.N., he challenges only the court’s failure to remove the two jurors who indicated that individuals had approached them and told them that they were praying for them. “Here, a relatively innocuous remark was made ... to a member or members of the jury ... T will pray for you.’ ... The comment, given its primary and generally accepted meaning, is simply not threatening.” White v. Smith, 984 F.2d 163, 166 (6th Cir.1993). The circumstances in this case do not present a case of presumed prejudice — Thompson was required to establish prejudice. See Minshew, supra. The record fails to show that Thompson met this burden. Thus, the circuit court did not err in denying Thompson’s motion for a mistrial based on a claim of alleged juror misconduct.
VIII.
Thompson asserts that the circuit court erred in allowing the State to use demonstrative aids during the presentation of its case. Specifically, he asserts that the use of mannequins, the victims’ clothing they had on when they were shot, and knitting needles to simulate the victims’ injuries was unduly prejudicial.
Defense counsel made the following objection: ‘Tour Honor, I’m sorry. I do not object to the demonstrative aid, but I do object to this witness jabbing and screwing this huge nail-looking object into this demonstrative aid head. They have some other devices they can use. That’s just too much. I’m sorry.” (R. 3013.) Counsel objected only to the use of the knitting needles to show the trajectory of the bullet wounds and specifically stated that he had no objection to the use of the mannequins.
As Professor Gamble writes:
“Some demonstrative evidence consists of the actual objects and things involved in the circumstances giving rise to the lawsuit. Other such items of evidence, however, will have played no direct role in the history of the case except in so far as they are offered for illustrative purposes. As to the latter form of evidence, a witness is called upon to describe the actual object, place or thing and this form of demonstrative evidence is offered to illustrate or clarify that testimony. The source of such evidence is generally of no consequence since it is being offered merely to explain or illustrate testimony. Consequently, the only foundational showing required for admissibility is proof that the evidence possesses sufficient accuracy as to be explanatory or illustrative of relevant testimony and thus helpful to the trier of fact. The decision of whether the offered evidence meets this particular test is vested in the trial court’s discretion.”
C. Gamble, McElroy’s Alabama Evidence § 122.01 (6th ed.2009).
“ ‘Demonstrations and experiments are permitted or prohibited in the trial court’s discretion. Thus, Alabama appellate courts have affirmed trial court *133 decisions permitting an experiment on cross-examination to test the defendant’s ability to calculate interest as he said he had; a demonstration using a mannequin and the defendant herself to discredit her assertion that the prosecuted homicide happened accidentally; a demonstration of the defendant’s version of how a fight occurred, the solicitor playing the deceased and the defendant playing himself; a demonstration wherein the defendant made prints of his bare feet in the sawdust on the courtroom floor; a demonstration by the defendant of the extent to which his injuries had impaired his ability to walk; and a demonstration between a brain damaged child and a special education therapist calculated to show the child’s physical and mental abilities.’ ”
Gobble v. State, 104 So.3d 920, 961 (Ala.Crim.App.2010) (quoting William A. Schroeder & Jerome A. Hoffman, Alabama Evidence § 12:25 (3d ed.2006) (footnotes omitted)).
“Whether to allow the prosecutor to use mannequins to aid the jury in understanding the trajectory of a bullet through a victim is within the sound discretion of the circuit court and a conviction ‘will not be reversed on appeal unless [that discretion] has been clearly and grossly abused.’ Ivey v. State, 369 So.2d 1276, 1278 (Ala.Crim.App.1979) (citations omitted). Further, this Court has held that the use of a mannequin to demonstrate a victim’s injuries is relevant and admissible. Id.; see Minor v. State, 780 So.2d 707, 765 (Ala.Crim.App.1999), overruled on other grounds, 780 So.2d 796 (Ala.2000); see also Gobble v. State, 104 So.3d at 961 (‘Demonstrations and experiments are permitted or prohibited in the trial court’s discretion. Thus, Alabama appellate courts have affirmed trial court decisions permitting an experiment on cross-examination to test the defendant’s ability to calculate interest as he said he had; a demonstration using a mannequin and the defendant herself to discredit her assertion that the prosecuted homicide happened accidentally; a demonstration of the defendant’s version of how a fight occurred, the solicitor playing the deceased and the defendant playing himself; a demonstration wherein the defendant made prints of his bare feet in the sawdust on the courtroom floor; a demonstration by the defendant of the extent to which his injuries had impaired his ability to walk; and a demonstration between a brain damaged child and a special education therapist calculated to show the child’s physical and mental abilities.’ (quoting William A. Schroeder and Jerome A. Hoffman, Alabama Evidence § 12:25 (3d ed.2006) (footnotes omitted))).”
Mitchell v. State, 84 So.3d 968, 1006 (Ala.Crim.App.2010). See State v. Tollardo, 134 N.M. 430, 434, 77 P.3d 1023, 1027 (2003) (“[C]ourts in other jurisdictions have affirmed the use of mannequins and dowel rods as visual aids to illustrate the trajectory of a bullet.”); State v. Feaster, 156 N.J. 1, 84, 716 A.2d 395, 436 (1998) (The mannequin “[w]as unlikely to have disturbed the jury more than the photos and video, which actually showed the corpse in a pool of blood.”); State v. Holmes, 609 S.W.2d 132, 136 (Mo.1980) (“Exhibit No. 4 [a papier-mache mannequin] admittedly was an accurate portrayal of the number and location of the stab wounds. If the showing of their location and number tends to be inflammatory it is because any accurate portrayal, whether presented by oral testimony, or by a photograph, or as in this ease by use of a papier-mache mannequin, would be inflammatory. Notwithstanding its possible in *134 flammatory nature, the exhibit met every test of probativeness. The exhibit visually demonstrated the nature and location of various wounds inflicted.”); State v. Paul-sen, 265 N.W.2d 581, 589 (Iowa 1978) (“The trial court did not err in permitting [the coroner] to use the medical mannequin to demonstrate the injury to [the victim] and to amplify his testimony.”). See also B. Finberg, Annot., Propriety, in Trial of Criminal Case, of Use of Skeleton or Model of Human Body or Part, 83 A.L.R.2d 1097 (1962).
The circuit court did not abuse its considerable discretion in allowing the demonstrative aids to be used during the State’s case to show the nature and extent of the injuries that had been inflicted on the victims.
IX.
Thompson argues that the circuit court committed reversible error in allowing evidence of prior bad acts to be admitted because, he argues, this evidence was unduly prejudicial.
Thompson moved that the State disclose any Rule 404(b), Ala. R. Evid., evidence that it intended to present at trial. (C.R. 36.) The circuit court granted the motion. (C.R. 95.) The State notified Thompson that it intended to present “evidence of the commission of other crimes on the weekend that the murders occurred, including specifically (but not limited to) the commission of one or more burglaries in Walker County, Alabama, and the theft of one or more vehicles on the same weekend.” (C.R. 194.) Thompson objected, arguing that the State should not be allowed to introduce “character evidence disguised as ‘other purposes’ under [Rule] 404(b)[, Ala. R. Evid.].” (C.R. 196.) At the pretrial hearing where this motion was discussed the prosecutor argued that the Walker County burglaries where admissible:
“[Prosecutor]: You can’t separate those out. It’s all part of one series of events. The old term to use there is the res gestae, which I know the Rules have progressed beyond that. So, we’re essentially under Rule 404(b) at this point. And 404(b) says that we can’t introduce evidence of other crimes, wrongs or acts, for the purpose of proving conformity therewith. And we cannot. There’s motive issues, there’s intent issues in this case.
“At the time that the officers were murdered, one of the officers was actually printing [Thompson’s] tennis shoe, doing fingerprint-type analysis on his tennis shoe, printing it so they could see if it matched a shoe print that was on a door that had been burglarized where the car was stolen in Walker County, a dry cleaners up there.
“... In order to show why they’re printing his shoe, we’ve got to show that they were investigating a burglary that occurred in Jasper.
“And, in fact, another item of evidence that we’ll have that we could prove to the jury is a fingerprint taken out of that business in Jasper that matches [Thompson’s] fingerprint. ABI Agent Mike Manlief obtained that and did the prints on that. ■
“So, we can connect him with that burglary. We can prove that he was involved in that burglary and that that, in addition to the receiving stolen property — which one might argue is not as serious a charge — part of our proof is going to be that he knew he was involved in this Jasper burglary and, therefore, it was a greater incentive for him to take the gun away from the officer and shoot them to get away because he was not just looking at a receiving stolen property charge on a vehicle sitting down here, he’s involved in *135 criminal activity in Walker County. And one of the aggravating factors that we’re going to be relying on, if we obtain a capital murder conviction, is that the offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, or that it was committed while he was in flight after committing or attempting to commit rape, robbery, burglary or kidnapping, burglary in this case being the one. And, of course, robbery, also when he took the gun from the officer.
“But I don’t think you can separate that out, and I don’t think, especially at this point, that you can — that you can exclude that evidence, based on 404(b), because we’ve got a right to go into it. It’s not like it happened some other time. You know, this is all within a twenty-four hour period.”
(R. 67-72.) The circuit court reserved ruling but later allowed the State to present the collateral-crime evidence. The court specifically stated that it would give a limiting instruction on the use of the evidence when it was admitted. (R. 1800.) The court gave the following instruction:
“Ladies and gentlemen, in this case, there may be evidence that the defendant was questioned and examined about a burglary or a break-in of a dry-cleaners or some other kind of store in Jasper in Walker County. You cannot consider that evidence as proof of [Thompson’s] character to infer that he committed the acts charged in this case. However, you may consider this evidence in determining [Thompson’s] motive and intent pertaining to the acts charged in this case.”
(R. 2020; emphasis added.) Similar instructions were given at other instances when this evidence was mentioned. (R. 2344-45; 2808; 8717-18.)
Rule 404(b), Ala. R. Evid., states:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, 'knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
In discussing the motive-and-intent exception to the general exclusionary rule, the Alabama Supreme Court has stated:
“ ‘Intent is the ripened purpose to effect a result; while motive is the moving power which leads the mind to desire the result and form the purpose.’ Fuller v. State, 269 Ala. 312, 336, 113 So.2d 153,175 (1959). Motive is defined as ‘an inducement, or that which leads or tempts the mind to do or commit the crime charged.’ Spicer v. State, 188 Ala. 9,11, 65 So. 972, 977 (1914). Motive has been described as ‘that state of mind which works to “supply the reason that nudges the will and prods the mind to indulge the criminal intent.” ’ [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]
“Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala.Cr.App.1986). ‘ “It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.”
*136 McAdory v. State, 62 Ala. 154 [ (1878) ].’ Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).”
Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988). “[T]he fact that evidence tending to show a motive to do an act charged to a person would also tend to prove that person guilty of another crime is no bar to the admission of such evidence.” C. Gamble, McElroy’s Alabama Evidence § 45.01(7) (6th ed.2009).
“Evidence which pertains to an accused’s motive or intent to commit the presently-charged offense is admissible as an exception to the general exclusionary rule applying to collateral acts or offenses. Nelson v. State, 511 So.2d 225, 236 (Ala.Cr.App.1986), aff'd 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Dyess v. State, 418 So.2d 208 (Ala.Cr.App.1982); Terry v. State, 397 So.2d 217 (Ala.Cr.App.), writ denied, Ex parte Terry, 397 So.2d 223 (Ala.1981). See also C. Gamble, McElroy’s Alabama Evidence § 69.01(7) (3rd 2d 1977). ‘Moreover if the accused’s commission of another crime is admissible in a present prosecution, the State may prove in meticulous detail the manner in which the accused committed such other crime.’ (Citations omitted.) Nelson, supra at 234.”
Coleman v. State, 552 So.2d 156, 158 (Ala.Crim.App.1988).
“ ‘Motive is defined as “an inducement, or that which leads or tempts the mind to do or commit the crime charged.” Spicer v. State, 188 Ala. 9,11, 65 So. 972, 977 (1914). Motive has been described as “that state of mind which works to ‘supply the reason that nudges the will and prods the mind to indulge the criminal intent.’ ” [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]
“ ‘Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala.Cr.App.1986). “ ‘It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.’ McAdory v. State, 62 Ala. 154 [ (1878) ].” Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).’ ”
Hatcher v. State, 646 So.2d 676, 679 (Ala.1994) (quoting Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988)). “In Harden v. State, 211 Ala. 656,101 So. 442 [ (1924) ], it was said that ‘if there is any evidence tending to support a reasonable inference that the homicide was committed to conceal another crime, evidence of such other crime is admissible.’” Duncan v. State, 278 Ala. 145, 172, 176 So.2d 840, 866 (1965).
In Ex parte Jackson, 33 So.3d 1279 (Ala.2009), the Alabama Supreme Court held that the court erroneously admitted evidence of a prior capital-murder conviction at Jackson’s capital-murder trial because the “prejudicial impact of that conviction outweigh[ed] any probative value provided by the evidence.” 33 So.3d at 1286. The Court cautioned that Rule 404(b) evidence must be “reasonably necessary to [the State’s] case.” 33 So.3d at 1286.
More recently, the Alabama Supreme Court again addressed the admission of Rule 404(b) evidence. In Ex parte Bill-ups, 86 So.3d 1079 (Ala.2010), the Alabama Supreme Court held that in admitting Rule 404(b) evidence the court must instruct the jury on the purpose for which the evidence was admitted and not merely recite to it the “laundry list” of Rule 404(b) exceptions. The Court stated:
*137 “By simply reciting the complete ‘laundry list’ of permissible theories under Rule 404(b), the trial court’s instruction in this case gave the jury inadequate guidance. See Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008) (‘[A]n appellate court “presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.” ’ (quoting Cochran v. Ward, 935 So.2d 1169,1176 (Ala.2006))). The trial court’s instruction also failed to limit the State to the purposes — as nonspecific as they were — that it advanced in support of admission of the evidence regarding Bill-ups’s involvement in the Avanti East killings. Thus, we conclude that the trial court erred by fading to limit the jury’s consideration of that evidence to only those purposes for which the evidence was purportedly offered by the State (plan, identity, motive, and intent). See Huddleston, supra; cf. United States v. Tse, 375 F.3d 148, 158 (1st Cir.2004) (finding that the district court ‘adequately limited the jury’s consideration of [certain Rule 404(b) ] evidence’ when the court instructed the jury that it could not use that evidence ‘to make a propensity inference’ and that the jury could use that evidence to determine only the defendant’s ‘knowledge and intent’).”
86 So.3d at 1085.
Here, the State was required to prove that Thompson intended to kill the three victims. Thompson’s defense was that his PTSD rendered him in a dissociative state with no specific intent to kill. The admission of the Rule 404(b) evidence to establish Thompson’s motive and intent was crucial to the State’s case. Moreover, the circuit court gave a detailed instruction on the use of such evidence in compliance with Ex parte Billups. The circuit court did not abuse its discretion in allowing this Rule 404(b) evidence to be admitted at Thompson’s trial.
X.
Thompson argues that the circuit court prevented him from presenting his defense because, he says, the court refused to allow Dr. Marianne Rosenzweig, a forensic psychologist, and Dr. Charles Nevels, a clinical psychiatrist, to testify that Thompson was in a “dissociative state on the night of the offense [and] he unconsciously reverted to the scripted behavior he learned through years of almost daily prolonged and repetitive videogame playing,” specifically, he says, the video game “Grand Theft Auto.” (Thompson’s brief, p. 9.) Specifically, Thompson asserts that this evidence was not subject to the test for “novel scientific evidence” but that it should have been evaluated under the more lenient test set out in Rule 702, Ala. R. Evid.
In his defense, Thompson presented the testimony of Dr. Marianne Rosenzweig, a forensic psychologist. She testified that she conducted a series of psychological tests on Thompson at Taylor Hardin Secure Medical Facility. She said that she spoke to Thompson four times in 2003, four times in 2004, and twice in 2005, and that she completed the Personality Assessment Inventory test, the Rorschach inkblot test, and the Trauma Symptom Inventory test. It was her opinion that Thompson suffered from PTSD. Dr. Rosenzweig testified that PTSD is the most severe anxiety disorder, that typically people with this illness have experienced a traumatic event or a series of traumatic events, and that some people with PTSD are unable to function. She testified that Thompson has difficulty making decisions, that he acts impulsively, that his ability to think properly is impaired, and that Thompson’s severe mental illness ren *138 dered him “incapable of appreciating the nature of his actions at the time of the alleged incident” because he was in a dissociative state. (R. 3328.)
At the conclusion of Dr. Rosenzweig’s testimony, defense counsel made a proffer, outside the presence of the jury, concerning the impact that Thompson’s playing of video games had on his' actions on the night of the murders. The circuit court indicated that it was conducting a Frye v. United States, 293 F. 1013 (D.C.Cir.1923), hearing to determine the admissibility of the proffered evidence. Defense counsel stated:
“We expect that Dr. Rosenzweig will testify that people with PTSD, and in particular Devin [Thompson], when they are sufficiently — receive sufficient stimulus, that they lapse off into their dissociative state; that frequently they will— to use a computer metaphor, go back to their default setting, and engage in whatever learned repetitive behavior that may have.
“Now, first of all, to distinguish that from the second issue, which is very propebly subject to a Frye standard, the second issue would be matters relating to the field of studying, for example, whether or not the playing of video games, in and of itself, contributes to aggression, contributes to violence, that sort of thing.”
(R. 3394-95.) The circuit court questioned Dr. Rosenzweig about whether there had been any studies to suggest the correlation between playing violent video games and their effect on people with PTSD. Dr. Rosenzweig testified that she had never had a patient or client who exhibited symptoms similar to Thompson’s. She said:.
“There is nothing published to my knowledge, on specifically on people who have PTSD and are in a dissociative state and how their prior experience with playing video games would affect their behavior in that state. I’m not aware of any specific study or writing in the professional literature on that.”
(R. 3421.) The circuit court found that the evidence of the frequent playing of the video game and its impact on Thompson’s conduct was inadmissible under the Frye test. (R. 3431.) Thompson objected, stating that the circuit court’s application of the Frye standard was too restrictive. (R. 3431.) On appeal, Thompson asserts that the correct standard for reviewing the admissibility of the evidence is Rule 702, Ala. R. Evid.
At the time of Thompson’s trial, Rule 702, Ala. R. Evid., provided:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, ■experience, training, or education, may testify thereto in the form of an opinion or otherwise.”[13]
At the time of the offenses and at the time of Thompson’s arrest and trial, the Frye test was the correct standard for determining the admissibility of novel scientific evidence in Alabama.[14] See Ex *139 parte Perry, 586 So.2d 242 (Ala.1991). The Frye test provides:
“ ‘Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in the twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.’ ”
Frye, 293 F. at 1014 (emphasis added).
In discussing the Frye standard, this court has stated:
“The admissibility of medical and scientific expert testimony is governed by the Frye test. Frye v. United States, 293 F. 1013 (D.C.Cir.1923); Ibm-Tamas v. United States, 455 A.2d 893 (D.C.App.1983). Under the Frye standard, expert testimony concerning a scientific or medical principle will be admissible only when the proponent of .the evidence establishes that the principle has achieved general acceptance in the scientific field to which it belongs. Adams v. State, 484 So.2d 1143 (Ala.Cr.Ápp.1985); Prewitt v. State, 460 So.2d 296 (Ala.Cr.App.1984); Dyas v. United States, 376 A.2d 827 (D.C.C.A.1977), cert. denied, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977); McCormick on Evidence, § 13 p. 31 (2d ed.1972). The danger of a jury’s according undue weight to unproven and perhaps unreliable scientific testimony justifies excluding such evidence. Frye v. United States, 293 F. at 1014.”
Hill v. State, 507 So.2d 554, 555 (Ala.Crim.App.1986).
“ ‘[T]he Frye test has been either ignored or rejected in cases in which the method used by the expert was a matter of physical comparison rather than scientific test or experiment; ... the basic data upon which the expert relied was verifiable by the factfinder; ... or where established techniques were applied to the solution of novel problems. ... Many of these cases have involved identification of bite marks by comparison of the defendant’s dental impressions to bite marks found on a victim’s body; ... and identification of footprints by comparing shoes found at the crime scene with shoes worn by the defendant; United States v. Ferri, 778 F.2d 985 (3d Cir.1985), cert. denied, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986); or by comparing footprints found at the crime scene with the defendant’s feet. State v. Mark, 286 N.W.2d 396 (Iowa 1980); State v. Bullard, 312 N.C. 129, 322 S.E.2d 370 (1984). In such cases, the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert’s assertions based on his special skill or knowledge. People v. Marx [54 Cal.App.3d 100, 126 CahRptr. 350 (1975) ].’ Furthermore, where understanding of the method is accessible to the jury, and not dependent on familiarity with highly technical or obscure scientific theories, the expert’s qualifications, and the logical bases of his opinions and conclusions can be effectively challenged by cross-examination and rebuttal evidence.’ ”
Bird v. State, 594 So.2d 644, 649 (Ala.Crim.App.1990) (quoting State v. Hasan, *140 205 Conn. 485, 534 A.2d 877, 880 (1987)), rev’d on other grounds, 594 So.2d 676 (Ala.1991)! “The proponent of the [novel scientific test] ha[s] the burden of demonstrating compliance with the Frye test.” Prewitt v. State, 460 So.2d 296, 302 (Ala.Crim.App.1984).[15]
“In Alabama, by statute, the Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ] standard applies only to the admissibility of DNA evidence. § 36-18-30, Ala.Code 1975; Bagley v. Mazda Motor Corp., 864 So.2d 301 (Ala.2003); Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 516 n. 5 (Ala.2000); Turner v. State, 746 So.2d 355 (Ala.1998); Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004).
“ “With respect to expert scientific testimony on subjects other than DNA techniques governed by § 36-18-30, Frye remains the standard of admissibility in Alabama. See Hoosier v. State, 612 So.2d 1352 (Ala.Crim.App.1992); Rivers v. Black, 259 Ala. 528, 68 So.2d 2 (1953).’
“Turner, 746 So.2d at 361 n. 7. See also Minor, supra; Parker v. State, 777 So.2d 937 (Ala.Crim.App.2000). Finally, Rule 702, Ala. R. Evid., governs the admissibility of nonscientific expert testimony. See Minor, supra; Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999).”
Barber v. State, 952 So.2d 393, 407 (Ala.Crim.App.2005).
Alabama has applied the Frye test in the following cases: Kimberly-Clark Corp. v. Sawyer, 901 So.2d 738 (Ala.Civ.App.2004) (admission of asbestosis evidence); Clemons v. State, 55 So.3d 314 (Ala.Crim.App.2003), rev’d on other grounds, 55 So.3d 348 (Ala.2007) (admission of positron emission tomograph (“PET”) scan to diagnose old brain injury); Hoosier v. State, 612 So.2d 1352 (Ala.Crim.App.1992) (admission of battering-parent profile); Prewitt v. State, supra (admission of hypnotically induced recollection); Hill v. State, 507 So.2d 554 (Ala.Crim.App.1986) (admission of evidence of battered-wife syndrome); Wynn v. State, 423 So.2d 294 (Ala.Crim.App.1982) (admission of polygraph examinations).
In Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999), an agent for the Federal Bureau of Investigation testified that his analysis of the crime scene and other evidence of the offense indicated that the crime was sexually motivated. 797 So.2d at 1150. This Court held that the testimony was not based on novel scientific evidence. Rather, it was based on the witness’s specialized knowledge regarding victimology, as well as crime-scene analysis. Thus, this Court held that the testi *141 mony was not subject to the Frye analysis. We stated:
“Crime-scene analysis and victimology do not rest on scientific principles like those contemplated in Frye; these fields constitute specialized knowledge. Specialized knowledge offers subjective observations and comparisons based on the expert’s training, skill, or experience that may be helpful to the jury in understanding or determining the facts. Crime-scene analysis, which involves the gathering and analysis of physical evidence, is generally recognized as a body of specialized knowledge. See generally 2 Wigmore, Evidence § 417b at 499 (1979); State v. Russell, 125 Wash.2d 24, 882 P.2d 747 (1994), cert. denied, 514 U.S. 1129, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995); United States v. Meeks, 35 M.J. 64 (C.M.A.1992); People v. Nolan, 152 Ill.App.3d 260, 105 Ill.Dec. 336, 504 N.E.2d 205 (1987); and Hill v. State, 647 S.W.2d 306 (Tex.App.1982). Therefore, because crime-scene analysis is not scientific evidence, we conclude that we are not bound by the test enunciated in Frye. Cf. Ex parte Dolvin, 391 So.2d 677 (Ala.1980) (holding that Frye was inapplicable when evidence is in the nature of physical comparisons as opposed to scientific tests or experiments).”
797 So.2d at 1151.
Recently, the United States Supreme Court in Brown v. Entertainment Merchants Ass’n, — U.S. —, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011), addressed the validity of a California statute that prohibited the sale or rental of “violent video games” to minors. In response to the State of California’s argument that the State had a compelling interest in monitoring the sale of the violent video games because, California said, violent video games caused violent behavior, the United States Supreme Court made the following comments:
“California relies primarily on the research of ... psychologists whose studies purport to show a connection between exposure to violent video games and harmful effects on children. These studies have been rejected by every court to consider them, and with good reason: They do not prove that violent video games cause minors to act aggressively (which would at least be a beginning). Instead, ‘[njearly all of the research is based on correlation, not evidence of causation, and most of the studies suffer from significant, admitted flaws in methodology.’ Video Software Dealers Assn. [v. Schwarzenegger ], 556 F.3d [950] at 964 [(9th Cir.2009)]. They show at best some correlation between exposure to violent entertainment and minuscule real-world effect, such as children’s feeling more aggressive or making louder noises in the few minutes after playing a violent game than after playing a nonviolent game.”
— U.S. at—, 131 S.Ct. at 2739.
Other courts have noted the lack of scientific evidence connecting the frequent playing of violent video games to violent behavior. See Entertainment Software Ass’n v. Granholm, 426 F.Supp.2d 646, 653 (E.D.Mich.2006) (“[Sjtudies have not provided any evidence that the relationship between violent video games and aggressive behavior exists. His tests fail to prove that ‘video games have ever caused anyone to commit a violent act, as opposed to feeling aggressive, or have caused the average level of violence to increase anywhere.’ ”); Entertainment Software Ass’n v. Blagojevich, 404 F.Supp.2d 1051, 1063 (N.D.Ill.2005) (“Even if one were to accept the proposition that playing violent video games increases aggressive thoughts or *142 behavior, there is no evidence that this effect is at all significant.”).
Here, the circuit court allowed Thompson’s two experts to testify that Thompson had PTSD and that he was in a dissociative state at the time of the murders. What the court did not allow was testimony that Thompson “unconsciously reverted to the scripted behavior he learned through years of almost daily prolonged and repetitive videogame playing.” (Thompson’s brief, p. 9.) This testimony is not consistent with the testimony that Alabama has held is nonscientific evidence, testimony concerning physical comparisons, that was subject to admissibility under the more lenient Rule 702, Ala. R. Evid., test, but is scientific-theory evidence subject to admissibility under the Frye test. Indeed, studies that have been conducted on the impact of the frequent playing of violent video games have not gained general acceptance in the scientific community. See, e.g., Brown v. Entm’t Merchs., supra. The circuit court did not err in evaluating this evidence under the Frye standard and disallowing this testimony because it failed to satisfy that test. Accordingly, we find no reversible error in the circuit court’s ruling excluding the above evidence.
XI.
Thompson next argues that the circuit court erred in allowing one of the State’s rebuttal witnesses, Morris Moore, to testify. Specifically, he argues that Moore was the principal at a school where one of the jurors was a teacher and that their close relationship violated the United States Supreme Court’s decision in Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546,13 L.Ed.2d 424 (1965), and the Alabama Supreme Court’s decision in Ex parte Pierce, 851 So.2d 618 (Ala.2002), and warrants reversal.
When Moore was called to testify Thompson objected and argued:
“[Defense counsel]: I understand from the State that he, Mr. Morris Moore, indicated that one of the jurors had made some comment to him about she is ready for the case to be over or some — something along those lines, which would, at least implicitly, indicate some feeling about the case. We just believe that it’s improper for a witness who’s had any communication with the jurors, even obliquely concerning the case, to testify.”
(R. 3605; emphasis added.) The State responded that it did not subpoena Moore until after counsel had spoken to Thompson’s medical expert and that he learned only about 20 minutes before Moore was called to the stand that there was a teacher on the jury. (R. 3606.) The circuit court then questioned Moore. Moore said that he was the principal at Hubbertsville High School, that the day he was testifying was his first day on that job, and that one of the teachers at Hubbertsville High School was on the jury. The only discussion that he had with this juror, Moore said, consisted of the juror’s stating that she wished the case would be over soon because she did not want the school term to start with a substitute teacher and Moore replying that he might be called as a witness. Moore said that the juror did not ask any questions concerning his possible testimony and that he did not volunteer any information. The court allowed Moore to testify in rebuttal. (R. 3611.)
At trial, Thompson did not make the same argument he now makes on appeal. Thompson’s argument at trial was merely that Moore could not testify because he had had a conversation with a juror. However, on appeal Thompson argues that, based on Moore’s close contact with a juror, Turner and Pierce require that his *143 conviction be reversed. Therefore, we review this claim for plain, error. See Rule 45A, Ala. R.App. P.
“In both Turner [v. Louisiana, 379 U.S. 466 (1965),] and Ex parte Pierce, [851 So.2d 606 (Ala.2000),] the jurors had close and continual contact with key prosecution witnesses throughout the trial; specifically, the law-enforcement officers who were in charge of taking care of the jury, who transported the jurors to and from their lodging each day, who ate meals with the jurors, and who conversed with the jurors on a regular basis throughout the trial, were key prosecution witnesses in both Turner and Ex parte Pierce. Based on this situation, the United States Supreme Court held in Turner, and the Alabama Supreme Court held in Ex parte Pierce, that the defendant’s due-process right to a fair trial by an impartial jury was violated and that prejudice could be presumed from such close and continual contact even if there was no evidence to show that the law-enforcement officers had discussed the facts of the case with the jurors. Specifically, the Court in Turner stated that ‘it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution.’ 379 U.S. at 478, 85 S.Ct. 546.”
Minor v. State, 914 So.2d 372, 412-13 (Ala.Crim.App.2004).
In this case, Moore was one of five witnesses called by the State to rebut Thompson’s mental-health testimony. Dr. Brent Willis, a psychologist at Taylor Hardin Secure Medical Facility, testified as a rebuttal witness that he had conducted a mental evaluation on Thompson in November 2004. It was his opinion that the test results were invalid because Thompson “over-endorsed a number of- symptoms.” He testified that he believed that Thompson had PTSD but that he was malingering and that he was not in a dissociative state when he killed the officers and the police dispatcher. Sue Tucker, one of Thompson’s ninth-grade teachers, testified in rebuttal that she did not see Thompson exhibit any signs of mental illness. Gail Crump, one of Thompson’s teachers at an alternative school in 2003, testified that in the nine weeks Thompson was in the alternative school for disciplinary problems she did not see him exhibit any mental-health problems. Morris Moore, one of Thompson’s ninth-grade teachers, testified that he taught Thompson history and that he never saw any indication that Thompson suffered from any mental illness nor was he a disciplinary problem. Dr. Kathleen Ronan, a clinical psychologist, testified that she had examined some of Thompson’s records and his statement to police and did not believe that he was in a dissociative state at the time of the murders because his statement was very detailed. She said that typically a person in a dissociative state has no recall of the incident and if the person has any recall it is very hazy.
“In both Turner [v. Louisiana, 379 U.S. 466 (1965),] and [Ex parte ] Pierce, [851 So.2d 606 (Ala.2000) ], prejudice was presumed because of the close and continual contact between the key witness and a juror. Pierce, 851 So.2d at 610. However, in this case the contact was not close and continual. ‘[Prejudice cannot be presumed under the facts in this case as it was in Turner and Ex parte Pierce; rather, as this Court held in Myers v. State, 677 So.2d 807, 810 (Ala.Crim.App.1995), “[i]n order to be entitled to [relief] due to contact by a juror with witnesses or others, prejudice must be shown.” ’ Minor [v. State ], 914 So.2d [372] 443 [ (Ala.Crim.App.2004) ].”
*144 Gobble v. State, 104 So.3d 920, 950 (Ala.Crim.App.2010).
Here, the contact between Moore and the juror was not “close and continual” nor was Moore a key State witness. Accordingly, prejudice is not presumed. Thompson was required to establish prejudice. See Gobble. Thompson failed to meet this burden. Accordingly, we find no violation of Turner or Pierce in this case.
XII.
Thompson next argues that the State violated the discovery order by failing to disclose statements that he made to medical personnel while in custody at Taylor Hardin Secure Medical Facility for his mental evaluation.
To rebut Thompson’s expert testimony that he was in a dissociative state at the time of the shootings, the State presented the testimony of Dr. Brent Willis. Dr. Willis testified that in his opinion Thompson was not in a dissociative state at the time of the murders. He then stated his reasons for this conclusion and commented on the statements Thompson had made to him about the murders. Thompson objected and argued that an order had been issued to Taylor Hardin concerning discovery but that Taylor Hardin had disclosed only the materials it had used in testing and evaluating Thompson and not notes that were taken during Dr. Willis’s interview with Thompson. Thompson then moved that this evidence be excluded. The State asserted that Dr. Willis had not been allowed to discuss the interview until Thompson raised a mental-illness defense and that the details of Dr. Willis’s interview with Thompson were not known to the State until they were presented in open court.[16] It asserted that the statements to Dr. Willis were not within the State’s control. After the circuit court questioned the State and clarified on the record that the information in Dr. Willis’s notes was not in any documents that the State had, the circuit court denied the motion to exclude the statements. (R. 3498-99.) Thus, in the present case, there was no evidence indicating that the State knew about the information in Dr. Willis’s notes, nor was there any evidence from which that knowledge could be imputed to the State or presumed. Accordingly, there was no violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in this instance. See Parker v. State, 587 So.2d 1072, 1086 (Ala.Crim.App.1991) (“ While it is true that under Brady the good faith of the prosecutor in not disclosing information is irrelevant, Brady does require that the information requested be known to the prosecution .... [T]hat knowledge may be presumed, as when the information is in *145 the prosecutor’s files(citations omitted)).
Furthermore, in Pace v. State, 714 So.2d 320 (Ala.Crim.App.1996), rev’d in part on other grounds, 714 So.2d 332 (Ala.1997), the defendant asserted that the lower court erred in not granting him expanded discovery in documents from several jails, the Alabama Department of Corrections, and Taylor Hardin Secure Medical Facility. - In affirming the circuit court’s denial of the discovery motion, we stated:
“There is no constitutional right to discovery in a criminal case; discovery is governed by Rule 16, Ala. R.Crim. P. Jefferson v. State, 645 So.2d 313 (Ala.Cr.App.1994). What the appellant sought in this case was full-blown discovery equivalent to that in a civil case. While the decision in [Ex parte] Monk[, 557 So.2d 832 (Ala.1989),] broadened discovery in capital cases, a prosecutor in a criminal case is not required to disclose evidence the prosecutor does not possess, except that evidence that is imputed — such as knowledge of law enforcement agents.”
714 So.2d at 330-31.
The statements Thompson made to medical personnel at Taylor Hardin were not in the State’s possession nor was knowledge of the statements imputed to the State. There was no discovery violation in this case. Thus, the circuit court committed no error in regard to this claim.
XIII.
Thompson next argues that the circuit court erred in allowing the statements he made to Dr. Willis during his mental evaluation to be admitted because, he says, the admission of the statements violated his Fifth and Fourteenth Amendment rights against self-incrimination and his Sixth Amendment right to counsel.
Dr. Willis testified in rebuttal concerning statements Thompson made to him during his mental evaluation. Dr. Willis testified that Thompson told him that “he done a lot of stupid stuff. He broke into a lot of places. He said, ‘people call me Spiderman because I was so athletic.’ He said, T broke into' a place and got clothes and stole a Camry and went home.’ ” (R. 3491.) The following then occurred:
“[Defense counsel]: We’re going to object to him referring to matters that are not relevant to his diagnosis. He had been — he has a limited confidentiality stipulation when.he is interviewing him to (inaudible) relevant only to his competency at the time of the offense and not all this other stuff.
“[Prosecutor]: We think it’s absolutely admissible. The defense has been raised. He based his diagnosis on this interview with him.
“The Court: He asked him and he specifically said, ‘as to that issue only, not competency.’
“[Prosecutor]: Yeah, not competency to stand trial.
“The Court: Overruled.
“[Defense counsel]: No, no, I don’t mean competency to stand trial. When they go in there, Judge, they tell them that what we’re telling you is — what you’re about to tell me is confidential, except as it relates to your mental state at the time of the' offense, which has nothing — what he just said has nothing to do with that.
“The Court: He just said it did.
“[Prosecutor]: He said it did.
“The Court: Overruled. Overruled.”
(R. 3491-92.)
Rule 11.2(b)(2), Ala. R.Crim. P., states:
“The results of mental examinations made pursuant to subsection (a)(2) [mental condition at the time of offense] *146 of this rule and the results of similar examinations regarding the defendant’s mental condition at the time of the offense conducted pursuant to Rule 11.4 shall be admissible in evidence on the issue of the defendant’s mental condition at the time of the offense only if the defendant has not subsequently withdrawn his or her plea of not guilty by reason of mental disease or defect. Whether the examination is conducted with or without the defendant’s consent, no statement made by the defendant during the course of the examination, no testimony by an examining psychiatrist or psychologist based upon such a statement shall.be admitted against the defendant in any criminal proceeding, except on an issue respecting mental condition on which the defendant has testified.”[17]
(Emphasis added.)
The Alabama Supreme Court has strictly construed Rule 11.2(b)(2), Ala. R.Crim. P., to limit the admissibility of statements made by a defendant during a mental evaluation to only those situations where the defendant has testified. The Supreme Court stated:
“The plain language of Rule 11.2(b)(2) unequivocally forbids the admission of statements made by a defendant or evidence derived from the defendant’s statements during a pretrial mental examination unless the defendant testifies about his or her mental condition. Consequently, because Brownfield did not testify at his trial, applying the plain language of Rule 11.2(b)(2), we must conclude that error occurred in the admission of Dr. Clinger’s testimony concerning statements Brownfield made during the mental examinations. Although it was proper to admit into evidence Dr. Clinger’s testimony regarding her opinion about Brownfield’s mental condition at the time of the offenses, the admission of her testimony regarding statements made by Brownfield during the mental examinations was error.”
Ex parte Brownfield, 44 So.Bd 43, 47-48 (Ala.2009).
Ultimately the Supreme Court upheld the admission of statements Brownfield made during his mental evaluation by concluding that the admission of the statements was harmless beyond a reasonable doubt. The Brownfield Court further stated:
“The inquiry, however, does not end here. This Court must determine whether it ‘appear[s] that the error complained of has probably injuriously affected [Brownfield’s] substantial rights.’ Rule 45, Ala. R.App. P., provides:
“ ‘No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’
“The Court of Criminal Appeals has further stated with regard to the application of the harmless-error rule:
“ ‘ “ ‘After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was.’ *147 Guthrie v. State, 616 So.2d 914, 981 (Ala.Crim.App.1993)', citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). ‘The harmless error rule applies in capital cases.’ Knotts v. State, 686 So.2d 431, 469 (Ala.Crim.App.1995), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), citing Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983). ‘In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not injuriously affect the appellant’s substantial rights.’ Coral v. State, 628 So.2d 954, 973 (Ala.Crim.App.1992), opinion after remand, 628 So.2d 988 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). ‘The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’ Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1997), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).”
‘“McNabb v. State, 887 So.2d 929, 976-77 (Ala.Crim.App.2001).’
“Sale v. State, 8 So.3d 330, 347 (Ala.Crim.App.2008). See also Ex parte Brown, 11 So.3d 933 (Ala.2008) (holding that the alleged improper admission of evidence in a capital trial was harmless);
Cothren v. State, 705 So.2d 849 (Ala.Crim.App.1997) (holding that the improper admission of the defendant’s coerced confession was harmless in light of the overwhelming evidence establishing that the defendant committed the capital offense).
“In this case, a review of the record establishes that the admission of Dr. Clinger’s testimony was harmless; the improperly admitted evidence could not have probably injuriously affected Brownfield’s substantial rights. The admission of testimony regarding Brownfield’s statements concerning his education and work experience is harmless because those statements are not relevant to whether Brownfield committed the offense or to his mental condition at the time of the offense. Consequently, testimony concerning those statements could not have probably injuriously affected Brownfield’s substantial rights. Likewise, Dr. Clinger’s testimony regarding Brownfield’s recollection of the events on December 23, 24, and 25, 2001, could not have probably injuriously affected Brownfield’s substantial rights because statements Brownfield made to law-enforcement officers on December 25 and 26, 2001, had been previously admitted into evidence and established with greater detail what Brownfield recalled regarding the events leading up to and following the murders.”
Brownfield, 44 So.3d at 47-49.
In this case, Thompson’s detailed confession was admitted into evidence. Thompson’s confession was significantly more incriminating than were the statements he made to Dr. Willis. Accordingly, the admission of statements made by Thompson to Dr. Willis during his mental evaluation was harmless beyond a reasonable doubt. See Brownfield, supra. We find no reversible error in regard to this claim.
*148 XIV.
Thompson next argues that the circuit court erred in allowing evidence of his behavioral problems in school to be admitted during Gail Crump’s testimony in the guilt phase.
The State called Crump to testify in rebuttal concerning Thompson’s mental health. Crump testified that she supervised Thompson when he was in the alternative school, that he was in the alternative-school program twice for a total of 12 weeks in the fall of 2003, and that he received counseling while in the program. She said that she did not refer him to mental-health counseling and that all the students in that program received counseling for their behavioral problems.
Thompson argued the following: “[W]e’re going to object to this line of questioning. It’s nothing more than thinly disguised evidence of bad character, talking about all of this Alternative School and people with behavioral problems and this — all this counseling for behavioral problems.” (R. 3571). The State asserted that the evidence was relevant to show the basis of Crump’s knowledge concerning Thompson’s mental condition. The Court held: “Based upon the defense in this case, based upon the evidence elicited by [Thompson], the objection is overruled.”[18] (R. 3572.)
“ ‘ “Rebuttal evidence, even evidence of prior crimes, is generally admissible within the sound discretion of the trial court. Vincent v. State, 231 Ala. 657, 165 So. 844 (1936); Jones v. State, [362 So.2d 1303 (Ala.Cr.App.1978) ]; Norris v. State, 429 So.2d 649 (Ala.Cr.App.1982).” Peterson v. State, 452 So.2d 1372 (Ala.Cr.App.1984).’ Campbell v. State, 508 So.2d 1186, 1189 (Ala.Cr.App.1986).”
Walker v. State, 631 So.2d 294, 301 (Ala.Crim.App.1993).
“ ‘It has long been held that “wide latitude” is allowed both the defendant and the state in inquiries into a person’s mental state when an issue as to the sanity of such person is presented.’ Barbour v. State, 262 Ala. 297, 303, 78 So.2d 328, 333 (1954); Peoples v. State, 257 Ala. 295, 58 So.2d 599 (1952); Smith v. State, 257 Ala. 47, 57 So.2d 513 (1952); Hall v. State, 248 Ala. 33, 26 So.2d 566 (1946); Parvin v. State, 248 Ala. 74, 26 So.2d 573 (1946); Eldridge v. State, 247 Ala. 153, 22 So.2d 713 (1945). ‘Where insanity is relied upon as a defense, every act of the accused’s life which throws some light on such issue is relevant thereto.’ Nichols v. State, 276 Ala. 209, 211, 160 So.2d 619, 621 (1964). ‘These inquiries, however, are subject to the necessary limitation that the acts, declarations and conduct inquired about must have a tendency to shed light on the accused’s state of mind when the act for which he is being tried was committed.’ Barbour, supra, 262 Ala. at 303, 78 So.2d at 333.”
Ex parte Vaughn, 869 So.2d 1090, 1095 (Ala.2002).
As Professor Gamble writes:
“As a general proposition, evidence of the conduct and condition of a person whose mental capacity is material is ad *149 missible whether such conduct or condition occurs at, near, prior, or subsequent to the time in issue. It commonly is said that, upon the issue of mental capacity, wide latitude must be allowed all parties in making proof. We have statements to the effect that every act of a person’s life is relevant to the issue of that person’s mental capacity. However, it is generally agreed that this ‘every act’ rule must be understood to carry the necessary limitation that the acts inquired about must possess a tendency to make more probable the mental capacity existing at the time in issue.”
C. Gamble, McElroy’s Alabama Evidence § 61.01(6) (6th ed.2009).
Crump’s testimony was admissible to rebut the testimony of Thompson’s experts concerning his mental condition. See Vaughn, supra. Thus, there was no error in the admission of Crump’s testimony.
XV.
Thompson next argues that the circuit court made several erroneous rulings that, he says, denied him a fair trial. We will address each claim individually.
A.
First, Thompson argues that it was error for the circuit court to admit a copy of a mug shot of Thompson and fingerprints from a drink can because the original mug shot and drink can were not available.
Danny Jenkins, the chief agent for the Twenty-Fourth Circuit Drug Task Force, testified that on June 7, 2003, he was called to the Fayette Police Department. When he arrived he surveyed the scene and discovered, on top of a filing cabinet in the booking room, two Polaroid instant photographs of Thompson. Those photographs were scanned. The prosecutor introduced the scanned photographs of Thompson into evidence. Jenkins testified that the scanned copy was an accurate copy of the original photographs. Thompson objected, arguing that the copies were not the originals. The prosecutor responded that the originals had been lost. The circuit court allowed the copies to be admitted into evidence. (R. 2046.)
“A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.” See Rule 1003, Ala. R. Evid. The circuit court did not err in allowing the scanned copy of the photographs of Thompson to be admitted into evidence.
Gail Peters, a latent-print examiner with the Alabama Department of Public Safety, testified that she received a fingerprint for comparison in Thompson’s case. The print, she said, had been lifted from a Mountain Dew soft-drink can that had been collected from a dry-cleaning business that had been burglarized. Thompson objected and argued that the soft-drink can had not been given to counsel during discovery. The State argued that the can could not be located but that a proper chain of custody for the fingerprint taken from the can had been established. The court allowed the fingerprint to be received into evidence. (R. 2806.) The fingerprint matched Thompson’s fingerprint.
“The Alabama Supreme Court, in Ex parte Gingo, 605 So.2d 1237 (Ala.1992), adopted the United States Supreme Court’s position in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the allegations that the state failed to preserve evidence potentially useful to the defense:
*150 “‘“[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.” Young-blood, 488 U.S. at 58,109 S.Ct. at 337. “The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police’s knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.” Youngblood, 488 U.S. at 57 (footnote), 109 S.Ct. at 337 (footnote), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).’
“605 So.2d at 1240-41. Gingo additionally recognized that a defendant’s right to due process can be violated when the loss or destruction is of evidence so critical to the defense that its loss or destruction makes the trial fundamentally unfair. Id. (citing Youngblood, 488 U.S. at 67,109 S.Ct. at 342).”
May v. State, 710 So.2d 1362, 1369-70 (Ala.Crim.App.1997).
The Arizona Court of Appeals when considering a similar issue stated: “In reviewing whether a defendant has been denied a fair trial due to the destruction of evidence, the court must look to the circumstances of each particular case. The fingerprints themselves were saved and were available for appellant’s use. Under the facts of this case, we find no prejudice.” State v. Reasoner, 154 Ariz. 377, 386, 742 P.2d 1363,1372 (1987).
Here, the soft-drink can could not be located but the fingerprint taken from the can was available to defense and a proper predicate was established for the admission of that fingerprint. Thus, Thompson was not prejudiced because the drink can the fingerprint was taken from could not be located.
B.
Thompson next asserts that the court erred in denying his motion for discovery of records of the National Crime Information Center (“the NCIC”) of the law-enforcement personnel who were scheduled to testify at his trial.
Thompson moved that he be given access to the NCIC or to the criminal records for all the State witnesses. (C.R. 158.) The circuit court granted the motion in respect to all non-law-enforcement witnesses and denied the motion as it related to law-enforcement witnesses. (C.R. 188.)
“We have held in Alabama in a number of cases that a defendant is not entitled to the general disclosure of the criminal records of the state’s witnesses. See, e.g., Davis v. State, 554 So.2d 1094 (Ala.Crim.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991); Wright v. State, 424 So.2d 684 (Ala.Crim.App.1982) (no absolute right of disclosure of criminal records of state’s witnesses); Mardis v. State, 423 So.2d 331 (Ala.Crim.App.1982); Mack v. State, 375 So.2d 476 (Ala.Crim.App.1978), aff'd, 375 So.2d 504 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (Ala.1980). We have also held that the trial court’s refusal to order the prosecution, pursuant to a defendant’s discovery motion, to provide the criminal record of each expected witness for the state was not a violation of Brady and its progeny. Davis v. State, 554 So.2d at 1100.”
Hardy v. State, 804 So.2d 247, 286 (Ala.Crim.App.1999). The circuit court did not abuse its considerable discretion in denying the motion as it related to law-enforcement personnel. Accordingly, we find no reversible error in regard to this claim.
*151 c.
In a one-paragraph argument in Thompson’s brief, he asserts that the circuit court erred in allowing “State witnesses [Walter] Darren Blake and Michael Brown to testify about the trajectory of the bullets in the victims’ bodies.” (Thompson’s brief, p. 115.)
Walter Blake, a criminal investigator with the Alabama Department of Public Safety, testified that he was the lead investigator for the triple homicide. He testified concerning the condition of the crime scene. Blake was asked about the injuries he observed on Officer Crump’s body and testified that he observed injuries to Officer Crump’s left shoulder and neck and a bullet hole in the clothing in his neck area. When questioned by the prosecutor, Blake testified that the hole appeared to be an exit wound. The following occurred:
“[Prosecutor]: And based on your training and experience, did. this wound relate in any way to the bullet hole that you saw in his back that we just saw?
“[Blake]: Yes, ma’am.
“[Prosecutor]: The first one being the entrance wound?
“[Blake]: Yes, ma’am.
“[Prosecutor]: Okay.”
(R. 2575.) Thompson objected and argued that Blake was not a pathologist. The court instructed the prosecutor to rephrase the question. (R. 2576.)
“In Lovejoy v. State, 33 Ala.App. 414, 34 So.2d 692 [ (1948) ], it was held that a police officer was qualified to testify concerning entrance and exit wounds.” Page v. State, 41 Ala.App. 153, 157, 130 So.2d 220, 223 (1960). There was no error in admitting Blake’s testimony concerning the entrance and exit wounds he observed on Officer Crump’s body.
Michael Brown, a forensic-pathology technician with the Alabama Department of Forensic Sciences, testified that he assisted Dr. John Glenn with approximately 300 autopsies and that he had assisted him at least 50 times in tracking the paths of bullets through victims’ bodies. He said that he assisted Dr. Glenn in tracking the bullet paths in the three victims in this case. Thompson objected to this testimony.[19]
“[A] properly qualified expert may testify to the ‘path of flight’ or trajectory of the bullet....” Ivey v. State, 369 So.2d 1276, 1280 (Ala.Crim.App.1979) (on rehearing). Brown was qualified as an expert and properly allowed to testify concerning the path of the bullets through the victims’ bodies. Also, there was no dispute concerning the path of the bullets. Accordingly, we find no error in the admission of Brown’s testimony.
XVI.
Thompson next argues that the circuit court’s instructions to the jury in the guilt phase were unconstitutional. He cites several different grounds in support of this contention.
“ ‘A trial court has broad discretion when formulating its jury instructions .... ’ Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999) (citing Williams v. State, 710 So.2d 1276, 1305 (Ala.Crim.App.1996)). ‘When reviewing a trial court’s jury instructions, [this Court] must view [the instructions] as a whole, not in bits and pieces, and as a reasonable juror would have interpreted *152 them.’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).
“ ‘Although ... [a] defendant is entitled to have the trial court instruct the jury on his theory of defense, it is ... well established that [t]he trial judge may refuse to give a requested jury charge when the charge is either fairly and substantially covered by the trial judge’s oral charge or is confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law.’
“Reeves v. State, 807 So.2d 18, 41 (Ala.Crim.App.2000) (citations and quotations omitted). See also Riley v. State, 875 So.2d 352, 358 (Ala.Crim.App.2003) (holding that ‘the trial judge properly refused the charge because the charge was substantially covered by the trial judge’s oral charge’).”
Miller v. State, 63 So.3d 676, 701 (Ala.Crim.App.2010).
In this case, at the conclusion of the jury instructions defense counsel made no objections to any of the court’s charges.
“In setting forth the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ ”
Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996). “The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh against his claim of prejudice.” Ex parte Boyd, 715 So.2d 852, 855 (Ala.1998).
With these principles in mind we review Thompson’s claims of error.
A.
Thompson first asserts that the circuit court erred in instructing the jury that Thompson’s flight from the scene indicated his consciousness of guilt.
The State requested that the court charge the jury on flight. The circuit court gave the following instruction:
“I charge you, ladies and gentlemen of the jury, that all evasions or attempts to evade justice by a person suspected or charged with a crime are circumstances from which a consciousness of guilt may be inferred, if connected with other incriminating facts. Of themselves, they may not warrant a conviction but they are relevant as evidence and the weight to which they are entitled, it is the province of the jury to determine under proper instructions from the Court.”
(R. 3843.)
Thompson argues on appeal that this instruction was erroneous because, he says, he relied on the defense of PTSD and the jury should have been informed that it “needed to first consider whether the defendant had other possible motives for behaving as he did after the crime.” (Thompson’s brief, p. 98.) He cites Ex parte Weaver, 678 So.2d 284 (Ala.1996), to support his argument.
The Alabama Supreme Court in Weaver reversed Weaver’s conviction because the trial court gave an erroneous flight instruction when there was no evidence of flight. In Weaver the trial court instructed the jury: “ ‘A defendant’s flight to avoid prosecution may be considered by you as tending to show his consciousness of guilt.’ ” 678 So.2d at 285. The Court held that the instruction suggested that the only inference that could be drawn *153 from the flight evidence was that the flight was motivated by a consciousness of guilt.
The Alabama Supreme Court in Ex parte Clark, 728 So.2d 1126 (Ala.1998), approved a flight instruction similar to the one given in this case and stated:
“The facts of [Ex parte ] Weaver [, 678 So.2d 284 (Ala.1996),] are distinguishable from the facts of this case. In Ex parte Weaver, the defendant Weaver murdered the victim in December 1989 and left the state in September 1990. When Weaver left the state, he was not aware that he was under suspicion for the crime for which he was later accused. Clark, on the other hand, left the state almost immediately after the crime and traveled extensively, using the victim’s automobile and credit cards. The immediacy of his departure, coupled with his attempt to take money from Posey’s account before that departure, clearly, in our opinion, made flight pertinent for the jury to consider.”
728 So.2d at 1137.
The facts in this case, like those in Clark, are distinguishable from the facts in Weaver. The instruction given in this case “does not improperly raise the evidence of flight to a presumption of guilt ...” Dallas v. State, 711 So.2d 1101, 1108 (Ala.Crim.App.1997). There was no plain error in the circuit court’s jury instructions on flight.
B.
[Ill] Thompson asserts that the circuit court’s instruction on reasonable doubt was erroneous because, he says, it lowered the State’s burden of proof. Specifically, he challenges the instruction that in order to acquit Thompson the jury’s doubt “must be an actual doubt, and not a mere guess or surprise; it is not a forced or captious doubt.” (Thompson’s brief, p. 99.) He relies on Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), to support this contention.
At the charge conference, defense counsel requested several instructions related to the burden of proof. The first requested charge, number 4, stated:
“Synonymous with ‘clear and convincing evidence’ and ‘to the reasonable satisfaction of the jury’ is proof by the preponderance of the evidence that, taking the evidence as a whole, such proof shows that the fact or cause sought to be proved is more probable than not.”
(C.R. 299.) Requested jury charge 5 stated: “A preponderance of the evidence means evidence of greater weight or evidence which is more convincing than that offered in opposition to it.” (C.R. 300.) Requested jury charge 6 read:
“Proof beyond a reasonable doubt is the highest level of certainty recognized in the law. Clear and convincing evidence requires that the existence of the disputed fact be a probability. Again, the proof beyond a reasonable doubt requires a significantly greater degree of certainty than required to meet the clear and convincing evidence standard.”
(C.R. 301.) The circuit court refused the above charges and stated that it would give the pattern jury instruction on reasonable doubt. Thompson did not object after the circuit court gave its instruction on reasonable doubt. Thus, we review this claim for plain error. See Rule 45A, Ala. RApp. P.
The United States Supreme Court in Cage v. Louisiana held that use of the terms “grave uncertainty, actual substantial doubt, and moral certainty” to define reasonable doubt could be interpreted “to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.” 498 U.S. at 41. Cf. Vic *154 tor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (use of the phrase “moral certainty” in the court’s instruction did not lower the State’s burden of proof).
“The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Cf. Hopt v. Utah, 120 U.S. 430, 440-441, 7 S.Ct. 614, 618-20, 30 L.Ed. 708 (1887). Indeed, so long as the court instructs the jury on the necessity that the defendant’s guilt be proved beyond a reasonable doubt, see Jackson v. Virginia, 443 U.S. 307, 320, n. 14, 99 S.Ct. 2781, 2789, n. 14, 61 L.Ed.2d 560 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government’s burden of proof. Cf. Taylor v. Kentucky, 436 U.S. 478, 485-486, 98 S.Ct. 1930, 1934-1935, 56 L.Ed.2d 468 (1978). Rather, ‘taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.’ Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).” -
Victor, 511 U.S. at 5.
We have held that use of some of the terms found offensive in Cage does not necessarily constitute reversible error. See Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991). In affirming a reasonable-doubt instruction substantially similar to the challenged instruction we stated:
“Although the trial court did refer to a reasonable doubt as an ‘actual doubt,’ it did not state that the doubt must be ‘grave’ or ‘substantial,’ as the faulty charge in Cage [v. Louisiana, 498 U.S. 39 (1990) ] instructed. See Cage, 498 U.S. at 40, 111 S.Ct. at 328 (holding that the terms ‘grave’ and ‘substantial’ suggest a higher degree of doubt than that actually required to acquit).”
Smith v. State, 756 So.2d 892, 922 (Ala.Crim.App.1997).
The court’s reasonable-doubt instruction did not violate the United States Supreme Court’s decision in Cage and did not constitute plain error.
C.
Thompson next argues that the circuit court erred in failing to instruct the jury that Thompson could not be convicted of capital murder if he did not have the intent to commit the underlying felony or if the underlying felony was committed as a “mere afterthought.”
Thompson requested that the court charge the jury: “The defendant is not guilty of a capital offense where the defendant did not have the requisite intent to commit the accompanying felony ... or if the felony was a mere afterthought and unrelated to the murder.” (C.R. 306-09.) The court stated that it would charge on the “accompanying felony, the pattern jury charges on robbery, capital murder during armed robbery. So, 11, 12, 13 and 14 are refused.” (R. 3704.)
The court charged the jury that the felony had to be committed during the course of the murder and that Thompson had to have both the specific intent to kill and the intent to commit the underlying felony. In finding no plain error in a court’s failure to use the term “mere afterthought,” the Alabama Supreme Court recently stated:
“The trial court specifically instructed the jury that ‘the intent to rob and the intent to kill would have to coexist in the defendant’s mind in order for the capital offense to occur.’ Although the trial court did not state specifically that for the jury to find Brown guilty of capital *155 murder-robbery the taking of the property could not be a mere afterthought of the murder, the trial court’s instruction adequately communicated the law by instructing the .jury that the robbery had to occur ‘during* the course of the murder and that the intent to murder and the intent to rob had to coexist. Plain error did not occur in this regard. See Ex parte Windsor, 683 So.2d 1042,1058-60 (Ala.1996); Reeves v. State, 807 So.2d 18, 42-44 (Ala.Crim.App.2000); and Woods v. State, 789 So.2d 896, 932-33 (Ala.Crim.App.1999) (recognizing that although the taking of property as a mere afterthought will not support a capital-murder conviction based on an underlying robbery, the trial court does not have to use the term ‘mere afterthought’ in its jury instructions on the robbery element of the capital murder).”
Ex parte Brown, 74 So.3d 1039, 1054 (Ala.2011). The circuit court did not commit plain error in failing to use the term “mere afterthought” in its instructions on the commission of the accompanying felony.
Thompson also argues in this section of his brief that the circuit court erred in failing to give jury instructions on murder, robbery, and felony murder. Thompson asserts that according to Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), his death sentence was unconstitutional because, he says, the jury was deprived of a “third option.”
Thompson did not specifically request an instruction on any lesser-included offenses. The only instructions he requested were instructions related to the commission of the underlying felony, the robbery of the officer’s gun, as a mere afterthought; each of these instructions contained a citation to a case. “The refusal of a requested charge does not constitute error where the charge bears citation of authority.” Yeager v. State, 500 So.2d 1260,1267 (Ala.Crim.App.1986).
Because Thompson did not request instructions on any lesser-included offenses, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The United States Supreme Court in Beck invalidated Alabama’s prior death-penalty law because it prevented a jury from considering lesser-included offenses and because the Due Process Clause required such instructions when the evidence at trial warranted them. In Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the Court ■ further explained its holding in Beck and stated:
“Beck [v. Alabama, 447 U.S. 625 (1980),] held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction. The jury’s discretion is thus channeled so it may convict a defendant of any crime fairly supported by the evidence.”
456 U.S. at 611. “A defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the evidence to support the charge. Ex parte Smith, 756 So.2d 957, 963 (Ala.2000).” Pilley v. State, 930 So.2d 550, 562 (Ala.Crim.App.2005).
“A trial court may refuse to charge on a lesser-included offense only when: (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense; or (2) the charge would tend to mislead or confuse the jury. Turner v. State, 708 So.2d 232, 234 (Ala.Crim.App.1997) (citing Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988)).”
*156 McClain v. State, 26 So.3d 491, 495 (Ala.Crim.App.2009).
Where the evidence will support a charge on the offense of capital murder, a charge on the lesser-included offense of felony murder is warranted only if a reasonable theory of the evidence indicates that the murder may not have been intentional. See, e.g., Peoples v. State, 951 So.2d 755, 758 (Ala.Crim.App.2006) (“ ‘ “[F]elony murder does not require intent to kill; the only intent necessary is the intent to commit the underlying felony.’”” (citations omitted)); Calhoun v. State, 932 So.2d 923, 969 (Ala.Crim.App.2005). In the present case, there was no reasonable theory of the evidence that indicated that the murders were not intentional. Nor was there any evidence that the taking of the gun and the killings were not committed pursuant to one course of conduct.
There was no rational basis to support a conviction on any lesser-included offense. Thus, the circuit court did not commit plain error in failing to sua sponte instruct the jury on murder, robbery, and felony murder.
D.
Thompson next argues that the circuit court erred in failing to give detailed instructions in regard to each count for each victim. Thompson does not challenge the accuracy of the given instructions; he merely asserts that the court should have repeated each instruction for every count of the indictment.
The circuit court gave the following instructions:
“Now in Counts 1 and 2 of the indictment, the Defendant is charged with murder of a law enforcement officer. Now I’m going to tell you the elements and what the State must prove.
“The law states that the intentional murder of a law enforcement officer because of an official or job-related act is capital murder. A person commits an intentional murder of a law enforcement officer if he causes the death of a police officer because of some official or job-related act or performance of such officer, and in performing the act or acts which caused the death of that person, he intends to kill that person.
“To convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder of a law enforcement officer:
“1. In Count 1, that Arnold Gunther Strickland is dead; in Count 2, that James Eddie Crump is dead;
“2. That the Defendant, Devin Darnell Thompson, alias, Devin Darnell Moore, caused the death of, in Count 1, Arnold Gunther Strickland by shooting him; in Count 2, James Eddie Crump, by shooting him;
“3. That in committing the acts which caused the death of, in Count 1, Arnold Gunther Strickland; in Count 2, James Eddie Crump, the Defendant intended to kill the deceased. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific;
“4. That, in Count 1, Arnold Gunther Strickland was a police officer; in Count 2, James Eddie Crump was a police officer;
“5. That the murder took place because of some official or job-related act or performance of, Arnold Gunther Strickland in Count 1; James Eddie Crump in Count 2; and
“6. That the Defendant knew that the deceased was a law enforcement officer at that time.”
(R. 3827-29.)
In affirming á federal district court’s incorporation of certain instructions in a *157 case involving multiple counts, the United States Court of Appeals for the First Circuit stated:
“In light of the perfectly sensible course taken by the judge, the appellants’ claim is unfounded. A trial court has broad discretion to formulate jury instructions as it sees fit, as long as it touches all the bases. See United States v. DeStefano, 59 F.3d 1, 4 (1st Cir.1995). Here, taking the charge as an integrated whole, see, e.g., United States v. Cintolo, 818 F.2d 980,1003 (1st Cir.1987), cert. denied, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987), we find no error.”
United States v. Houlihan, 92 F.3d 1271, 1299 n. 31 (1st Cir.1996).
“The primary function of a trial court’s instructions is to create a roadmap for the jurors, limning those legal rules that they must follow in finding the facts and determining the issues in a given case. For the most part, the law provides no set formulae for converting these legal rules into lay language — and the choice of what words are to be spoken belongs, within wide margins, to the trial judge.”
United States v. Paniagua-Ramos, 251 F.3d 242, 245 (1st Cir.2001).
The circuit court did not abuse its broad discretion in failing to repeat, for each separate count of the indictment, the same jury instructions.
XVII.
Thompson argues that his trial was rendered fundamentally unfair by prosecutorial misconduct. He cites several grounds in support of this contention.
“ ‘In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.’ Smith v. State, 698 So.2d 189, 202-03 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (citations omitted); Bush v. State, 695 So.2d 70, 131 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citations omitted). ‘The relevant question is whether the prosecutor’s comments “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). ‘Prosecutorial misconduct is subject to a harmless error analysis.’ Bush v. State, 695 So.2d at 131 (citations omitted); Smith v. State, 698 So.2d at 203 (citations omitted).”
Simmons v. State, 797 So.2d 1134, 1161-62 (Ala.Crim.App.1999) (opinion on return to remand).
“This court has held on many occasions that in order to determine whether a statement of the prosecutor was improper, ‘it must be examined in its context and in light of what had transpired, that is, in light of preceding argument of defense counsel, to which the prosecutor’s argument was an answer.’ Washington v. State, 259 Ala. 104, 65 So.2d 704 (1953); Gibson v. State, 347 So.2d 576 (Ala.Crim.App.1977); Rutledge v. State, [482 So.2d 1250] (Ala.Crim.App.1983). The rule in Alabama is that ‘re *158 marks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused’s counsel and are in reply to or retaliation for his acts and statements.’ Shewbart v. State, 33 Ala.App. 195, 32 So.2d 241, cert. denied, 249 Ala. 572, 32 So.2d 244 (1947); Camper v. State, 384 So.2d 637 (Ala.Crim.App.1980); Wilder v. State, 401 So.2d 151 (Ala.Crim.App.), cert. denied, 401 So.2d 167 (Ala.1981), cert. denied, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981); Miller v. State, 431 So.2d 586 (Ala.Crim.App.1983); Rutledge, supra.”
Henderson v. State, 460 So.2d 331, 333 (Ala.Crim.App.1984).
Thompson did not object to the now-challenged instances of prosecutorial misconduct; thus, we review these claims for plain error. See Rule 45A, Ala. R.App. P.
“ ‘While this failure to objeet does not preclude review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ].... ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).”
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (emphasis omitted).
Before closing arguments, the circuit court gave the following instruction to the juiy:
“Now, this is somewhat like the opening statement in that it is not evidence in the case, and shouldn’t be considered as evidence in the case. Now, later on, I will charge you, at the conclusion of the closing statements, more about this, about the arguments of the lawyers. But even though it’s not evidence, and shouldn’t be considered as evidence, it’s still a very important part of the trial. They can argue their positions to you and they can argue reasonable inferences from the evidence to you as they argue their cases.”
(R. 3708.) When the court gave its formal jury charges, it again instructed:
“[I]n determining what the true facts are in this case, you are limited to evidence that has been presented from the witness stand as opposed to matters that have been stated by the lawyers in the course of the trial. What the lawyers have said, both for the State and for the Defendant, is not evidence in this case. What they have argued to you at various points in the trial is not evidence.”
(R. 3818-19.) “[A]n appellate court ‘presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.’ ” Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008).
With these principles in mind, we review the individual claims raised by Thompson.
A.
Thompson asserts that the prosecutor sought to inflame the passions of the jury when he made the following argument:
“When something like 9/11 happens and we see all of the people like me that were running out of those buildings, and then you look at all of the men and women like Arnold Strickland, James Crump and Ace Mealer running into it, doing their jobs, it reminds us that these men and women, daily, put their lives on *159 the line for the rest of us. We don’t like that when they pull us over. We don’t appreciate them when they’re writing us a ticket. We take them for granted and get aggravated when we call maybe sometimes and can’t get through on the line, but all this time they’re doing their jobs, protecting us, fulfilling their duty without reservation, without complaint, till something happens and we are reminded of that. I believe June the 7th of 2003 was our 9/11 of here in Fayette. We were reminded that Arnold and James and Ace were doing their jobs, protecting us and our children from those who would harm us.”
(R. 3766-67.) See Thomas M. Fleming, Annot., Negative Characterization or Description of Defendant, by Prosecutor During Summation of Criminal Trial, as Ground for Reversal, New Trial, or Mistrial—Modem Cases, 88 A.L.R.4th 8 (1991).
“A prosecutor is entitled to argue forcefully. ... ‘[EJnthusiatic rhetoric, strong advocacy, and excusable hyperbole’ are not grounds for reversal.... The jury are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides.”
Commonwealth v. Wilson, 427 Mass. 336, 350, 693 N.E.2d 158, 171 (1998). Cf. Gonzalez v. State, 115 S.W.3d 278 (Tex.Ct.App.2003) (prosecutor’s comparison of the defendant to terrorist Osama bin Laden was improper).
“‘[SJtatements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and not expected to become factors in the formation of the verdict.’ ” Duren v. State, 590 So.2d 360, 364 (Ala.Crim.App.1990) (quoting Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989)).
The prosecutor did not compare Thompson to a terrorist; he merely stated what every juror knew: that the triple homicide was a tragedy for the community of Fay-ette. The prosecutor’s comments did not result in any error.
In this section of his brief, Thompson also argues that the prosecutor erred in making the following argument:
“All that I ask, ladies and gentlemen, is that you do your jobs. Evaluate all this evidence. Do it with deliberation. Do it with the care that you know you ought to. Do it in the way that would make the memory of these three fine men proud. Do it in a way that would justify their faith in you. Weigh this evidence. Do it with the knowledge that your work here has been made easier by all these other people doing their jobs.”
(R. 3615-16.)
“Generally, an exhortation to the jury to ‘do the right thing,’ to ‘do your job,’ or to ‘do your duty' is error if it ‘implfies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court’s instructions on the law.’ ” Jackson v. State, 791 So.2d 979, 1029 (Ala.Crim.App.2000).
Here, the prosecutor did not argue that the jurors should ignore the law but that the jurors should evaluate all the evidence. The prosecutor’s argument did not constitute error.
B.
Next, Thompson argues that the prosecutor improperly vouched for the strength of the State’s case when he made the following argument:
“Now, one of the things that I worry about in doing this job is getting everybody here to believe that it really hap *160 pened here. This isn’t Birmingham; it’s not Atlanta; it’s not Washington D.C.; it’s Fayette, Alabama. It’s just as normal and as good a place to live as what there is any place in the United States of America. Things like this don’t happen here, but it did. It happened here. That’s one of the reasons we’ve been so meticulous in our presentation of the evidence to you. That’s why when a witness might have made a mistake on where he put a wound path or where some chain of custody issue came in, we made sure we came back and corrected it so you could see that the evidence is here. We want there to be no question about the facts. [Thompson] murdered these men and the evidence is overwhelming to support his confession.”
(R. 3806-07.) Thompson asserts that this argument suggested that “state officials had already reviewed the evidence and decided that [Thompson] was guilty.” (Thompson’s brief, p. 49.)
We do not agree with Thompson’s characterization of the argument; instead, we consider the argument to be a comment on the strength of the State’s case against Thompson — a proper subject for closing argument.
“This comment by the prosecutor was an argument to the jury concerning the strength of the State’s case, McWhorter v. State, 781 So.2d 257, 321 (Ala.Crim.App.1999), affirmed, Ex parte McWhorter, 781 So.2d 330 (Ala.2000), cert. denied, McWhorter v. Alabama, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001), and reasonable inferences and conclusions that could be drawn therefrom. As such, this comment did not adversely affect Johnson’s substantial rights.”
Johnson v. State, 120 So.3d 1130, 1170 (Ala.Crim.App.2009). The prosecutor’s argument did not constitute error, much less plain error.
C.
Thompson next argues that the prosecutor improperly vouched for the veracity of Agent Johnny Tubbs, a witness for the State, when the prosecutor made the following argument in closing:
“[Defense counsel] said that Agent Tubbs went over there to get him, basically. [Defense counsel] told you that, that he went over there to try to — didn’t go over there to help him. I admit that, he didn’t go to help. [Defense counsel] wants you to believe he went over there to get him, get him to say things and put things in his mind that would help /all convict him. That’s not what Agent Tubbs "said. When asked specifically, when hammered about that by [defense counsel] he said, ‘I went over there to find out what happened.’ You remember that Mr. Tubbs had only — he came up here and went into the police department, saw the bodies lying there and then, immediately, was told to go over there and take a statement from this defendant who had been caught.... How do you know that this was the statement of the defendant based upon his accurate recollection of the events? Well, first of all, Johnny Tubbs told us. Now, if there was evidence in here that Johnny Tubbs is a liar, if there was evidence in here that he had been fired from his job for lying, or that he wasn’t worthy of belief under oath, that somehow his credibility had been attacked, then, sure, I wouldn’t be standing up here taking up for him. I wouldn’t be standing up here arguing on his behalf. But there is no question of his credibility before you.
“Johnny Tubbs is an ABI [Alabama Bureau of Investigation] agent. Do you know what happens to ABI agents that make up statements? They get fired. *161 They get prosecuted if they commit perjury in courts. They go to jail. There is no evidence that this man has ever lied under oath about anything that he did. His credibility is not at issue here. He told you. He told you what happened.”
(R. 3795-96.)
“A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. ‘[Pjrosecutors must avoid making personal guarantees as to the credibility of the state’s witnesses.’ Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).”
DeBruce v. State, 651 So.2d 599, 610 (Ala.Crim.App.1993).
In Kowalczyk v. United States, 936 F.Supp. 1127 (E.D.N.Y.1996), the prosecutor argued in closing that a police officer who had testified in the case was credible because he was an “officer who is sworn to uphold the law, not to come in court and lie.” In finding no reversible error, the court stated:
“[T]he Second Circuit has recognized, that ‘[w]hile the prosecutor should avoid statements such as “[the government witness]” told the truth,’ if the summation does not amount to ‘urgfing] that the jury should accept [the] testimony because the government believed it,’ a reversal is unwarranted. [United States v.] Parker, 903 F.2d [91] at 101 [(2d Cir.1990)]; see also United States v. Smith, 778 F.2d 925 (2d Cir.1985). The Court finds that while this ... statement perhaps should not have been made, it did not constitute ‘vouching. ...’”
936 F.Supp. at 1149. See also William B. Johnson, Annot., Propriety and Prejudicial Effect of Comments by Counsel Vouching for Credibility of Witness — Federal Cases, 78 A.L.R. Fed. 23 (1986).
We have scrupulously reviewed the arguments made by counsel in the guilt-phase closing arguments and are confident that none of the arguments “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
XVIII.
Thompson argues that it was a violation of the Double Jeopardy Clause to charge and convict him of six counts of capital murder for the murder of three individuals. At trial, Thompson did not argue that his convictions violate the Double Jeopardy Clause; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Count I of the indictment charged Thompson with murdering Officer Arnold Strickland while Officer Strickland was on duty; count II charged Thompson with murdering Officer James Crump while Officer Crump was on duty; count III charged Thompson with murdering two or more people during one course of conduct; count IV charged Thompson with murdering Officer Strickland during the course of a robbery; count V charged Thompson with murdering Crump during the course of a robbery; and count VI charged Thompson with murdering Mealer during the course of a robbery. Thompson was convicted on all six counts of capital murder.
Recently we addressed this issue and stated:
*162 “Flowers was convicted of two counts of capital murder — one count for killing Philyaw during the course of a robbery and one count for killing Philyaw during the course of a kidnapping. The Alabama Supreme Court has held that convictions on more than one count of capital murder for killing one victim do not violate the Double Jeopardy Clause. See Ex parte McWilliams, 640 So.2d 1015 (Ala.1993). The Supreme Court in McWilliams stated:
“ ‘In this case, McWilliams was not prosecuted for the same offense after an acquittal; nor was he prosecuted for the same offense after a conviction. That is, he was not prosecuted twice for the same offense. Moreover, while in King [v. State, 574 So.2d 921 (Ala.Crim.App.1990),] the defendant received four separate prison sentences for the same offense, McWilliams has only been sentenced to die once and, indeed, can only be put to death once.
[[Image here]]
“ ‘In the present case, it is clear that the jury knew that it was convicting McWilliams of murdering Patricia Reynolds only once. It is also clear that the jury knew that McWilliams’s crime was made capital because his victim was murdered in the course of one robbery and one rape. We conclude, therefore, that the sentencing court has not prescribed a greater punishment than the legislature intended. Even if McWilliams’s rights against double jeopardy had been violated by the two convictions of robbery-murder, the convictions for one count of rape-murder would remain; and either of these would be sufficient to support a death sentence.’
“640 ■ So.2d at 1022 (footnote omitted). Citing McWilliams, this Court has upheld numerous capital-murder convictions against similar double-jeopardy attacks. See Adams v. State, 955 So.2d 1037 (Ala.Crim.App.2003); Taylor v. State, 808 So.2d 1148 (Ala.Crim.App.2000); Powell v. State, 796 So.2d 404 (Ala.Crim.App.1999); Whitehead v. State, 111 So.2d 781 (Ala.Crim.App.1999); Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999); Boyd v. State, 746 So.2d 364 (Ala.Crim.App.1999); Burtram v. State, 733 So.2d 921 (Ala.Crim.App.1998); Hyde v. State, 778 So.2d 199 (Ala.Crim.App.1998); Mitchell v. State, 706 So.2d 787 (Ala.Crim.App.1997); Grayson v. State, 675 So.2d 516 (Ala.Crim.App.1995); Hunt v. State, 659 So.2d 933 (Ala.Crim.App.1994). There was no double-jeopardy violation when the jury returned guilty verdicts against Flowers on two counts of capital murder for killing one victim — Philyaw.”
Flowers v. State, 922 So.2d 938, 957-58 (Ala.Crim.App.2005). See also Belisle v. State, 11 So.3d 256, 280 (Ala.Crim.App.2007) (“ ‘A defendant can be convicted of two or more capital murders for the death of one victim, so long as those convictions are in accordance with Blockburger [v. United States, 284 U.S. 299 (1932) ], i.e., so long as each conviction required an element not required in the other convictions.’ ”).
Each of the counts for which Thompson was charged and convicted required proof of an element not found in the other counts. There was no double-jeopardy violation in charging Thompson with and convicting him of six counts of capital murder for the killing of three victims.

Penalty-Phase Issues

XIX.
Thompson argues that the circuit court erred in allowing victim-impact evidence to be presented at the penalty phase. Specif *163 ically, he argues that the victims’ family members and a friend of one of the victims should not have been allowed to present evidence concerning how the victims’ deaths affected their lives. He implies that because this evidence did not constitute an aggravating circumstance, it was not admissible at the penalty phase. Thompson did not object to the testimony of the family members and only objected to the friend’s testimony on the basis that the friend was not a relative of any of the victims and should not be allowed to testify for that reason. (R. 3897.) Accordingly, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
Four of the victims’ family members and a friend of one of the victims testified at the penalty phase about how they heard about the murders, their reactions to the murders, and the impact of the victims’ deaths on their lives.
Section 13A-5-45(d), Ala.Code 1975, states:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentencing hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is afforded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.”
(Emphasis added.)
“In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court overruled two cases that had held that victim-impact evidence and argument could not be presented during the penalty phase of a capital-murder trial: Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The Court held:
“ ‘[A] State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. “[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.” Booth, 482 U.S., at 517 (White, J., dissenting) (citation omitted). By turning the victim into a “faceless stranger at the penalty phase of a capital trial,” Gathers, 490 U.S., at 821 (O’Connor, J., dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.’
“501 U.S. at 825, 111 S.Ct. 2597.”
Gissendanner v. State, 949 So.2d 956, 963 (Ala.Crim.App.2006). “ ‘ “[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim’s death on the victim’s family in the penalty phase of a capital trial.” ’ ” Freeman v. State, 776 So.2d 160, 187 (Ala.Crim.App.1999) (quoting Hyde v. State, 778 So.2d 199, 213 (Ala.Crim.App.1998), quoting in turn, McNair v. State, 653 So.2d 320, 331 (Ala.Crim.App.1992)).
There was no reversible error in admitting the victim-impact evidence at the pen *164 alty phase of Thompson’s capital-murder trial.
XX.
Thompson next argues that it was error for the prosecutor and the circuit court to state repeatedly that the jury’s verdict in the penalty phase was a recommendation. Specifically, he asserts that these remarks allowed the jury to feel less responsibility for its verdict and that the remarks violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.
“[T]he condemnation in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), is that ‘it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant’s death rests elsewhere.’ 472 U.S. at 328-29, 105 S.Ct. at 2639. We fully support that principle, yet under Alabama law, the trial judge — not the jury — is the ‘sentencer.’ ‘[W]e affirm the principle that, in Alabama, the “judge, and not the jury, is the final sentencing authority in criminal proceedings.” Ex parte Hays, 518 So.2d 768, 774 (Ala.1986); Beck v. State, 396 So.2d [645] at 659 [(Ala.1980) ]; Jacobs v. State, 361 So.2d 640, 644 (Ala.1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979).’ Ex parte Giles, 632 So.2d 577, 583 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994). ‘The jury’s verdict whether to sentence a defendant to death or to life without parole is advisory only.’ Bush v. State, 431 So.2d 555, 559 (Ala.Crim.App.1982), aff'd, 431 So.2d 563 (Ala. 1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). See also Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993). ‘We have previously held that the trial court does not diminish the jury’s role or commit error when it states during the jury charge in the penalty phase of a death case that the jury’s verdict is a recommendation or an “advisory verdict.” White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).’ Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993).”
Taylor v. State, 666 So.2d 36, 50-51 (Ala. Crim.App.1994). See also Price v. State, 725 So.2d 1003, 1026 (Ala.Crim.App.1997).
There was no error in the prosecutor’s and the court’s references that the jury’s verdict in the penalty phase was a recommendation. See Taylor, supra.
XXI.
Thompson argues that the jury instructions in the penalty phase were unconstitutional. He asserts several grounds in support of this contention.
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, “‘the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams, 795 So.2d at 780.
“ ‘ “In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th *165 Cir.1993), cited Boyde v. California, 494 U.S. 370, 380 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325,141 L.Ed.2d 699 (1998).” ’
“Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim. App.1998). Moreover, ‘[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).”
Snyder v. State, 893 So.2d 488, 548 (Ala.Crim.App.2003).
After the circuit court concluded its jury instructions in the penalty phase, Thompson made no objections. (R. 4213.) Thus, we review these claims for plain error. See Rule 45A, Ala. R.App. P.
A.
First, Thompson argues that the circuit court erred in failing to instruct the jury, in accordance with § 13A-5-46, Ala. Code 1975, what its verdict should be if it found that the aggravating and the mitigating circumstances were entitled to equal weight. He cites the Supreme Court’s case of Ex parte Bryant, 951 So.2d 724 (Ala.2002), in support of this argument.
In Bryant, the Alabama Supreme Court found plain error in the court’s instructions on the weighing process at the penalty phase of Bryant’s capital-murder trial. The court held that the instructions implied that the jury could recommend death even if it found the existence of no aggravating circumstances. In discussing its decision in Bryant, the Alabama Supreme Court has stated:
“The charge in this case was not infected with the peculiar error present in [Ex parte ] Bryant [, 951 So.2d 724 (Ala.2002) ], that is, the jury in this case was not invited to recommend a sentence of death "without finding any aggravating circumstance. It was that invitation in Bryant that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error ‘seriously affeet[ed] the fairness, integrity or public reputation of [these] judicial proceedings,’ Ex parte Davis, 718 So.2d [1166,] at 1173-74 [ (Ala.1998) ], so as to require a reversal of the sentence.”
Ex parte McNabb, 887 So.2d 998, 1004 (Ala.2004).
Here, the circuit court gave the following instruction on the aggravating and the mitigating circumstances:
“Now, the process of weighing aggravating and mitigating circumstances against each other in order to determine the proper punishment is not a mechanical process. Your weighing of the circumstances against each other should not consist of merely adding up the number of aggravating circumstances and comparing that number to the total number of mitigating circumstances. The law of this state recognizes that it is possible, in at least some situations, that one or a few aggravating circumstances might outweigh a larger number of mitigating circumstances. The law of this *166 state also recognizes that is it possible, in at least some situations, that a large number of aggravating circumstances might be outweighed by one or a few mitigating circumstances. In other words, the law contemplates that different circumstances may be given different weights or values in determining the sentence in a case. And you, the jury, are to decide what weight or value is to be given to a particular circumstance in determining the sentence, in light of all the other circumstances in this case. You must do what — excuse me. You must do that in the process of weighing the aggravating circumstances against the mitigating circumstances.
[[Image here]]
“Now, ladies and gentlemen, if after a full and fair consideration of all the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, and that the aggravating circumstance outweighs the mitigating circumstances, your verdict would be, “we, the jury, recommend that the Defendant ... be punished by death.’ ...
“However, if after a full and fair consideration of all the evidence in this case, you determine that the mitigating circumstances outweigh any aggravating circumstances that exist, or you’re not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict would be to recommend punishment of life imprisonment without parole.”
(R. 4211-12.)
In affirming a circuit court’s instructions that were virtually identical to the above instructions, we stated:
“[W]e note that these instructions are materially identical to those in the Alabama Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178. ‘A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.’ Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).
“Moreover, the Alabama Supreme Court and this Court have upheld instructions virtually identical to the instructions given in this case against similar challenges. See Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997); McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2003) (opinion on rehearing); Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001); Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999); aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); and Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989).”
Lewis v. State, 889 So.2d 623, 690-91 (Ala.Crim.App.2003).
For the above reasons, we find no plain error in the court’s instructions on the weighing process to be used when assessing the aggravating and the mitigating circumstances.
B.
Second, Thompson argues that the circuit court erred in failing to instruct the jury that it must find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt *167 before Thompson could be sentenced to death.
“The state is required to prove beyond a reasonable doubt the existence of aggravating circumstances, but the State is not required to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.” Brown v. State, 686 So.2d 385, 401 (Ala.Crim.App.1995).
“Section 13A-5-46(e)(3), Ala.Code 1975, provides: ‘If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death.’ In interpreting this statute, we have stated: ‘For the death penalty to be imposed in Alabama, it does not have to be proven that beyond a “reasonable doubt” the aggravating circumstances outweigh the mitigating circumstances. The aggravating circumstances must simply outweigh the mitigating circumstances.’ Williams v. State, 601 So.2d 1062,1082-83 (Ala.Crim.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992).”
Bryant v. State, 951 So.2d 732, 740 (Ala.Crim.App.2003). See also Lawhom v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990) (“[W]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party.”).
Clearly, the circuit court committed no error in failing to instruct the jury on an incorrect statement of the law.
C.
Thompson next argues that the circuit court’s instructions led the jury to believe that it could not consider mercy when reaching its verdict. Specifically, Thompson asserts that the court’s instruction that “you must avoid any influence of passion, prejudice, or any other arbitrary factor” was improper.
The United States Supreme Court in Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), considered the validity óf a jury charge, in the penalty phase of a capital-murder trial, that instructed the jury that it could not consider sympathy. In approving the instruction, the Court stated:
“Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror’s own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors’ emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary.... At the very least, nothing in Lockett [v. Ohio, 438 U.S. 586 (1978),] and Eddings [v. Oklahoma, 455 U.S. 104 (1982),] prevents the State from attempting to ensure reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant’s mitigating evidence in the form of a ‘reasoned moral response,’ [California v.] Brown, 479 U.S., [538] at 545, 107 S.Ct., [837]-at 841 [(1987)] (emphasis in original), rather than an emotional one. The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or *168 caprice. See id., at 541-543, 107 S.Ct., at 889-840.”
494 U.S. at 492-93.
“ ‘In Kuenzel v. State, 577 So.2d 474, 495 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), this court stated that “[t]he Alabama provisions for the imposition of capital punishment nowhere mention mercy.” Here, the trial court instructed the jury that its verdict should be based only on the evidence presented and the law as instructed by the court. The jury was instructed that it “must avoid any influence of passion, prejudice or any other arbitrary factor.” (R. 3007-08.) In California v. Brown, 479 U.S. 538, 539, 107 S.Ct. 837, 838, 93 L.Ed.2d 934 (1987), the United States Supreme Court held that “an instruction informing jurors that they ‘must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public . feeling’ during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.” ’ ”
Brown v. State, 11 So.3d 866, 921 (Ala.Crim.App.2007) (quoting Perkins v. State, 808 So.2d. 1041, 1134-35 (Ala.Crim.App.1999), vacated on other grounds, Perkins v. Alabama, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002)).
The circuit court’s instructions were consistent with Alabama law and did not constitute error.
D.
Fourth, Thompson argues that the court erred in failing to give an instruction on the use of victim-impact evidence. Specifically, he asserts that the jury was not instructed how to properly consider this evidence when weighing the aggravating and the mitigating circumstances.
In Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009), we addressed a similar argument and stated:
“‘Johnson complains that the consideration of victim impact evidence in his case was unconstitutional because the jury was not directed how to consider the evidence. The Supreme Court of Arkansas has rejected this claim, citing the Supreme Court’s direction that “‘[a] capital sentencer need not be instructed on how to weigh any particular fact in the capital sentencing decision.’ ” Kemp [v. State, 324 Ark. 178], 919 S.W.2d [943] at 956 [ (1996) ] (quoting Tuilaepa [v. California], 512 U.S. [967] 979, 114 [ (1994) ]). See Johnson I [v. State ], [326 Ark. 430,] 934 S.W.2d [179] at 189 [ (1996) ] (citing Kemp). Particularly given the Court’s statement in Payne [v. Tennessee, 501 U.S. 808 (1991) ] that “[t]here is no reason to treat [victim impact] evidence differently than other relevant evidence is treated,” 501 U.S. at 827, 111 S.Ct. 2597, the state court’s decision to require no special instruction is consistent with established federal law. We further agree with the district court that nothing in the Supreme Court’s decisions regarding unconstitutionally vague statutes, e.g., Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), suggests that a State may not allow victim impact evidence in the penalty phase of a capital case without a specific instruction to the jury about how to consider that evidence.’
*169 “Johnson v. Norris, 587 F.Bd 840, 851 (8th Cir.2008). This holding is consistent with Alabama law. Alabama courts have not required circuit courts to sua sponte give a limiting instruction on the use of victim-impact evidence in the penalty phase of a capital-murder trial.”
74 So.3d at 109. See also Leza v. State, 351 S.W.3d 344 (Tex.Crim.App.2011) (trial court committed no error in failing to give instruction on limiting the consideration of victim-impact evidence); Decay v. State, 352 S.W.3d 319, 330 (Ark.2009) (“This court has previously held that although a proffered instruction [regarding the use of victim-impact evidence] may be a correct statement of the law, it is unnecessary to give it when its substance is covered by other instructions.”); People v. Morgan, 42 Cal.4th 593, 624, 67 Cal.Rptr.3d 753, 778, 170 P.3d 129, 150 (2007) (“Defendant contends the trial court was required to give a sua sponte limiting instruction on how the jury should approach victim impact evidence presented at the penalty phase in order to ensure that ‘emotion would [not] overcome the jurors’ reason, preventing them from making a rational penalty decision. ...’ We disagree.”). Cf. Williams v. State, 188 P.3d 208, 226 (Okla.Crim.App.2008) (“[W]e held that the failure to give [victim-impact instruction] is not always fatal.”).
The circuit court did not commit error in failing to give an instruction on the use of victim-impact evidence in the penalty phase. See Vanpelt.
XXII.
Thompson argues that pros-ecutorial misconduct rendered his sentencing hearing fundamentally unfair. He argues several grounds in support of this contention.
“There is no doubt that, in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused.... If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation.”
Dunlop v. United States, 165 U.S. 486, 498, 17 S.Ct. 375, 41 L.Ed. 799 (1897). “On the other hand, ‘[w]e must not lose sight of the fact that a trial is a legal battle, a combat in a sense, and not a parlor social affair.’ Arant v. State, 232 Ala. 275, 280, 167 So. 540,' 544 (1936).” Davis v. State, 494 So.2d 851, 853 (Ala.Crim.App.1986).
“ ‘In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued at their true worth and are not expected to become factors in the formulation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).’ ”
Callahan v. State, 767 So.2d 380, 392 (Ala.Crim.App.1999) (quoting Bankhead v. State, 585 So.2d 97, 105-07 (Ala.Crim.App.1989)).
*170 “ ‘[I]t is not enough that the prosecutors’ remarks were undesirable or even universally condemned.’ Darden v. Wainwright, 699 F.2d [1031] at 1036 [ (11th Cir.1983)]. The relevant question is whether the prosecutors’ comments ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. .1868, 40 L.Ed.2d 431 (1974).”
Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
“[P]rosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Cr. App.1982). ‘Statements of counsel and argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict.’ Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984).”
Armstrong v. State, 516 So.2d 806, 809 (Ala.Crim.App.1986).
Thompson did not object to many of the now challenged instances of prosecutorial misconduct; therefore, we review those claims under the plain-error rule. See Rule 45A, Ala. R.App. P.
“ ‘While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ].... ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).”
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (emphasis omitted).
The United States Supreme Court stated the following concerning plain error as it related to a prosecutor’s argument:
“Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, ... the remarks must be examined within the context of the trial to determine whether the prosecutor’s behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor’s [remark] would have on the jury’s ability to judge the evidence fairly....
[[Image here]]
“Especially when addressing [a claim of] plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:
“ ‘In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.’ Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).
“It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means. As the Court stated in United States v. Socony-Vacuum Oil. Co., 310 U.S. [150], at 240, 60 S.Ct. [811], at 852 [84 L.Ed. 1129 (1940)], ‘each case necessarily turns on its own facts.’ ”
United States v. Young, 470 U.S. 1, 11-16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). See *171 also Ex parte Parker; 610 So.2d 1181 (Ala.1992).
Moreover, the circuit court on several occasions instructed the jury that arguments of counsel were not evidence and should not be considered as evidence. Jurors are presumed to follow the court’s instructions. See Burgess v. State, 827 So.2d 134,162 (Ala.Crim.App.1998).
With these principles in mind, we review Thompson’s claim of error.
A.
Thompson asserts that the following argument made by the prosecutor in his rebuttal closing argument in the penalty phase was erroneous: ■
“Justice sets a standard that we must all try to measure up to if we’re going to live in a free society. Whether it be in our daily lives, our churches, in judging cases, we all have to measure up to the mark of justice. If there is one reason to recommend the death penalty in this case, I suggest to you that it was sitting out here in this courtroom yesterday, out here in these pews, Julian Crump wanted to be a policeman before his daddy died.”
(R. 4191.) The prosecutor also referenced the family members of the other victims.
“The prosecutor [may] properly comment on the victim’s lost roles as a family member and a friend during closing arguments at the sentencing phase of the trial.” Smith v. State, 838 So.2d 413, 458 (Ala.Crim.App.2002). Nonetheless,
“[t]he State should not encourage the jury to impose the death penalty out of sympathy for the victims. Le [v. State], 947 P.2d [535] at 554 [ (Olda.1997) ]. While such comments are not to be condoned, we do not believe the comments in the present case were so grossly improper to warrant reversal or modification.”
Warner v. State, 144 P.3d 838, 891 (Okla.Crim.App.2006).
While we do not condone the above comments, we are confident that the argument did not so “infect the [proceedings] with unfairness” that Thompson was denied due process. See Darden, supra; Dunlop, supra.
B.
Thompson next asserts that the prosecutor improperly compared his rights with those of the victims. Specifically, Thompson challenges the following argument:
“But [Thompson’s psychologist] told you that all these things from all these records — which include all this hearsay, which is admissible at this stage — all of these things would make you sympathize with the defendant to the extent that you would recommend to the Judge that he impose a life sentence. And what did he tell her to tell you? He told her to tell you that he doesn’t want to die because he still wants to see his family. He still thinks that he has some right that he didn’t afford the victims of his crimes.”
(R. 4167.)
Although this Court has frequently noted that a prosecutor should not compare the rights of a victim with those of the defendant, we have held that such arguments rarely rise to the level of plain error.
“The prosecutor made numerous references to the victim’s rights and several times implied that her rights were to be weighed against the appellant’s. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having *172 been uttered in the heat of debate and were not expected to become factors in the formation of the verdict.”
McNair v. State, 653 So.2d 320, 337-38 (Ala.Crim.App.1992) (emphasis added). See also Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011); Brown v. State, 11 So.3d 866, 918-19 (Ala.Crim.App.2007). The argument in this case did not rise to the level of. plain error. See McNair, supra.
C.
Thompson next argues that the prosecutor “denigrated the role of mitigation” when he made the following argument in closing:
“They’re wanting you to look at the Defendant’s life up to a certain point, and they want you to forget about June the 7th of 2003, which is a moment, a date, a time, that defines this defendant’s life. You cannot look at this life without considering that date. You cannot ignore his crimes in evaluating this case. Sympathies are what they want you to look at; crimes are what the law requires.”
(R. 4166.)
“A prosecutor’s argument ‘in telling the jury not to let sympathy, emotions, or compassion affect its decision ... did not result in any error.’ Stewart v. State, 601 So.2d 491, 506 (Ala.Cr.App.1992).” De-Bruce v. State, 651 So.2d 599, 613 (Ala.Crim.App.1993).
The prosecutor’s argument did not “denigrate the role of mitigating evidence.” The argument was consistent with the instructions given by the court that it should not consider “passion, prejudice, or any other arbitrary factor” when reaching its verdict. There was no error in regard to this claim.
D.
Thompson argues that the prosecutor improperly expressed his opinion concerning the appropriateness of the death sentence when he made the following argument:
“I’ve only had to do this one time before. And it is a difficult thing to develop the resolve — where you have beliefs such as those many of you have expressed, religious beliefs, beliefs about your faith, belief in God, to develop the resolve to make a recommendation that someone be sentenced to death. And it is with very solemn seriousness that the State makes this recommendation that you make this recommendation at this time.
[[Image here]]
“One of the jurors, earlier in their comments about the death penalty, indicated the seriousness with which they face this duty and that they would face their oath, stating, very appropriately, ‘if the evidence is there, I could recommend it, but it would really have to be there.’ I submit to you that if it’s not there in this case, it’s never there.”
(R. 4114-15.)
In Torres v. State, 962 P.2d 3, 18 (Okla.Crim.App.1998), the Oklahoma Court found that the prosecutor’s argument — “If this isn’t a death penalty case, what is?”— was error but that the error was harmless. In Williams v. State, 684 So.2d 1179, 1206 (Miss.1996), the Mississippi Supreme Court held that the following prosecutor’s argument was not reversible error: “I have had capital murders where I did not ask for the death penalty.”
We are convinced after reviewing the record that the prosecutor’s comments did not rise to the level of plain error — they did not undermine the fundamental fairness of the proceedings. Accordingly, we *173 find no reversible error in regard to this claim.
E.
Thompson asserts that, in closing arguments, the prosecutor improperly referred to exhibits that were not admitted into evidence. Specifically, he asserts that the prosecutor committed misconduct by commenting on the mannequins that had been used during trial because, he says, they were used only as demonstrative aids and were not admitted into evidence.
“It is not uncommon for demonstrative aids to be displayed and referred to without ever being formally offered or admitted into evidence.” 2 McCormick on Evid. § 214 Demonstrative Aids (2009).
“ ‘Demonstrative or real evidence, or evidence by inspection, is such evidence as is addressed directly to the senses of the court or jury without the intervention of the testimony of witnesses, as where various things are exhibited in open court.’ Kabase v. State, 31 Ala.App. 77, 83,12 So.2d 758, 764 (1943), and authority cited therein. Where the jury has had an adequate view of real evidence it is not strictly needful to make a formal introduction of it in evidence. Smith v. State, 344 So.2d 1239, 1241 (Ala.Cr.App.), cert. denied, 344 So.2d 1243 (Ala.1977); Rainey v. State, 48 Ala.App. 530, 266 So.2d 335 (1972). ‘The tenor or its proffer is immaterial. It becomes evidence — the fact it imports— when it is properly identified and exhibited before the jury in open court for their inspection.’ Kabase, 31 Ala.App. at 83, 12 So.2d at 764. Although the towel had not been formally introduced, the fact that it had been used in connection with the giving of testimony made it evidence in the case which properly remained before the jury. Smith, supra.”
Murrell v. State, 377 So.2d 1102, 1107 (Ala.Crim.App.1979). See also Berard v. State, 402 So.2d 1044, 1047 n. 1 (Ala.Crim. App.1981) (“Although the slides were not formally admitted, the fact that they were used in connection with the giving of testimony made them evidence in this case.”).
The prosecutor’s arguments referring to the demonstrative aids were well within the scope of proper closing arguments and did not constitute error.
F.
Thompson argues that the prosecutor improperly argued that he should be sentenced to death based on speculation. The prosecutor argued:
“‘Is an eight-by-ten cell enough for the rest of the life of this Defendant?’ T shot those officers because I didn’t want to go to jail.’ This Defendant will not have it that way. He wasn’t going to have it that way on June 7th, 2003, and it is not enough for him.”
(R. 4114.)
The above argument did not invite the jury to speculate. The prosecutor was merely asking a rhetorical question. “Rhetorical questions are permissible. United States v. Green, 305 F.3d 422, 430 (6th Cir.2002).” United States v. Thomas, 105 FedAppx. 773, 783 (6th Cir.2004). “Rhetorical questions are generally within the scope of jury argument, so long as they are based upon a reasonable deduction from the evidence.” Harris v. State, 56 S.W.3d 52, 56 (Tex.Ct.App.2001).
The prosecutor was arguing that the death penalty was the appropriate punishment in this case. There was no improper argument in regard to this claim.
G.
Thompson asserts that the prosecutor erred in urging the jury to rely on *174 the Bible instead of the law when determining the correct punishment in the penalty phase.
The prosecutor argued the following in his rebuttal closing argument:
“It’s interesting that [defense counsel] quoted our Lord. Jesus, himself, made the statement that we — over, in John, the 7th chapter, in the 24th verse, he said, ‘judge not according to appearance, but judge righteous judgment.’ What does that mean? Don’t judge on how it looks or how it sounds, judge on the facts, judge righteously, judge rightly. Judge on this evidence, not on all this sympathy stuff that they’re talking about. What happened; what did he do; how bad was it, what he did; and what’s the just punishment. Judge righteous judgment.
“Make no mistake, ladies and gentlemen, when we start talking about God’s view of this, God never excuses sin. His son dies....”
(R. 4169-70.) Thompson objected, and the court stated: “[Defense counsel] you stood up there and read out of the King James Bible.” In closing, defense counsel made the following argument:
“All of you, in your church life and in your faith life and in your families and in your homes, have been taught values; you’ve been taught right and wrong; you’ve been taught what’s important. I’m not much of a teacher but I’m going to read you something from — that was said by the greatest teacher who was ever here as he was walking around the shores of the Sea of Galilee.
“Here’s what he said, ‘then the King will say to those on his right hand, “Come, O blessed of my Father, inherit the kingdom prepared for you from the foundation of this world; for I was hungry and you gave me food, for I was thirsty and you gave me drink, I was a stranger and you welcomed me, I was naked and you clothed me, I was sick and you visited me, I was in prison and you came to me.” Then the righteous will answer him and say, “Lord, when did we see thee hungry and feed thee, or naked and clothe thee, or in prison and come visit thee?” And the King will say unto them, “Truly, I say to you, as you did it to the least among me, you did it to me.” “As you did it to the least among me, you did it to me.” ’
“All of you all have heard that taught many times. This is what it’s talking about. This is the least among us. This is the one who never had a chance. This is the one who never had a mother to sit him in her lap and hug his neck and tell him that she loved him.”
(R. 4146-47.)
“A prosecutor has a right to reply in kind to the argument of defense counsel. This ‘reply-in-kind’ doctrine is based on fundamental fairness.” Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999). “ ‘When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.’” Davis v. State, 494 So.2d 851, 855 (Ala.Crim.App.1986).[20]
*175 In upholding a prosecutor’s argument— in reply — that a defendant should be sentenced to death in accordance with God’s law, we stated:
“We find that the prosecutor’s comments, when taken in context with the entire closing arguments, were proper as a reply in kind to the Biblical argument made by Melson’s counsel during closing argument that no man ‘dare judge the life of another. That’s up to God.’ (R. 2124.) ‘“A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel. See Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala.1984).” DeBruce v. State, 651 So.2d 599, 609 (Ala.Cr.App.1993).’ Taylor [v. State ], 666 So.2d [36,] 65 [(Ala.Crim.App.1994)]. The prosecutor’s argument permissibly sought to differentiate between God’s laws and man’s laws, so as to counter the argument by Melson’s counsel that only God can judge and punish man. See Daniels v. State, 650 So.2d [544], 561 (Ala.Cr.App.1994).
“Furthermore, ‘“[argument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts and public characters, or to principles of divine law or biblical teachings.” General appeals for law enforcement are within the permissible range of a prosecutor’s closing argument.’ Williams v. State, 710, So.2d 1276, 1301 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998) (citations omitted).”
Melson v. State, 775 So.2d 857, 891-93 (Ala.Crim.App.1999).
The prosecutor’s arguments were a reply-in-kind to the closing argument of defense counsel and did not constitute error, much less plain error.
H.
Thompson asserts that the prosecutor improperly commented on his lack of remorse. The prosecutor argued:
“I ask you, ladies and gentlemen, we’ve been here four weeks — we’ve been here a month, nearly — I ask you, does he look horrified to you as he sits over there between his lawyers? Does he look horrified about what he’s done? Or does he not, rather, look as one with no remorse?”
(R. 4173.)
In Hunt v. Commonwealth, 304 S.W.3d 15 (Ky.2009), the prosecutor commented that Hunt had shown a “total and complete lack of remorse or regret over anything that occurred.” In finding no reversible error, the Kentucky Supreme Court stated:
“Rather than a comment on Hunt’s silence, we construe the statements as relating to his courtroom demeanor. A prosecutor is entitled to comment on the courtroom demeanor- of a defendant. Woodall v. Commonwealth, 63 S.W.3d 104, 125 (Ky.2001). We find no error in the comments cited.”
304 S.W.3d at 38. “The conduct of the accused or the accused’s demeanor during the trial is a proper subject of comment:” Wherry v. State, 402 So.2d 1130,1133 (Ala.Crim.App.1981). This Court has held that “remorse is ... a proper subject of closing arguments.” Ex parte hoggins, 771 So.2d 1093,1101 (Ala.2000).
The prosecutor’s comments were within the wide scope of proper prosecutorial argument and did not constitute error.
I.
Thompson asserts that the prosecutor improperly argued in closing that *176 the appellate court would review the jury’s verdict. •
The prosecutor argued:
“If [Thompson] gets the death penalty, as we argue to you that he should, he’ll die one day at an appointed hour with fair warning, plenty of time to talk to his family, plenty of time to plead his case to the highest courts.... ”
(R. 4187.) Defense counsel objected to this argument and moved for a mistrial. The court sustained the objection and instructed the jury to disregard the comment. (R. 4188.)
“Initially, we observe that the appellant has no adverse ruling from which to appeal. In each instance the trial court instructed the jury to disregard the complained of arguments.... As we have previously stated, ‘The trial court’s immediate curative instruction concerning the prosecution’s comment creates a prima facie presumption against error. Holliday v. State, 641 So.2d 325, 329 (Ala.Cr.App.1994); Mathis v. State, 414 So.2d 151 (Ala.Cr.App.1982).’ ”
Smith v. State, 756 So.2d 892, 928 (Ala.Crim.App.1998). The circuit court instructed the jury to disregard the comment; thus, the court cured any possible error that may have occurred. See Eaton v. State, 759 So.2d 562 (Ala.Crim.App.1999). Accordingly, there is no error in regard to this claim.
J.
Thompson last argues that the cumulative effect of the prosecutorial misconduct denied him a fair trial and a reliable sentencing hearing.
“After thoroughly reviewing the record and considering the allegations of prose-cutorial misconduct cumulatively, we find no prosecutorial misconduct, but even if there was impropriety, this Court finds that the cumulative effect of any alleged errors did not probably injuriously affect [the defendant’s] substantial rights and does not require reversal.”
Stanley v. State, 143 So.3d 230, 305 (Ala.Crim.App.2011) (emphasis added). We hold that the cumulative effect of the alleged instances of prosecutorial misconduct did not adversely affect Thompson’s substantial rights and does not require reversal.
XXIII.
Thompson next argues that sentencing an 18-year-old to death is cruel and unusual punishment in violation of the Eighth Amendment.
The United States Supreme Court in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183,161 L.Ed.2d 1 (2005), held that it was unconstitutional to execute a defendant who was under the age of 18 when he committed murder. See also Adams v. State, 955 So.2d 1037 (Ala.Crim.App.2003), rev’d in part, 955 So.2d 1106 (Ala.2005). The United States Supreme Court stated:
“Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in Thompson [v. Oklahoma, 487 U.S. 815 (1988)], drew the line at 16. In the intervening years the Thompson plurality’s conclusion that offenders under 16 may not be executed has not been challenged. The logic of Thompson extends to those who are un-, der 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. *177 It is, we conclude, the age at which the line for death eligibility ought to rest.”
543 U.S. at 574.
The Alabama appellate courts have applied the holding in Roper to those individuals who were under the age of 18 when they committed murder. See Ex parte Adams, 955 So.2d 1106 (Ala.2005) (Supreme Court remanded case, in which defendant was 17 years of age at the time of the murder, for reconsideration of sentence in light of Roper); Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006) (remanded case for Hyde, who was 17 years old at the time of the offense, to be resen-teneed to life imprisonment without parole); Wimberly v. State, 931 So.2d 60 (Ala.Crim.App.2005) (death sentence set aside because Wimberly was 17 years old at the time of the murder); Duke v. State, 922 So.2d 179 (Ala.Crim.App.2005) (Duke’s death sentence was vacated because Roper was released while case was pending on appeal and Duke was 17 years old at the time of the murders); Duncan v. State, 925 So.2d 245 (Ala.Crim.App.2005) (death sentence set aside because Duncan was 17 years old at the time of the murder).
Thompson was 18 years of age at the time of the murders. Thus, his death sentence is consistent with Roper and the Eighth Amendment.
XXIV.
Thompson asserts that his death sentence is unconstitutional because, he says, he was a traumatized, abused, and mentally ill 18-year-old and, he says, his “mental age” warranted that he be treated as a juvenile.
Alabama has not addressed the issue whether a defendant’s “mental age” should be considered when determining whether a death sentence is authorized. The few states that have addressed this issue have held that Roper does not authorize the consideration of a defendant’s mental age. The Kentucky Supreme Court thoroughly addressed this issue in Bowling v. Commonwealth, 224 S.W.3d 577 (Ky.2006), and stated:
“Bowling argues that the Roper decision must be interpreted as prohibiting the execution of not only those offenders whose chronological age is below eighteen, but also those offenders whose mental age is below eighteen. Bowling contends that unlike the Supreme Court’s prior decisions dealing with the juvenile death penalty, Roper defines ‘juvenile’ and ‘youthful person’ in terms of the mental development and impairments that are inherent in anyone who functions as a juvenile, not just those who are chronologically juveniles. See Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurality opinion prohibiting imposition of death penalty on any juvenile under the chronological age of sixteen at the time of offense). See also Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
“Bowling points out that the Roper decision focuses on the immaturity, irresponsibility, and susceptibility to negative influences inherent in juveniles, and how such factors prevent the only recognized goals of the death penalty — retribution and deterrence of prospective offenders — from being satisfied. Thus, Bowling concludes that because such rationale has no relation to a person’s chronological age, but only to his or her mental age, the Court was clearly imposing a broad restriction against the execution of any offender who mentally functions below the level of an average chronological eighteen year old.
*178 “We do not necessarily disagree that, in theory, the broad concepts espoused by the Supreme Court could pertain to those who function at the mental level of a juvenile. To be sure, the Roper Court recognized that there are adults who have the mental abilities of a juvenile, as well as those juveniles who function at a level far beyond their years. For that reason, however, the Court established a bright line rule:
‘“Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in Thompson drew the line at 16. In the intervening years the Thompson plurality’s conclusion that offenders under 16 may not be executed has not been challenged. The logic of Thompson extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.’
“Roper, 543 U.S. at 574, 125 S.Ct. at 1197-98, 161 L.Ed.2d at 24-25. The plain language of Roper compels the conclusion that its prohibition is limited to ‘the execution of an offender for any crime committed before his 18th birth-day_’ Id. at 588, 125 S.Ct. at 1206, 161 L.Ed.2d at 38 (O’Connor, J. dissenting).
[[Image here]]
“Bowling has not cited any published authority prohibiting the death penalty based upon ‘juvenile mental age.’ Nor has Bowling demonstrated a national consensus that mental age should be a criterion by which to exclude the death penalty. Without question, the Supreme Court has been presented with and has considered the concept of mental age. Penry [v. Lynaugh, 492 U.S. 302 (1989) ]. Thus, we conclude that Roper v. Simmons only prohibits the execution of those offenders whose chronological age was below eighteen at the time of the commission of the offense. See also Hill v. State, 921 So.2d 579, 584 (Fla.2006).”
224 S.W.3d at 582-84 (footnote omitted). See also Mitchell v. State, 235 P.3d 640, 659 (Okla.Crim.App.2010) (“We find the Bowling decision well reasoned and persuasive.”); State v. Campbell, 983 So.2d 810, 830 (La.2008) (“Roper established a bright-line demarcation for application of the standard announced therein, rather than a standard which could be applied to a defendant’s ‘mental age’ on a case-by-case basis.... ”); Hill v. State, 921 So.2d 579, 584 (Fla.2006) (“Hill’s third claim is that his mental and emotional age places him in the category of persons for whom it is unconstitutional to impose the death penalty under [Roper ]. This claim is without merit. Roper does not apply to Hill. Hill was twenty-three years old when he committed the crimes at issue. Roper only prohibits the execution of those defendants whose chronological age is below eighteen.”).
We adopt the reasoning of the courts cited above. Roper establishes a bright-line rule- based on the chronological age of the defendant, and this Court will not depart from Roper to consider Thompson’s “mental age.”
*179 XXV.
Thompson asserts that his death sentence must be vacated in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 158 L.Ed.2d 556 (2002).
The United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466,120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), held that any fact that increases a sentence above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. The Supreme Court extended this holding to death-penalty cases in Ring. Before trial, Thompson moved that the indictment against him be dismissed because, he said, it violated Ring. (C.R. 147.) The circuit court denied the motion. (R. 65.)
On appeal, Thompson argues that Ring invalidated Alabama’s death-penalty law because, he says, “a sentence of death can only be imposed where a jury finds unanimously and beyond a reasonable doubt (1) that the statutory aggravating circumstances exist beyond a reasonable doubt and (2) that the aggravating circumstance(s) outweighs the mitigating circumstances.” (Thompson’s brief, p. 108.)
“[T]he weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (‘Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.’); Zant v. Stephens, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (‘sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does’).”
Ex parte Waldrop, 859 So.2d 1181, 1189 (Ala.2002).
“Ring requires only that the jury unanimously find the existence of an aggravating circumstance in order to make the defendant death-eligible. Alabama law does not require that the jiffy’s advisory verdict be unanimous before it can recommend death. See § 13A-5-46(f), Ala.Code 1975. Nothing in Ring supports Miller’s claim that the jury’s advisory verdict be unanimous.”
Miller v. State, 913 So.2d 1148, 1169 n. 4 (Ala.Crim.App.2004) (opinion on return to remand). See Gobble, 104 So.3d at 976 {“Ring does not require a unanimous recommendation for the death penalty before a defendant may be sentenced to death.”).
Next, Thompson asserts that his death sentence violates Ring because, he says, there is no basis for concluding that the jury found the aggravating circumstances to exist beyond a reasonable doubt.
“Ring and Apprendi do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in ‘an increase in a defendant’s authorized punishment ... ’ or ‘ “expose[ ] [a defendant] to a greater punishment....” ’ Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggrava *180 ting circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became ‘exposed’ to, or eligible for, the death penalty. The trial court’s subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier is not an ‘element’ of the offense.”
Waldrop, 859 So.2d at 1190.
Thompson’s sentence does not violate the Supreme Court’s decision in Ring.
XXVI.
■ [168] Thompson argues that evolving standards of decency have rendered Alabama’s method of execution in violation of the Eighth Amendment because, he says, the method is cruel and unusual punishment.
Effective July 1, 2002, Alabama’s primary method of execution is lethal injection involving a three-drug protocol. Section 15 — 18—82.1(a), Ala.Code 1975. Section 15 — 18—82.1(c), Ala.Code 1975, provides: “A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.” Section 15 — 18—82.1(h), Ala.Code 1975, also provides: “In any case in which an execution method is declared unconstitutional the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.”
The constitutionality of Alabama’s method of execution has been addressed by the United States Supreme Court and the Alabama Supreme Court.[21] In Ex parte Belisle, 11 So.3d 328 (Ala.2008), the Alabama Supreme Court stated:
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 [170 L.Ed.2d 420 (2008) ], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ■ ‘Simply because an execution method may result in pain, either by 'accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s *181 use of lethal injection as a method' of execution does not violate the Eighth Amendment to the United States Constitution.”
11 So.3d at 339.
Alabama’s method of lethal injection does not constitute cruel and unusual punishment, and Thompson is not entitled to relief on this claim.
XXVII.
Thompson asserts that the pre-sentence report was unreliable. Thompson argues in his brief: “Because Mr. Moore was unable to contest this highly prejudicial commentary, the inadmissible statements contained in this presentence report were prejudicial to Mr. Moore and deprived him of a reliable sentencing de-termination_” (Thompson’s brief, p. 113.)
The record shows that at the sentencing hearing before the court, defense counsel noted for the record that he had read the presentence report and had gone over the report with Thompson. (R. 4224.) The court specifically asked Thompson if he had any evidence to offer concerning the presentence report and the mental evaluations. The State asked that the Court rely on the evidence that had been presented at trial. Thompson objected to the facts set out in the presentence report but failed to inform the court which facts he was disputing. (R. 4222.)
Section 13A-5-47, Ala.Code 1975, specifically provides that a presentence report must be prepared. Rule 26.3(b), Ala.R.Crim. P., lists the contents of a presen-tence report and states:
“The presentence report may contain:
“(1) A statement of the offense and the circumstances surrounding it;
“(2) A statement of the defendant’s prior criminal and juvenile record, if any;
“(3) A statement of the defendant’s educational background;
“(4) A statement of the defendant’s employment, background, financial condition, and military record, if any;
“(5) A statement of the defendant’s social history, including family relationships, marital status, interests, and activities, residence history, and religious affiliations;
“(6) A statement of the defendant’s medical and psychological history, if available;
“(7) Victim Impact Statements; and
“(8) Any other information required by the court.”
In addressing a claim that a capital-murder defendant’s presentence report included unreliable information, we have stated:
“It is clear to this court that the report is entirely consistent with Alabama’s capital murder statute regarding evidence to be considered in sentencing. Section 13A-5-45(d), Ala.Code state's, ‘[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.’ Further, the report itself is an out-of-court statement and is entirely hearsay. However, it is admissible under § 13A-5-47 Code of Alabama, being specifically called for consideration by the trial court.
“It is equally clear to this court that the summary of the offense contained in the pre-sentence report was not prejudicial to this appellant. He argues that *182 this summary contained an opinion [by the parole officer] as to his culpability in the crime in question. This argument is without merit. The appellant’s culpability was established by the jury’s verdict of guilt. Further, the summary of the offense is consistent with the evidence presented by the State and with the appellant’s own statement which was admitted into evidence at trial. The áppel-lant was not prejudiced by this information.”
Thompson v. State, 508 So.2d 871, 880 (Ala.Crim.App.1986).
We revisited this issue in Hyde v. State, 778 So.2d 199 (Ala.Crim.App.1998), and stated:
“The appellant’s argument that the trial court improperly considered the presen-tence report is without merit. The sentencing order shows that the trial court independently considered and weighed the evidence concerning the aggravating circumstances and the mitigating circumstances; the order does not indicate that the trial court considered any improper evidence in reaching its decision.... In addition, the appellant’s argument that the report contained improper hearsay evidence is also without merit. The ‘report itself is an out-of-court statement and is entirely hearsay. However, it is admissible under § 13A-5-47, Code of Alabama, being specifically called for consideration by the trial court.’ Thompson v. State, 503 So.2d 871, 880 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). Finally, we presume that the trial court disregarded any improper evidence in sentencing the appellant. Sockwell, supra; Lightbourne [v. Dugger, 829 F.2d 1012 (C.A.11 1987)], supra, Whisenhant [v. State, 555 So.2d 219 (Ala.Cr.App.1988) ], supra.”
778 So.2d at 219.
The circuit court’s sentencing order does not reflect that it considered any inaccurate information when it sentenced Thompson to death. The court’s detailed order reflects that the court relied on the evidence presented at trial. Accordingly, we find no error in regard to this claim.
XXVTII.
Thompson last argues that the cumulative effect of all the alleged errors warrants that his convictions and sentence be reversed.
“ ‘The Alabama Supreme Court has set forth the cumulative-error rule as follows: “[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.” Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P..). Applying this standard to Lewis’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected Lewis’s substantial rights at trial.’ ”•
Sharifi v. State, 993 So.2d 907, 946-47 (Ala.Crim.App.2008) (quoting Lewis v. State, 24 So.3d 480, 538 (Ala.Crim.App.2006)).
Applying the above standard in this case, we find that the cumulative effect of any nonreversible errors did not adversely affect Thompson’s substantial rights, and he is due no relief on this claim.
*183 XXIX.
Last, as required by § 13A-5-53, Ala.Code 1975, we must consider the propriety of Thompson’s capital-murder conviction and sentence of death.
Thompson was convicted of six counts of capital murder for murdering Officer Arnold Strickland, Officer James Crump, and Leslie “Ace” Mealer pursuant to one scheme or course of conduct, for murdering the victims during the course of a robbery, and for murdering Officers Strickland and Crump while they were on duty.
The record shows that Thompson’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The circuit court found the following aggravating circumstances: that the murders were committed during the course of a robbery, § 13A-5-49(4), Ala.Code 1975; that the murders were committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody, § 13A-5-49(5), Ala.Code 1975; that the murders were committed to disrupt or to hinder the lawful exercise of a governmental function or the enforcement of laws, § 13A-5-49(7), Ala.Code 1975; and that the murders were committed pursuant to one scheme or course of conduct, § 13A-5-49(9), Ala.Code 1975. The circuit court stated the following regarding the aggravating circumstances:
“The Court finds that four of the aggravating circumstances enumerated by Statute were proven beyond a reasonable doubt:
“1. The capital offense was committed while [Thompson] was engaged in or was in the commission of, or flight after committing robbery, 1st degree. The jury’s verdicts establish the existence of this circumstance, and the verdict is amply supported by the evidence. The pistol [Thompson] took from Officer Strickland belonged to the City of Fayette and was issued as his service firearm and was found in the patrol car taken by [Thompson] when he wás arrested in Mississippi. It is [Thompson’s] counsel’s position that the taking of the pistol was an ‘afterthought’ and this aggravating circumstance should not be considered.
“The robbery statute does not require that the robber be armed prior to the robbery. Instead, the robber must be ‘armed with a deadly weapon or dangerous weapon’ during the robbery or the flight therefrom. Here, [Thompson] took Officer Strickland’s pistol and killed him and the other two men. Clearly [Thompson] was armed during the robbery and during the flight therefrom. [Thompson’s] counsel’s argument is without merit and the Court finds the existence of this aggravating circumstance. There was only one robbery, hence only one .aggravating circumstance pursuant to this statutory ground, although there were three murders.
“2. The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. There is absolutely no question that the three murders occurred while [Thompson] was effecting an escape from custody. [Thompson] was taken into custody after being found in possession of a vehicle reported stolen and this information was communicated to Officers Strickland and Crump through proper law enforcement channels. [Thompson] was undergoing the booking process at the police station before being transported to the Fayette County Jail when he took Officer Strick *184 land’s gun, killed the three men, and escaped in a police cruiser.
“3. The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. After [Thompson] was transported to the Fayette Police Station, Officers Strickland and Crump were advised by law enforcement . officials from Walker County that the vehicle being driven by [Thompson] was stolen from a business and that other businesses in the same vicinity had been burglarized. One of the businesses was a dry cleaners and dry cleaning had been found in [Thompson’s] vehicle. Officer Crump was in the process of making a print of [Thompson’s] shoe to develop evidence in further investigation of the alleged break-ins when [Thompson] killed the two officers and Mr. Mealer. It is abundantly clear that these murders were committed to disrupt the lawful exercise of a governmental function and enforcement of laws as to the investigation of the defendant, the stolen car, and other alleged break-ins and burglaries in Jasper.
“4. [Thompson] intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct. The jury’s verdict establishes, existence of this aggravating circumstance, and the verdict is overwhelmingly supported by the evidence. It is undisputed that [Thompson] shot and killed Arnold Gunther Strickland, James Eddie Crump and ... Leslie Franklin Mealer pursuant to one scheme or course of conduct.
“SUMMARY OF AGGRAVATING CIRCUMSTANCES
“No statutory aggravating circumstances other than those outlined above were established by the State. However, those that have been described are in the aggregate extremely weighty. [Thompson] has not killed two persons pursuant to one scheme or course of conduct — he killed three. [Thompson] did not intentionally kill only one person, or two, during the course of a robbery— he killed three. And finally, the entire circumstances that enveloped the killings — striking down two police officers and a 911 dispatcher, charged with serving, protecting, and insuring the public’s safety, for the purpose of escaping from custody and hindering the enforcement of laws have tremendous weight.”
(C.R. 342-44.)
The circuit court stated the following concerning the mitigation circumstances:
“This Court is required to enter specific findings concerning the existence or nonexistence of each mitigating circumstance enumerated by statute. Before dealing with the mitigating circumstances, however, the Court wishes first to evidence the Court’s clear understanding of the evidence presented by [Thompson] as mitigation.
“There are several mitigating circumstances to be considered by the Court. However, primary focus of [Thompson’s] evidence of mitigating factors are [Thompson’s] troubled childhood and diagnosis of Post Traumatic Stress Disorder (PTSD). These issues are closely related as it is alleged that [Thompson’s] abusive childhood resulted in PTSD. The Court will consider these as separate mitigating factors and also as they relate one to the other.
“[Thompson] was born out of wedlock on the 15th day of May 1985, to fifteen-year-old Gloria Thompson. [Thompson’s] father is Kenneth W. Moore and Gloria Thompson was Kenneth Moore’s babysitter. [Thompson] lived with his biological mother until he was five years *185 old. Gloria Thompson lived a chaotic life of drug and alcohol abuse and had numerous sexual partners. [Thompson] was removed from his mother’s custody at age five and lived in many different places with relatives and in foster homes.
“At seven years of age [Thompson] went to live with his biological father who was allegedly cruel and abusive to [Thompson] during his childhood and adolescence. Family members testified that [Thompson] worked for up to forty hours per week beginning at seven years of age for his father’s janitorial service, that [Thompson] was beaten by his father and was made to do grueling physical exercise as punishment. There was also testimony that [Thompson’s] father verbally abused him and that the physical and verbal abuse was directed at other family members in [Thompson’s] presence. At age fifteen [Thompson] ran away from his father’s home and moved back with his mother.
“The Court understands that [Thompson’s] environment had a role in making [Thompson] what he is. Against the aggravating circumstances enumerated previously, however, the necessity for every person being morally responsible for his or her own actions causes these environmental factors which are offered as mitigation to appear weak. There is no question that environment was not kind to [Thompson]. Nonetheless, what [Thompson’s] parents did to him does little, in and of themselves, to mitigate what [Thompson] did to Officers Strickland and Crump and dispatcher Mealer. The argument that when a bad social environment produces bad people, that fact should in some way mitigate the punishment for these bad people, leads ultimately to the absurd conclusion that only people who come from an impeccable social background deserve the death penalty if they commit capital murder.
“Experts for [Thompson] and [the] State diagnosed [Thompson] with PTSD and the evidence supports this conclusion. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, commonly known as DSM-IV states that the essential feature of PTSD is the development of characteristic symptoms following exposure to an extreme traumatic stressor. The DSM-IV describes many characteristics of PTSD which include dissociative symptoms that are described as a disruption in the usually integrated functions of consciousness, memory, identity, or perception.
“[Thompson’s] experts testified that [Thompson] was in a dissociative state when he shot and killed the three men and was incapable of realizing the seriousness or wrongfulness of his actions. Dr. Rosenzweig, one of [Thompson’s] experts, testified that in [Thompson’s] mind, he perceived he was in a bad dream when he killed the three men and during his escape. The State’s experts testified [Thompson] was not in a dissociative state when he committed the murders. The State’s experts further testified that it is very rare for PTSD to rise to the level of a legal defense or for a person to be in a dissociative state as described by [Thompson’s] experts.
“The evidence is clear that [Thompson] has PTSD, it is also clear that this disorder did not rise to the level of the legal defense of mental disease or defect. [Thompson] knew the difference between right and wrong, and knew what he was doing — he is not at all entitled to have his behavior excused because of severe mental disease or defect. That issue was determined by the jury when it found [Thompson] guilty of *186 the offenses, and I totally agree with the jury’s findings.
“The Court finds that [Thompson’s] abusive and troubled childhood is determined to be a non-statutory mitigating circumstance. [Thompson’s] disorder of PTSD, though not rising to the level of severe mental disease or defect, is quite capable, however, of producing emotional stress and of substantially impairing the ability of the defendant to conform his conduct to the requirements of law. Both these mitigators are factual and real. However, the law does not say that the existence of either or both of these mitigators concludes the process of analysis. After it has been determined that they exist, they must be weighed against the aggravating circumstances. The Court will now specifically address each of the statutory designated mitigating circumstances.
“1. [Thompson] has no significant history of prior criminal activity. The Court finds, based on the evidence, that [Thompson] has no significant history of prior criminal activity. The Court finds this to be a mitigating circumstance. As a mitigating circumstance, however, it is extremely weak in comparison to the aggravating circumstances of this offense.
“2. That the capital offense was committed while [Thompson] was under the influence of extreme or emotional disturbance. This mitigating circumstance presents some difficulty in determining its existence and how much weight to assign it. [Thompson’s] counsel contends that [Thompson], as a result of PTSD, re-experienced the past trauma of his father’s abuse at the police station and this triggered a dissociative state.
“Common sense dictates that any person would experience some emotional disturbance when taken into custody for the investigation of a felony. This, by itself, hardly recommends the resulting emotional distress as a mitigator. There were no objective or external stressors that explain -or mitigate the actions of the defendant. Whatever stress [Thompson] may have experienced was more the result of PTSD than the result of events that occurred outside his own mental processes and is more a factor to consider under mitigating circumstance No. 6. Emotional distress that is produced by emotionally stressful events would be entitled to more weight than emotional distress produced by [Thompson’s] own personality. PTSD, is itself, in a sense, an emotional disturbance. The Court finds that mitigating circumstance No. 2 exists but, standing on its own, it is given very little weight.
“3. That the victim was a participant in [Thompson’s] conduct and consented to it. There is no support in the evidence for this mitigating circumstance. On the contrary, throughout the guilt and sentencing phases, [Thompson’s] counsel argued that Officers Strickland and Crump and dispatcher Mealer did nothing to contribute to their deaths.
“4. That [Thompson] was an accomplice in the capital offense committed by another person and his participation was relatively minor. There is no support in the evidence for this mitigating circumstance.
“5. That [Thompson] acted under extreme duress or under substantial influence of another person. There is no support in the evidence for this mitigating circumstance.
“6. That the capacity of [Thompson] to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. The Court finds that this *187 mitigating circumstance exists because PTSD affected [Thompson]. However, we should quickly note that [Thompson’s] ability to appreciate the criminality of his conduct was not impaired. He knew that what he was doing was wrong and criminal. He chose to do it anyway. The great difficulty with this mitigating circumstance is not whether it exists — it does exist. The problem is how much weight to assign it.
“[Thompson’s] experts, Drs. Rosenzweig and Nevels, both testified that [Thompson] had PTSD and was in a dissociative state when he murdered the two officers and dispatcher Mealer— that [Thompson] thought he was in a ‘bad dream.’ The State’s experts, Drs. Willis and Ronan, testified that [Thompson] was not in a dissociative state when he killed the three men. They also testified that a dissociative state, as described by [Thompson’s] experts, is a rare occurrence and that a person in a dissociative state can’t recall details or adjust their behavior to specific events.
“Both during and after the murders [Thompson] engaged in purposeful activity and adjusted his behavior to specific events including taking a fingerprint card with identifying information from the police station, taking car keys from the body of one of the police officers, taking a police cruiser, attempting to reenter the police station to retrieve his shoe, changing his route of escape after hearing reports on the police radio, changing clothes, hiding the police cruiser and removing the emergency light bar, attempting to buy gasoline and, hiding the police car where the defendant was taken into custody near Columbus, Mississippi.
“The statement given by [Thompson] to Alabama Bureau of Investigation Agent Johnny Tubbs shows that he clearly remembered events and details that were unknown to Agent Tubbs. Furthermore, based on another statement given to Dr. Willis, [Thompson’s] statement to Agent Tubbs was censored for incriminating information.
“Two statements by [Thompson] to Dr. Willis demonstrate [Thompson’s] cold-blooded and remorseless intent. [Thompson] matter of factly told Dr. Willis that after he shot dispatcher Mealer multiple times that ‘he (Mealer) was on his hands and knees so I shot him in the head.’ Upon remembering that he had left one shoe in the police station, [Thompson] told Dr. Willis that the reason he went back in the police station to retrieve the shoe was T wanted my brand new K-Swiss shoes, I paid $85.00 for them, they look good — I didn’t want to throw them out.’
“Aside from a disturbing and chilling description of these horrific murders, these statements show that [Thompson] clearly could recall the details and adjust his behavior to the events. The notion that [Thompson] was in an dissociative state and that he thought he was in a bad dream is not supported by the evidence and is far fetched, to say the least. In weighing this circumstance, it does little to mitigate the aggravating circumstances.
“7. The age of [Thompson] at the time of the crime. [Thompson] was 18 years old at the time of the crime. His youth is a mitigating circumstance, but a weak one. Coupled with other mitigating factors that have previously been discussed, [Thompson’s] youth makes him the appropriate object for sympathy. The Court finds that it is indeed difficult to order the execution of a young man with all his life before him. [Thompson’s] youth is undisputed and it, is a mitigating circumstance; but against the entirety of the evidence in *188 this case, it does little to mitigate the aggravating circumstances.
“Counsel for [Thompson] argued for the Court to consider several additional non-statutory mitigating circumstances, the first being the cooperation of [Thompson]. This mitigating circumstance is not supported by the evidence. After killing the three men, [Thompson] fled and took action to evade capture. When [Thompson] was taken into custody, he did give a statement to ABI Agent Tubbs. However, as discussed above, the statement to Agent Tubbs was censored for incriminating information. The Court finds that this non-statutory mitigating circumstance does not exist.
“[Thompson’s] counsel argued that [Thompson’s] contrition and remorse should be considered a non-statutory mitigating circumstance. [Thompson] did make statements that could be interpreted as evidence of remorse and contrition, including [Thompson’s] address to the victim’s families at sentencing. However, there are many other statements and actions by [Thompson] that are clear evidence of a lack of remorse, including his statements to Agent Tubbs and most notably to Dr. Willis. [Thompson] had other opportunities to voice his remorse in statements to law-enforcement officials, doctors, and experts but failed to do so.. The Court has had an opportunity to observe [Thompson] during these proceedings, including his address to the victim’s families, and has seen no evidence of a genuine expression of remorse or contrition. The Court finds that this mitigating circumstance does not exist.
“[Thompson’s] counsel next argued the lack of evidence of the future dangerousness of [Thompson] should be considered a non-statutory mitigating circumstance. [Thompson’s] experts testified that [Thompson] would benefit from treatment and/or counseling and the State offered no evidence of the future dangerousness of [Thompson], The Court finds that this mitigating circumstance does exist. However, against the entirety of this case it does very little to mitigate the aggravating circumstances and is given very little weight.
“The next mitigating circumstance argued by [Thompson’s] counsel is any residual doubt, especially to mental health issues. This mitigating circumstance is not supported by the evidence. The guilty verdicts returned by the jury constituted factual findings against the plea of not guilty by mental disease or defect. The Court has previously addressed these issues in this Order at length in its findings concerning non-statutory mitigating circumstances and in statutory designated circumstances Five and Six. Based upon the evidence, the Court finds that this mitigating circumstance does not exist.
“[Thompson], through counsel, next argued for the Court to consider a sentence of life without the possibility of parole as sufficient punishment as a non-statutory mitigating circumstance. Based upon the evidence and the four aggravating circumstances established beyond a reasonable doubt, the Court finds that this mitigating circumstance does not exist. The death penalty in this case is entirely appropriate and warranted.
“Counsel for [Thompson] next contends [Thompson] has the ability to conform to prison life and that this should be considered a mitigating circumstance. The State offered evidence of [Thompson’s] behavior and his violation of rules and regulations while incarcerated in the Tuscaloosa County Jail. [Thompson] disputed this evidence. Based upon the *189 evidence, the Court finds that this mitigating circumstance does not exist.
“The last non-statutory mitigating circumstance argued by [Thompson’s] counsel was that the [Thompson] was loved by and loved his family. Based upon the evidence offered by [Thompson] during the guilt and sentencing stages of trial, it is clear that this mitigating circumstance is not supported by the evidence. The Court finds that this mitigating circumstance does not exist.”
(C.R. 344-52.)
Thompson asserts that the circuit court erred in not assigning more weight to the mitigation evidence concerning his abusive and violent upbringing and that he was under the influence of extreme emotional disturbance when he committed the murders. He further asserts that it was error for the court to not find as a mitigating circumstance the fact that Thompson was loved by his family.
“‘While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’ ” Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989)). “The weight to be attached to the ... mitigating evidence is strictly within the discretion of the sentencing authority.” Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000).
“ ‘[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983), rev’d on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.’ ”
Bush v. State, 695 So.2d 70, 94 (Ala.Crim. App.1995) (quoting Clisby v. State, 456 So.2d 99, 102 (Ala.Crim.App.1983)). See also Douglas v. State, 878 So.2d 1246,1260 (Fla.2004) (“We conclude that the trial court did not abuse its discretion in giving little weight to the mitigating facts relating to [the defendant’s] abusive childhood.”); Hines v. State, 856 N.E.2d 1275, 1282-83 (Ind.App.2006) (“The trial court is not obliged to weigh or credit mitigating factors the way a defendant suggests.... [or] to afford any weight to [the defendant’s] childhood history as a mitigating factor in that [the defendant] never established why his past victimization led to his current behavior.”).
Thompson also argues that it was error for the circuit court to count robbery as both an element of the capital murder and an aggravating circumstance. He specifically argues that double-counting fails to narrow the class of those eligible for the death penalty.
“It is true that under Alabama law at least one statutory aggravating circumstance under Ala.Code 1975, § 13A-4-49, must exist in order for a defendant convicted of a capital offense to be sentenced to death. See Ala.Code 1975, § 13A-5-45(f) (‘Unless at least one aggravating circumstance as defined in *190 Section 13A-5-49 exists, the sentence shall be life imprisonment without parole.’); Johnson v. State, 823 So.2d 1, 52 (Ala.Crim.App.2001) (holding that in order to sentence a capital defendant to death, the sentencer ‘ “must determine the existence of at least one of the aggravating circumstances listed in [Ala.Code 1975,] § 13A-5-49” ’ (quoting Ex parte Woodard, 631 So.2d 1065, 1070 (Ala.Crim.App.1993))). Many capital offenses listed in Ala.Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49:
“ ‘For example, the capital offenses of intentional murder during a rape, § 13A-5-40(a)(3), intentional murder during a robbery, § 13A-5-40(a)(2), intentional murder dming a burglary, § 13A-5-40(a)(4), and intentional murder during a kidnapping, § 13A-5-40(a)(l), parallel the aggravating circumstance that “[t]he capital offense was committed while the defendant was engaged ... [in a] rape, robbery, burglary or kidnapping,” § 13A-5-49(4).’
“Ex parte Woodard, 631 So.2d at 1070-71 (alterations and omission in original).
“Furthermore,, when a defendant is found guilty of a capital offense, ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.’ Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (‘The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.’). This is known as ‘double-counting’ or ‘overlap,’ and Alabama courts ‘have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.’ Ex parte Trawick, 698 So.2d 162,178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App.1992).”
Ex parte Waldrop, 859 So.2d 1181,1187-88 (Ala.2002).
“Here, the ‘narrowing function’ was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that ‘the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.’ The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.”
Lowenfield v. Phelps, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
Section 13A-5-53(b)(2), Ala.Code 1975, requires that this Court independently weigh the aggravating and the mitigating circumstances. After such an independent weighing we are convinced that the death penalty was the appropriate sentence in this case.
Section 13A-5-53(b)(3), Ala.Code 1975, requires that we determine whether Thompson’s sentence is disproportionate or excessive when compared to penalties imposed in similar cases. Thompson’s sentence is neither.
Finally, as required by Rule 45A, Ala. RApp. P., we have searched the record for any error that may have adversely affected *191 Thompson’s substantial rights and have found none.
„ ,, „ For the foregoing reasons, we affirm Thompson’s capital-murder convictions and sentence of death.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and BURKE, JJ., concur.

. This case was originally assigned to another member of this Court; it was reassigned to Judge Joiner on March 1,2011.

. The appellant is frequently called "Devin Moore” in the transcript; however, the indictment lists his name as "Devin Darnell Thompson.”

. Section 15-2-24, Ala.Code 1975, states: "When a change of venue is authorized, the trial must be removed to the nearest county free from exception, and it can be removed but once.”

. We have held: "The statutory restrictions of Alabama Code 1975, Section 15-2-24, allow *104 ing one change of venue, cannot be construed as operating to deny an accused the constitutional right to a fair trial.” Hines v. State, 384 So.2d 1171, 1184 (Ala.Crim.App.1980).

. Rule 11, Ala. R. Juv. P., was in effect at the time Thompson made his statement. This rule was rescinded effective January 9, 2009, and replaced by § 12-15-202, Ala.Code 1975, which specifically addresses the rights of a child.

. The United States Supreme Court in Ash-craft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944), held that Ashcraft's confession, made after he was subjected to 36 hours of interrogation, was involuntary.

. Thompson also asserts that the court should have suppressed statements Thompson made *115 while being "transported to the Lowndes County jail.” (Thompson’s brief, p. 111.) When Officer Gary Farrior, a former officer at the Fayette Police Department, was questioned about this, the following occurred: "[Prosecutor]: Did he say anything on the ride to the jail? [Officer Farrior]: No, sir, not aword.” (R. 178.)

. To protect the anonymity of the jurors, we are using initials.

. This statute was substantially amended effective November 1, 2005. Thompson was tried in August 2005.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. Rule 18.4(g)(3), Ala. R.Crim. P., provides that the last person or persons struck shall be the alternates. For purposes of Batson we view the alternate jurors as having been struck. See Ex parte Bankhead, 625 So.2d 1146, 1147 (Ala.1993). Thus, our numbers reflect the alternate jurors as having been struck.

. The circuit court specifically stated that it would not consider the statements made by the police chief. (R. 1840.)

. The Supreme Court recently amended Rule 702, Ala. R. Evid.; the amendment became effective January 1, 2012. See infra notes 14 and 15.

. The legislature recently amended § 12 — 21— 160, Ala.Code 1975. See Act No. 2011-629, Ala. Acts 2011. The amendment became effective January 1, 2012. As amended, § 12— 21-160, Ala.Code 1975, now governs, with some exceptions, the admissibility of expert testimony regarding scientific, technical, or other specialized knowledge. See § 12-21-160, Ala.Code 1975.
Section 12-21-160, as amended, applies to all "non-juvenile felony proceedings in which *139 the defendant that is the subject of the proceeding was arrested on the charge that is the subject of the proceeding on or after January 1, 2012.”

. The United State Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that the adoption of Rule 702, Fed.R.Evid., superseded the Frye general-acceptance test. Rule 702, Fed.R.Evid., was amended to reflect the Supreme Court’s decision in Daubert. This rule now reads:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.”
As noted above, the legislature recently amended § 12-21-160, Ala.Code 1975. Subsections (a) and (b) of 12-21-160 now include language virtually identical to the language in Rule 702, Fed.R.Evid. Additionally, the Alabama Supreme Court recently amended Rule 702, Ala. R. Evid., to make it consistent with the recent amendment to § 12-21-160, Ala. Code 1975. See supra note 14.

. Specifically, the following exchange occurred:
"[Prosecutor]: Judge, this is — as I said earlier, he has had access to Dr. Willis for quite some time. This information was privileged and we were not even allowed to discuss it with him until after this defense became a real defense. We met with him and discussed it some with him on Friday. He gave us some of the information and some of the stuff he’s said here, we've not even heard.
“He is not under our control. He works for a different agency, the Department of Mental Health and Retardation. And we don't think it's — we know that—
"THE COURT: Did you have this information before? I mean, this hasn’t — this has not been in — you didn't have it?
"[Prosecutor]: No, no, I didn’t have it. We did not have it....
"COURT: I mean, this isn’t any documents that the State had?
“[Prosecutor]: No, sir.
"THE COURT: You’ve produced all the documents you have?
“[Prosecutor]: Yes, sir.”
(R. 3498-99.)

. Rule 12.2(b), Fed.R.Crim.P., likewise allows the government to present mental-health evidence to rebut mental-health evidence presented by a defendant.

. In a one-sentence argument in this section of his brief, Thompson also challenges certain testimony during the penalty phase from Roger Satcher, one of Thompson’s teachers. Satcher testified on direct examination that Thompson was not a behavioral problem. On cross-examination the State asked this witness about the basis of his knowledge. Satcher testified that Thompson was sent home from school one day because the school suspected that he was high on a controlled substance. This was within the proper scope of cross-examination. See Ex parte Deardorff, 6 So.3d 1235, 1241 (Ala.2008).

. Thompson also asserts that the circuit court erred in denying his motion for a judgment of acquittal made after the jury’s ver-diet. In this motion he argued the same grounds we have addressed separately in this opinion.

. In Gobble v. State, 104 So.3d 920, 978 (Ala.Crim.App.2010), we stated:
"[A]lthough some states forbid any biblical references in closing arguments — State v. Berry, 141 S.W.3d 549 (Tenn.2004), and Fontenot v. State, 881 P.2d 69 (Okla.Crim.App.1994) — Alabama has recognized that ‘counsel’s argument should not be so restricted as to prevent reference, by way of illustration, ... to principles of divine law or biblical teachings,’ [Ex parte ] Waldrop, 459 So.2d [959] at 963 [ (Ala.1984) ]. However, we have also held that the discretion to argue biblical references is not unlimited.”

. This Court is bound by the decisions of the Alabama Supreme Court. See § 12-3-16, Ala.Code 1975.